1                    THE UNITED STATES DISTRICT COURT
                  FOR THE SOUTHERN DISTRICT OF TEXAS
2                          HOUSTON DIVISION


3
     THE UNITED STATES OF      )   No. H-07-CR-362
4    AMERICA                   )
                               )   HOUSTON, TEXAS
5     -vs-                     )   JULY 2, 2008
                               )
6    KEVIN XU                  )   8:32 a.m.

7                              Volume III

8                     TRANSCRIPT OF JURY TRIAL
                BEFORE THE HONORABLE SIM LAKE AND A JURY
9
   A P P E A R A N C E S:
10
   FOR UNITED STATES:
11     SAMUEL LOUIS and VERNON LEWIS
       Office of the US Attorney
12     919 Milam
       PO Box 61129
13     Houston, Texas 77208
       713-567-9000
14     713-718-3406(fax)

15   FOR DEFENDANT:
       COLIN B. AMANN and JULIE A. KETTERMAN
16     Ketterman & Amann
       P.O. Box 131766
17     2603 Augusta, Suite 1060
       Houston, Texas 77057
18     713-522-97777
       713-522-9888(fax)
19
       SEAN BUCKLEY
20     Habern, O'Neil, Buckley & Pawgan, LLP
       300 West Davis, Suite 540
21     Conroe, Texas 77301
       713-863-9400
22
       INTERPRETERS:
23     JUNE HU MANDARIN
       PETER WANG
24
          OFFICIAL COURT REPORTER:  JEANETTE C. BYERS, RPR, CSR
25           PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPH,
          TRANSCRIPT PRODUCED BY COMPUTER-AIDED TRANSCRIPTION

1
                              I  N  D  E  X
2
WITNESS                                                              PAGE
3    ROBERT SHERMAN
     CROSS-EXAMINATION(con't)............................  252
4    REDIRECT EXAMINATION................................  291
     RECROSS-EXAMINATION.................................  295
5    MICHAEL DALTON
     DIRECT EXAMINATION..................................  309
6    CROSS-EXAMINATION...................................  336
     REDIRECT EXAMINATION................................  356
7    RECROSS-EXAMINATION.................................  357
     JaCINTA BATSON
8    DIRECT EXAMINATION..................................  359
     CROSS-EXAMINATION...................................  388
9    REDIRECT EXAMINATION................................  396
     CLINT JONES
10   DIRECT EXAMINATION..................................  397
     CROSS-EXAMINATION...................................  417
11   REDIRECT EXAMINATION................................  426
     DR. CHRISTIN NIELSEN
12   DIRECT EXAMINATION..................................  428
     CROSS-EXAMINATION...................................  443
13   DR. ANTON FISCHER
     DIRECT EXAMINATION..................................  452
14   CROSS-EXAMINATION...................................  463
     REDIRECT EXAMINATION................................  467
15   ED TARVER
     DIRECT EXAMINATION..................................  469
16   CROSS-EXAMINATION...................................  476

17   GOVERNMENT RESTS.....................................  477

18   DEFENDANT'S MOTION...................................  478

19      REPORTER'S CERTIFICATION..........................  493

20

21

22

23

24

25

SHERMAN    -    CROSS

```
 1              (Outside the presence of the jury.)

 2              THE COURT:  You wanted to take up something before

 3    the jury came in.

 4              MR. LOUIS:  Yes, Your Honor.

 5              THE COURT:  What is it?

 6              MR. LOUIS:  This morning I've asked Mr. Amann if I

 7    could call a witness out of order, Mr. Steven Chao.  Mr. Chao

 8    purchased some Cialis over the internet and that purchase was

 9    referenced in Mr. Xu's computer and it's also an allegation

10    that's part of the indictment as far as Cialis.  Mr. Amann

11    thought that it might be 404(b).  From my perspective it is

12    part of the indictment.

13              THE COURT:  Where is it alleged in the indictment?

14              MR. LOUIS:  On Page 4, part of the conspiracy, under

15    C.

16              THE COURT:  Okay.  I'm looking at Page 4.  I don't

17    see anything.

18              MR. LOUIS:  If you'll look under the matters to

19    violate the conspiracy -- No. C, to violate the Food, Drug and

20    Cosmetic Act with the intent to defraud and mislead cause a

21    counterfeiting of trademarks Viagra and Cialis in violation

22    of --

23              THE COURT:  Do you have any reference to this person

24    in here as a manner or means or overt act?

25              MR. LOUIS:  No, I do not because it's part of the
```

1    conspiracy.

2         THE COURT:  Is There any relationship between

3    Mr. Chao and Mr. Xu?

4         MR. LOUIS:  Yes, Your Honor.

5         THE COURT:  What?

6         MR. LOUIS:  The relationship is that Mr. Chao

7    purchased Cialis over the internet.  We have receipts of that.

8    And then within Mr. Xu's computer is the actual sale,

9    Mr. Chao's name, his address.  So that's the relationship

10   between Mr. Chao and Mr. Xu, the reference of the sale.

11        THE COURT:  So Mr. Xu sold the same counterfeit drugs

12   to Mr. Chao?

13        MR. LOUIS:  Yes, it's the same milligrams, it's the

14   same as Mr. Xu -- what happened to Mr. Chao, after receiving

15   this information from Mr. Xu's computer; went to Mr. Chao and

16   Mr. Chao provided to the agents the sample that he had of the

17   Cialis that he purchased over the internet.  That sample was

18   tested and determined to be counterfeit.

19        THE COURT:  So why wouldn't this be admissible?

20        MR. AMANN:  Judge, I think it is evidence of a

21   extraneous offense that is outside the scope of this

22   indictment.  Number one, I think the evidence will show that

23   they cannot tie the purchase by Mr. Chao from Mr. Xu.  I think

24   he purchased from an online pharmacy company and there is no

25   connection between that online pharmacy company and Mr. Xu.

SHERMAN   -   CROSS

1          THE COURT:  Does Mr. Chao have any -- will he testify

2     that he had any personal dealings with Mr. Xu?

3          MR. LOUIS:  No, sir, no, Your Honor.  He will testify

4     that he made a purchase over the internet after he saw the

5     advertisement.  He purchased it over the internet, sent the

6     money to an account and --

7          THE COURT:  I think we're going to do this:  You can

8     use it, after Mr. Xu testifies, you can use it for purposes,

9     perhaps, of impeachment depending on what he says about the

10    long drug legend that I kept out yesterday.

11         MR. LOUIS:  Yes, sir.

12         THE COURT:  I'm not going to allow it as part of your

13    case in chief.  I think, whether or not it's 404(b) evidence,

14    the potential prejudice far outweighs any relevance.  That's

15    my ruling.

16         MR. LOUIS:  I understand.

17         MR. AMANN:  Judge, I don't want to mislead the Court

18    in any way, implicitly or explicitly, we haven't decided for

19    sure whether, of course, whether Mr. Xu --

20         THE COURT:  I understand that.  And that's your

21    choice.  But I'm just saying if he testifies, it might be

22    relevant then.

23         MR. AMANN:  Yes, sir.

24         THE COURT:  Okay.  Bring the jury in.

25         Did you have any -- by the way, did you have law

SHERMAN   -   CROSS

1    supporting your proposed language.

2         MR. AMANN:  Judge, what I referenced was the

3    indictment itself where the fifth element of my requested

4    charge, which was the one at issue for the Court is actually

5    pled in the indictment as an element so, therefore, I believe

6    it is element of the offense.  Since they pled it, they must

7    prove it.

8         THE COURT:  He submitted four Fifth Circuit cases,

9    which set out, although there's no argument that the fifth

10   element should be included, they all say, these are the four

11   elements.

12        MR. AMANN:  Yes, I've read *Sultan*, *Hanafy*.  I

13   actually pulled those cases when I was putting my requested

14   charge together.  But I examined the indictment for the

15   elements that he pled because I don't think there should be

16   any kind of constructive amendment and since the Government

17   has pled that --

18        MR. LOUIS:  There's no constructive amendment.

19   That's how you plead the charge.  It's been that way --

20        THE COURT:  I'll take a look at it.

21        Bring the jury in.  We don't want to waste any time.

22   I didn't mean to say "waste."  We don't want to delay the

23   trial any longer.

24        (The jury comes in.)

25        THE COURT:  Good morning, ladies and gentlemen.

SHERMAN  -  CROSS

252

 1    Please be seated.  Thank you, again, for being here on time.

 2              Mr. Sherman, please come around to the witness stand.

 3              You may continue your cross-examination.

 4              MR. AMANN:  Thank you, Your Honor.

 5                            ROBERT SHERMAN

 6    having been previously duly sworn, testified as follows:

 7                      CROSS-EXAMINATION(con't)

 8    BY MR. AMANN:

 9    Q.   Agent Sherman, good morning.

10    A.   Good morning, sir.

11    Q.   All right.  I want to go back and pick up a little bit

12    where we left off yesterday and I'll try to streamline this --

13    A.   Sure.

14    Q.   -- and get to the heart of the matter as quick as we

15    possibly can.  In the Bangkok meeting, the first meeting that

16    you had with Kevin Xu and, of course, his wife was present,

17    you told us about that, did you ever ask Mr. Xu where his

18    factory, supposed factory was located?

19    A.   I don't recall asking him specifically.

20    Q.   All right.  Did you at any time -- let's not worry about

21    the first meeting -- had you at any time during the

22    conversation with Mr. Xu ask him where his factory was located

23    that manufactured these prescription drugs?

24    A.   He told me he had a factory.  I can't recall if he

25    specifically said it was in China.

Jeanette Byers, CSR, RPR (713)250-5087

SHERMAN   -   CROSS

```
1   Q.   All right.  But you never asked him where it was?

2   A.   No.

3   Q.   Did you ever ask him how long he had been in business?

4   A.   He volunteered he'd been in business six years.

5   Q.   Six years?

6   A.   Yes.

7   Q.   Did you ask him who worked with him?

8   A.   Excuse me?

9   Q.   Did you ask who worked with him, if he had any partners,

10  any owners, any --

11  A.   Yes, I did.

12  Q.   Did he mention anybody?

13  A.   He mentioned -- he said he had a partner with an

14  individual in Europe, I believe, operating out of Luxemburg.

15  And then he said that he wasn't directly a partner but a major

16  client for his European distribution.

17  Q.   Okay.  With respect to the factory and I'm concentrating

18  now on the factory that you claim Mr. Xu supposedly had in

19  China.  Did he ever or did you ever ask him whether he had

20  partners or co-owners in that factory?

21  A.   I didn't.

22  Q.   Did you ever ask him how big the factory was?

23  A.   No, I did not.

24  Q.   Did you ever ask him how many employees --

25  A.   No, I did not.
```

SHERMAN   -   CROSS

```
 1   Q.   -- were employed at that factory?

 2           Now, at some point -- let me -- if I can retrieve

 3   these boxes for you.  If you can get out your log sheet

 4   because I'm going to ask you some dates.

 5   A.   Okay.

 6   Q.   Your Honor, may I use the easel right here?

 7           THE COURT:  Sure.

 8           MR. AMANN:  Now, let me turn this a little bit so you

 9   can see it as well.

10   BY MR. AMANN:

11   Q.   Now, this first shipment of drugs came in to you before

12   the Bangkok meeting?

13   A.   That's correct.

14   Q.   All right.  Do you have -- and I'm just going to put

15   No. 1 for that first shipment -- do you have the date for me,

16   sir, when these were received?

17   A.   I believe the date was December 13th, 2006, but to

18   confirm it, I would have to look at the exhibit with the

19   correspondence custody receipt.

20   Q.   Can I get that for you?

21   A.   Yes.

22   Q.   Do you know which document it was?

23   A.   No.

24           MR. LOUIS:  It should be 3-A.

25
```

SHERMAN  -  CROSS

```
 1   BY MR. AMANN:

 2   Q.   That's correct, December 13th, 2007.

 3   A.   No, '06.

 4   Q.   '06, I'm sorry.  Okay.  December 13th, 2006.

 5            Now, at some point you got a second shipment, a

 6   sample test run; is that right?

 7   A.   That's correct.

 8   Q.   I'm not going to -- let me get these boxes out of your

 9   way.

10   A.   Okay.

11   Q.   I don't need to haul all of those --

12   A.   Thank you.

13   Q.   I don't need to haul them over, I think we can do that

14   without taking out that stuff.

15            Do you know, sir, when that second shipment was

16   received by y'all?

17   A.   On or about December 26, 2006.

18   Q.   Apparently shortly after the first one.

19   A.   That's correct.

20   Q.   All right.  Now, we have another shipment; is that

21   correct?

22   A.   Yes, sir.

23   Q.   We'll call that No. 3.

24   A.   Yes, sir.

25   Q.   When is that shipment?
```

SHERMAN  -  CROSS

1   A.   February 20th, 2007.

2   Q.   All right.  Now, do we have another one?

3   A.   Before the meeting I believe that's the last one.

4   Q.   That's the last one.  Now, are there any subsequent

5   shipments?  I mean, Is There -- I'm trying to get them all

6   down there.

7   A.   Yes.

8   Q.   Okay.  We have a fourth one?

9   A.   On or about -- give me a moment here -- April 10th, I

10  believe, I'll have to look at the exhibit for the next -- the

11  actual exhibit where the chain of custody for the next

12  shipments.

13          MR. LOUIS:  7-A.

14          MR. AMANN:  Thank you.

15          THE WITNESS:  7-A is February 20th so it should be

16  the next one.

17          MR. LOUIS:  Oh, I'm sorry.

18          MR. AMANN:  We've got February 20th.

19          MS. KETTERMAN:  22-A.

20          MR. AMANN:  22-A?

21          MR. LOUIS:  22-A.

22          MR. AMANN:  Thank you.

23  A.   April 13th, 2007.

24  BY MR. AMANN:

25  Q.   April 13th, 2007.  Is that it?

SHERMAN   -   CROSS

```
 1   A.   No.

 2   Q.   One more?

 3   A.   I think two more.

 4   Q.   Two more, okay.

 5   A.   Yes, two more, I belive.

 6           MR. LOUIS:  24-A.

 7           MR. AMANN:  24-A, thank you.

 8           MR. LOUIS:  And 26-A.

 9           MR. AMANN:  Thank you.

10   A.   I think there's more than that actually.  Okay.  Another

11   one on April 13th, 2007.

12   BY MR. AMANN:

13   Q.   Two on April 13th, 2007?

14   A.   Yes.

15   Q.   All right.  I'm just going to write in parenthesis out

16   here to the side times two.

17   A.   Okay.  Is There three?  Hold on.

18   Q.   All right.

19   A.   Let me just make sure.  One, two, three.

20   Q.   All right.  Three.

21   A.   And I'd like to see the exhibit for the April 22nd, I

22   believe it should be, 2007.

23   Q.   Do you have that exhibit in front of you?

24   A.   The receipt, no, I don't, but just to verify for

25   accuracy.
```

1   Q.   Okay.

2           MR. LOUIS:   29-A.

3           MR. AMANN:   Thank you.

4   A.   Thank you.  April 22nd, 2007.

5   BY MR. AMANN:

6   Q.   Okay.  So April 22nd, 2007.  Okay.

7   A.   And the final one should be June 12 -- and if I may see

8   the exhibit for that -- 2007.

9           MS. KETTERMAN:   That's 38..

10  BY MR. AMANN:

11  Q.   Okay.  Last one.

12  A.   That's correct, June 12th, 2007.

13  Q.   June 12th, 2007.  So now we have those six shipments that

14  come into you.  Are those all of them?

15  A.   I think it's eight shipments, isn't it, or nine?  I

16  believe it's eight shipments, sir, not six.

17  Q.   Sir?

18  A.   I believe it's eight shipments, not six.

19  Q.   Okay.  Are we --

20  A.   Let me check here.

21  Q.   You've got one that's got three coming in.

22  A.   Okay.  On dates you're talking about?

23  Q.   One, two, three, four, five, six, seven, eight.

24  A.   Okay.

25  Q.   Are you comfortable that we have them covered?

SHERMAN  -  CROSS

1    A.    Yes.

2    Q.    All right.  Now, I believe, sir, we talked or the

3    Government talked with you yesterday about a drug alert that

4    came in from somewhere in Europe.

5    A.    Yes, sir, MHRA.

6    Q.    MHRA, Medical Healthcare Products Regulatory Agency;

7    correct?

8    A.    That is correct, sir.

9    Q.    And that drug alert, what is the date of that drug alert?

10   A.    Dated May 25th, 2007.

11   Q.    Okay.  So we have the alert May 25th, 2007; right?

12   A.    Yes, sir.

13   Q.    So I'll let you hang onto those.  So it's true, is it

14   not, that these one, two, three, four, five, six, seven of

15   these shipments that came into you from Mr. Xu occurred before

16   the notice of that drug alert on May 25th?

17   A.    They were referring to the Plavix drug alert, yes, that's

18   correct.

19   Q.    All right.  That is correct; right?

20   A.    That is correct.

21   Q.    Okay.  Now, we also talked about whether or not Mr. Xu

22   entered into a contract with you.  And I think when you were

23   talking about contracts, you were talking about something that

24   we think of as formalized written piece of paper that

25   memorializes the agreement between the parties; right?

1    A.    Yes, sir.

2    Q.    Is that fair?

3    A.    That's fair.

4    Q.    Without me having to relive my law school days, can we

5    agree, sir, just for purposes of our discussion here, that

6    basically a contract involves one side making an offer; right?

7    A.    That's half of it, right.

8    Q.    That's half of it.  I'm not done.  The other half or the

9    other third of it is that the other side has to either accept

10   or reject that offer?

11   A.    That's correct.

12   Q.    Now, and to make things just really square on a business

13   aspect -- from a business aspect we also need what's called

14   consideration.  There's got to be money.

15   A.    Yes.

16   Q.    All right.  So you need an offer, the other side has to

17   either accept or reject it, then there's got to be some money;

18   right?

19   A.    Most cases, yes.

20   Q.    Most cases, yes.  Now, did you ever ask Mr. Xu to sign

21   anything for you?

22   A.    No.  In fact, he specifically said he didn't want a

23   contract, he wanted it oral.

24   Q.    He wanted it oral?

25   A.    Yes.

SHERMAN  -  CROSS

```
 1   Q.   Are you familiar -- well, Is There a difference between

 2   an oral contract and a written contract, so far as you know,

 3   what's legally binding?

 4   A.   I'm not an attorney.

 5        MR. LOUIS:  I'll object to this witness's competency

 6   about legal terms.

 7        THE COURT:  He already said he's not an attorney.

 8   BY MR. AMANN:

 9   Q.   All right.  Now, if we look at Government's Exhibit No --

10   make sure I get the right one here for you -- Exhibit No --

11        MR. AMANN:  I'm sorry, Your Honor.  If we could turn

12   the Elmo on, please.

13        THE COURT:  It should be on.

14        MR. AMANN:  It should be on.  Then I'm doing

15   something wrong.

16        THE COURT:  Have you turned yours on down there?

17        MR. AMANN:  It says power.

18        THE COURT:  I don't have the projector on.  It will

19   take a second.

20        MR. AMANN:  Okay.  I'm sorry, Judge.

21   BY MR. AMANN:

22   Q.   All right.  Okay.  Government's Exhibit No. 12.

23   A.   Yes, sir.

24        MR. AMANN:  I'm -- with the permission of the

25   Government, I'm using my copies.
```

SHERMAN  -  CROSS

1   BY MR. AMANN:

2   Q.   You sent an email to Kevin basically saying please

3   reconfirm your prices for Plavix, Tamiflu and Zyprexa; right?

4   A.   That's correct.

5   Q.   All right.  So you're asking him what does it cost;

6   correct?

7   A.   Verify the cost, yes.

8   Q.   On Government's Exhibit 13 -- it's already in evidence --

9   you say -- or this is coming from Mr. Xu to you, "Dear Ed,"

10  right?

11  A.   That's correct, sir.

12  Q.   And he makes you an offer.  We can offer you these

13  products for these prices; correct?

14  A.   That's correct.

15  Q.   So he's made the offer.  That's the first part of the

16  contract; right?

17  A.   That's the first part of negotiation.  I wouldn't

18  characterize it as a contract.

19  Q.   Okay.  It's the first step toward creating the contract?

20  A.   In the event one was finally consummated.

21  Q.   Yes.  Okay.  Let me make sure I don't get them out of

22  order here.  You accepted that offer, did you not?

23  A.   I did.

24  Q.   You did.  All right.  So he made the offer and you

25  accepted the offer; correct.

1  A.   That's correct, sir.

2  Q.   And then what Mr. Xu did is he sent you instructions for

3  where you should mail the money?

4  A.   Wire transfer the money, yes, sir.

5  Q.   Right.  So we had him making the offer to you, you

6  accepted the offer and then you paid money?

7  A.   That's correct.

8  Q.   That's the consideration.  So you had a contract with

9  Mr. Xu, didn't you?

10 A.   I didn't have a formal contract.  I had an agreement,

11 both verbal and email.

12 Q.   All right.  When you're saying "formal," you're saying it

13 just wasn't written.  Is that your definition of being formal?

14 And I don't mean to pick nits with you.

15 A.   Yes, I understand.  There was no formal written contract,

16 which is usually the case in dealing with such a

17 highly-regulated product as pharmaceuticals.  You don't deal

18 in the barter system with pharmaceutical products.

19 Q.   Mr. Xu sent you an email, which tells you that the

20 packing or the packaging for these products is designed for

21 the Euro market; right?

22 A.   That's correct.

23 Q.   What we talked about yesterday, the EU, the European

24 Union; correct?

25 A.   That's correct.

1  Q.   All right.  So obviously from your perspective when

2  you're entering into these negotiations for Mr. Xu, he is

3  telling you, sir, that these products are coming from the

4  European market, isn't he?

5  A.   No, he's not telling me that.

6  Q.   Well, the packaging is in French.

7  A.   It doesn't mean it's coming from the European market.

8  They could be printed in China.

9  Q.   If he is telling you that, "What I've got right now or

10 what I can get is French packaging" --

11 A.   Yes, sir.

12 Q.   -- that indicates to you, does it not, sir, that he is

13 dealing with product that comes from the European market?

14 A.   If it was legitimate product, but it's not.

15 Q.   Well, I'm not talking about what you know now.

16 A.   Okay.

17 Q.   All right.  I understand that.  I'm talking about from

18 the perspective at the time.  And at the time he was

19 representing to you what --

20       MR. LOUIS:  Objection.  Calls for speculation as to

21 what he knew what Mr. Xu knew.  That calls for speculation on

22 his part.

23       THE COURT:  Let me hear the question again.

24 BY MR. AMANN:

25 Q.   At the time, based on this email from reading it, Mr. Xu

SHERMAN  -  CROSS

```
 1   was telling you that, "What I've got or can get will be in

 2   French packaging and, therefore, comes from the European

 3   Union"?

 4           MR. LOUIS:  Objection.

 5           THE COURT:  Sustained.

 6   BY MR. AMANN:

 7   Q.   The product that you received, was it in French

 8   packaging?

 9   A.   This is the Casodex?

10   Q.   Yes.

11   A.   Yes, it was.

12   Q.   Okay.  Now, then Mr. Xu, when you were talking with him

13   both in Bangkok and later at the meeting back here in the

14   United States, he seemed to indicate that he was not concerned

15   with the packaging; correct?

16   A.   He was -- well, he would be able to provide or make the

17   packaging if we gave him a sample.

18   Q.   So he would be able to provide it for you; right?

19   A.   Yes.

20   Q.   All right.  Now, did you ask Mr. Xu whether he had a

21   factory, separate and apart from making these pharmaceuticals,

22   that he had a factory that was capable of reproducing the

23   printing necessary for the packaging?

24   A.   I didn't go that much into detail.  But one of the things

25   that Special Agent Mason asked during the meeting in Houston
```

1   on June 24th, 2007 is whether he obtained the packaging of

2   different products from separate people or from the same

3   individual.  He said, no, he got it all together because that

4   was a concern that Special Agent Mason asked that we'd have to

5   get the product from a variety of different sources.

6   Q.   Did you ask him whether he owned a factory that

7   manufactured or reproduced the packaging necessary to market

8   the product?  That's "yes" or "no," either you did or you

9   didn't.

10  A.   I don't recall.

11  Q.   All right.  Did you ever ask Mr. Xu during any of your

12  negotiations, either in Bangkok or back here in the United

13  States, what was the biggest order he had ever filled?

14  A.   Yes, I did.

15  Q.   What was the biggest order he had ever filled?

16  A.   I don't recall him giving a specific answer on that.

17  Q.   All right.  So he didn't answer that question?

18  A.   I don't recall that he gave a specific answer.

19  Q.   With regard to the biggest order that he had ever filled,

20  did he tell you how long it took him to fill that order?

21  A.   I'm not sure whether it's in the context of that

22  question.  I know that he had made statements that they could

23  do large production runs.  He talked about 10,000 tablets.  He

24  even talked, I believe, 100,000 production run and it would

25  take two months to prepare for that run.

SHERMAN   -   CROSS

1  Q.   Okay.  So he told you that it would take two months to

2  prepare to fill a big order?

3  A.   Yes.

4  Q.   All right.  And at the same time he's saying, "I've got a

5  factory that can do it"?

6  A.   Yes.

7  Q.   All right.  At the time?

8  A.   Yes.

9  Q.   Okay.  Now, I think it was at the second interview, the

10  conversation in the United States, Mr. Xu said he worked for a

11  petrochemical company?

12  A.   That was another one of his ventures, yes.

13  Q.   All right.  Did you ever ask him who that was?

14  A.   I asked where it was located and we were able to find it.

15  Q.   And where is that?

16  A.   I believe it was in Jacksonville, Florida.

17  Q.   And you were able to verify that Mr. Xu --

18  A.   He had some relationship.  We didn't know the extent of

19  the relationship.

20  Q.   Did you try to determine the extent of that relationship?

21  A.   No, we did not.

22  Q.   Did Mr. Xu tell you during his interview that he dealt

23  in -- second interview here in the United States -- he dealt

24  in steel?

25  A.   He had a -- several commodities.  Steel may have been one

SHERMAN    -    CROSS

1    of them.  I don't recall what they were.

2    Q.    Petrochemicals?

3    A.    Petrochemicals, solids.

4    Q.    Raw materials?

5    A.    Yes.

6    Q.    All right.  So various array of things that he was

7    involved with?

8    A.    That's correct.

9    Q.    That he was a trader for.  Now, the sample order, the --

10   whatever run -- which one of these eight -- we have actually

11   six shipments coming in and several of them were samples just

12   to make sure that it was going to verify your --

13   A.    Let me be more specific of what we mean by "samples,"

14   first of all.

15   Q.    Okay.

16   A.    I think that may be a little confusing.

17   Q.    Let me ask you this question then.

18   A.    Okay.

19   Q.    The sample run was to make sure that what he was able to

20   deliver he could deliver and you guys received it okay?

21   A.    They were all characterized as sample runs.  And there's

22   a reason for that.

23   Q.    All right.  Now, after Mr. Xu made these eight some odd

24   deliveries to you, I believe he was told that everything was

25   fine, this was good product; right?

SHERMAN    -    CROSS

1   A.    We were satisfied with the product.

2   Q.    And during the second meeting, the meeting in the United

3   States between you and -- was it Doug Mason?

4   A.    Special Agent Mason, yes, sir.

5   Q.    He was posing as a doctor?

6   A.    Yes, that's correct.

7   Q.    He was a medical doctor?

8   A.    Medical doctor.

9   Q.    And during that meeting he, in fact, told Mr. Xu that

10  we've received your, quote, sample runs, end quote, and

11  everything looks great; correct?

12  A.    Yes, he did.

13  Q.    All right.  Mr. Xu was never told -- you never told him

14  there was a problem with anything, did you?

15  A.    As far as a problem, no.

16  Q.    Okay.  Now, Mr. Xu -- or I believe you described, and you

17  can correct me if this was at the Bangkok meeting or at the

18  meeting here in the United States, that Mr. Xu described your

19  relationship or his relationship between you and he as very

20  special?

21  A.    Yes, sir, that's correct.

22  Q.    All right.  And I believe you emphasized that in your

23  testimony that your relationship was -- that he said it was

24  special.

25  A.    That's correct.

SHERMAN   -   CROSS

```
 1   Q.   Now, sir, do you think it's unusual for a businessman

 2   who's trying to get somebody's business to make them feel like

 3   they're a very special customer?

 4   A.   Happens all the time.

 5   Q.   What you were trying to do at both the Bangkok meeting

 6   and at the meeting in the United States, you were trying to

 7   get Mr. Xu's business, weren't you?

 8   A.   I was trying to ascertain whether Mr. Xu was involved in

 9   criminal activity.

10   Q.   And you were trying to get his business?

11   A.   I was trying to ascertain if he was involved in criminal

12   activity.  I'm not a businessman, I'm an undercover agent,

13   sir.

14   Q.   But you were posing as a businessman?

15   A.   That's correct.

16   Q.   And your persona as a businessman, you've got to play

17   your part; right?

18   A.   That's correct, yes.

19   Q.   And your part was, go out and get this guy's business?

20   A.   That's correct.

21   Q.   Okay.  Now, he wasn't playing a part, was he?

22   A.   No, he really was a counterfeiter.

23   Q.   Oh, he really was a counterfeiter?

24   A.   Yes.

25   Q.   That's your conclusion, isn't it?
```

1   A.   Yes.

2   Q.   Is it your job as a special agent to decide who is guilty

3   or not guilty or is that these people's job?

4           MR. LOUIS:   Objection.   Argumentative.

5           THE COURT:   Overruled.

6   A.   Sir?

7   BY MR. AMANN:

8   Q.   Is it your job as a person who is in law enforcement to

9   decide who is guilty or not guilty or is it the province of

10  the jury?

11  A.   It's for the jury, sir.

12  Q.   So it's not your job to go out and say, "You're guilty,

13  you're guilty, you're guilty," your job is to collect

14  evidence --

15  A.   That's true, sir.

16  Q.   -- and let these people decide.

17  A.   That is true, sir.

18  Q.   All right.   Mr. Xu in your persona -- your persona was,

19  "I'm in business.   I want to get his business."   And Mr. Xu

20  was trying to get your business, wasn't he?

21  A.   That's correct.

22  Q.   All right.   Now, we heard a recorded telephone

23  conversation where you tried to call Mr. Xu.

24  A.   That's correct.

25  Q.   And apparently you got his home number.

SHERMAN  -  CROSS

1  A.   I think it was an office, I'm not certain.

2  Q.   You're not certain whether it was his home or office

3  number?

4  A.   That's correct.

5  Q.   And you were given his cellphone number?

6  A.   I believe his cellphone, yes.

7  Q.   Were you ever able to discover who his cellphone provider

8  was?

9  A.   No, I wasn't.

10  Q.   Did you ever try to find that out?

11  A.   It was in China and we don't have access to those

12  records.

13  Q.   Are you saying that AT&T, Sprint and all those people

14  that provides cellphone service don't have international

15  service as well?

16  A.   I'm not aware that was his provider.

17  Q.   During the meeting that you had with Mr. Xu here in the

18  United States we can hear a cellphone ring and he actually

19  answers the phone, doesn't he?

20  A.   That's correct.

21  Q.   So the cellphone he was using was working in the United

22  States, wasn't it?

23  A.   Yes, but your provider can be anywhere in the world.

24  Q.   All right.  Did you try to find out who his provider was

25  so you could track down his cellphone records to see who he

SHERMAN    -    CROSS

1    was calling and who was calling him?

2    A.    No, we did not.

3    Q.    You also had his bank account information, didn't you?

4    A.    I don't recall what bank account information we had of

5    his.

6    Q.    Well --

7    A.    I'd have to see the exhibit.  When you say "bank

8    account," are you talking about transaction activity or just

9    the name of the account?

10    Q.    The name of the account that you were actually wiring --

11    here they are.  We've got Government's Exhibit No. 17 that's

12    kind of hard to read.  But you had bank account information,

13    the Beijing bank account, there's an address, there's a block

14    located in Beijing; right?

15    A.    That's correct.

16    Q.    So you knew where your money was going?

17    A.    That's correct.

18    Q.    This is the money that you as a businessman were paying

19    Mr. Xu for his product; right?

20    A.    That's correct.

21    Q.    You knew where this money was going.  We also have in

22    Government' Exhibit 20 he provided you the name of the

23    business --

24    A.    That's correct.

25    Q.    -- with an account number, again, an address, where to

1   send your money; correct?

2   A.   That's correct, sir.

3   Q.   All right.  Now, when you first met him, I think you

4   testified yesterday, you never got a card from him.

5   A.   I did get a card, but I lost it.

6   Q.   But you lost it.  He represented himself to be working

7   for Orient Pacific International, Limited; right?

8   A.   That's correct.

9   Q.   And at all times during your dealings with Mr. Xu that's

10  who he represented was his business; correct?

11  A.   Yes.

12  Q.   I believe yesterday we were talking about the very first

13  sample that was sent to you December 13th, 2006.

14  A.   Yes, sir.

15  Q.   I believe the Court asked you whether you still had the

16  box that that stuff had been shipped in and you said you had

17  destroyed that box.

18  A.   Yes, sir.

19  Q.   Now, we have, after the first one, we have one, two,

20  three, four, five, six, seven other shipments; right?

21  A.   Yes.

22  Q.   Do you have those boxes?

23  A.   No, not to my knowledge.  I don't think I do.

24  Q.   Did you destroy all those boxes?

25  A.   I believe so, yes.

SHERMAN   -   CROSS

275

1    Q.   Now, let me try to move this out so we can see.

2         Okay.  Sandra was an undercover operative for Eli

3    Lilly who is the big drug manufacturer; right?

4    A.   That's correct, sir.

5    Q.   We talked a little bit about her yesterday.  I don't need

6    to go over that.  In this email, which is Government's Exhibit

7    No. 20, Kevin is telling you:  Okay.  I'm sending you these

8    samples and here are the tracking numbers; correct?

9         And, by the way, when you wire money to a bank, there

10   is a paper trail created, isn't there?

11   A.   Yes, sir.

12   Q.   When you send something either by Federal Express, EMS,

13   however, we have to fill out a receipt, a paper trail is

14   created?

15   A.   Yes, sir.

16   Q.   So it's easy to trace where stuff went and where it came

17   from; correct?

18   A.   Yes, sir.

19   Q.   All right.  Now, Sandra in this email which, again, is

20   Government's Exhibit No. 20, this is Kevin talking to you;

21   right?

22   A.   Yes, sir.

23   Q.   It says, "Also Sandra asked us to send one his parcel to

24   your address also, please pay attention on it, the Sandra's

25   mail no. is" -- now, did Sandra send you guys something?

SHERMAN  -  CROSS

```
1  A.   No.

2  Q.   So --

3          THE COURT:  Did Sandra order the first two shipments?

4  I'm not clear on that.

5          THE WITNESS:  Well, Sandra on behalf of Eli Lilly

6  ordered the first, I believe it was, three shipments but they

7  were sent piecemeal.  So I think there was a total of four or

8  five of them were on behalf of Eli Lilly.

9          THE COURT:  How did you get involved?  Did Sandra

10 introduce you through the internet first?

11         THE WITNESS:  I beg your pardon, sir, could you

12 repeat that?

13         THE COURT:  How did you first come in contact with

14 Mr. Xu before you physically met him in Bangkok?

15         THE WITNESS:  That was the purpose of the meeting

16 to -- in Bangkok.  She was going to introduce me at that point

17 and that's when we were introduced.

18         THE COURT:  There was no email contact with him

19 before that?

20         THE WITNESS:  I don't recall.  I think we did, sir.

21         THE COURT:  But you had received the package from him

22 before then.

23         THE WITNESS:  Yes, she provided the address.

24         THE COURT:  And he sent them to you at her request?

25         THE WITNESS:  That's correct.
```

```
1              THE COURT:  All right.  Thank you.
2    BY MR. AMANN:
3    Q.   Okay.  I think that clears it up.  Also, Sandra asked you
4    to send -- we're talking about just what the judge was asking
5    you about.  They were kind of working together on this; right?
6    A.   It was an order that Sandra made.  And it was sent to our
7    box so we could assume possession of it as evidence and have
8    it analyzed.
9    Q.   And that's what Sandra's talking about, that's what Ed --
10   A.   I'm Ed, sir.
11   Q.   That's what Kevin is talking about here in his email to
12   persona Ed?
13   A.   That's correct, sir.
14   Q.   All right.  I got it.  Thank you very much.
15            Did -- let me see if I can find this exhibit,
16   Government's Exhibit No. 57.  Let me grab it out of here for
17   you so that you'll have a copy of it in front of you.  That
18   way you don't have to --
19   A.   Yes, sir.
20   Q.   All right.  Government's Exhibit No. 57.  And I'm going
21   to have to shrink it a little bit.  That's the wrong way
22   again.  Hopefully everybody is seeable.
23            Okay.  I believe you testified yesterday, sir, that
24   you compared the prices that Kevin was charging you with the
25   retail prices of these same prescriptions; correct?
```

SHERMAN    -    CROSS

1   A.   Yes, sir.

2   Q.   Now, retail is what a pharmacy sells to us for at a

3   price?

4   A.   A consumer walking in buying the drug.

5   Q.   Right, that's retail.

6   A.   Yes, sir.

7   Q.   Now, did you ever ask the pharmacies what they pay for

8   the product from the wholesaler-manufacturer?

9   A.   I don't recall.  I don't think I did.

10  Q.   Could we agree, sir, that the retail value of these

11  prescription drugs is going to be greater than what the

12  wholesale value is?

13  A.   That's correct, sir.

14  Q.   Because the pharmacy companies are certainly in business

15  to make money, like any business; right?

16  A.   Yes, sir.

17  Q.   And the only way they make money is to sell it to

18  pharmacies at such a profit that they themselves can make

19  money and then the pharmacies inflate that price and sell it

20  to the consumer; right?

21  A.   They sell it at a premium to make a profit.

22  Q.   Right.  You said it a lot better than I did.  So in this

23  scenario we have manufacturer, we have pharmacies and then at

24  the very end we have consumer; right?

25  A.   Yes, sir.

1   Q.   That's the chain of economic flow, if you want to call it

2   that.

3   A.   Pretty simplistic characterization, but that's pretty

4   good.

5   Q.   I'm a simplistic guy.  What happens is, the price -- the

6   pharmacies are actually -- they're middlemen, the pharmacies

7   are the middlemen, the ones who deal with --

8   A.   I don't know if you would characterize them as a

9   middleman or the final dispenser.

10   Q.   Well, in my simplistic hypothetical we have manufacturer,

11   pharmacies and consumer; the pharmacy is the middleman; right?

12   A.   Well, without --

13          THE COURT:  Let's move along.  We all got the drift

14   here.

15          MR. AMANN:  I'm sorry, Judge.

16   BY MR. AMANN:

17   Q.   You did not determine what the wholesale value was, did

18   you?

19   A.   No, I did not.

20   Q.   Did you ever call any insurance companies to see what

21   they -- what kind of payment they allow --

22   A.   No, sir, I did not.

23   Q.   -- for these drugs?

24   A.   No, sir.

25   Q.   So you don't know what the manufacturer charges for these

SHERMAN   -   CROSS

1   drugs, do you.

2   A.   No, I don't.

3   Q.   We can agree, though, it's going to be less than the

4   retail value that we see here on Government's Exhibit No. 57?

5   A.   Yes, sir, it would be.

6   Q.   But we don't know how much less?

7   A.   No, we don't.

8   Q.   Could be a lot?

9   A.   Could be.

10   Q.   And if it's a lot less, if the wholesale price is a lot

11   less, then there's not that -- there could not be that much

12   difference between what Mr. Xu was selling it for and what you

13   were paying for; right?

14   A.   I don't know that.

15   Q.   You don't know because you didn't check.  When Mr. Xu

16   came to the United States to meet with you and Dr. Doug, he

17   brought his wife with him?

18   A.   That's correct.

19   Q.   He came for the purpose of meeting you and Dr. Doug to

20   see if he could do business with you -- more business with

21   you?

22   A.   That's correct.

23   Q.   His -- at all times was Mr. Xu concerned that the -- and

24   this is on the tape recording, I suppose the jury can listen

25   to this for themselves?  His biggest concern was the packaging

1    and by that I mean, "You want U.S. packaging, I've got Euro

2    packaging."  That was a big concern for everybody, wasn't it?

3    A.    Certainly that was a significant issue, the packaging.

4    There were other issues also.

5    Q.    But he said he could do the packaging?

6    A.    He said if we provide a sample, yes.

7    Q.    All right.  And you have -- well, I think I've already

8    asked that question.  During your conversation with Mr. Xu he

9    referred to an HPLC machine?

10   A.    Yes.

11   Q.    Some kind of analytical device?

12   A.    Some very sophisticated, I guess, chemistry test

13   instrument.

14   Q.    All right.  He didn't seem to know much about it, did he?

15   A.    I didn't know much about it so I didn't know what to ask

16   him.

17   Q.    Okay.  And you have no idea how much one of those

18   machines cost?

19   A.    No, I don't.

20   Q.    Okay.  During your meeting with Mr. Xu, the meeting in

21   the United States, many times during that meeting Mr. Xu talks

22   about parallel importers, doesn't he?

23   A.    I don't recall it being many times, I can only recall it

24   being one or two.  He did mention parallel importers.

25   Q.    And he was trying to -- you didn't understand it at

SHERMAN  -  CROSS

282

1    first.  He had to say it a couple of times for you to

2    understand --

3    A.   I believe so, yes - --

4    Q.   -- parallel.  He was saying it but his first language is

5    Chinese.

6    A.   Yes, sir.

7    Q.   During that meeting was there anybody there that could

8    have been available to translate in Chinese for him?

9    A.   No.

10   Q.   So that -- okay.  During or at the end of the meeting,

11   obviously Mr. Xu was arrested.  And did he have his computer

12   with him?

13   A.   Yes, he did.  He had a laptop with him when he came to

14   the meeting.

15   Q.   Okay.  Was the laptop out in his car, was the laptop

16   actually -- did he walk into the meeting with it?

17   A.   He carried it into the meeting with him.

18   Q.   He carried it into the meeting?

19   A.   Yes, sir.

20   Q.   Okay.  So I guess he must have sat it down because the

21   first seven minutes or so on the tape it's messed up, we don't

22   see what's going on; right?

23   A.   I don't recall what he did with it.

24   Q.   All right.  You took his computer; right?

25   A.   That's correct.

SHERMAN   -   CROSS

1   Q.   He signed a consent to search the computer, didn't he?

2   A.   Yes, he did.

3   Q.   He said, "Y'all can got into my computer and find

4   whatever you need to find"; right?

5   A.   Yes.

6   Q.   He allowed you to do that?

7   A.   He signed a consent, yes, sir.

8   Q.   But beyond that, he also provided you password so that

9   you could access accounts, didn't he?

10   A.   Yes, he did.

11   Q.   Okay.  So he gave you his computer and he also gave you

12   passwords to get into his various and sundry accounts?

13   A.   Yes, sir.

14   Q.   So you would have access to everything?

15   A.   Yes, sir.

16   Q.   So it's fair to say he cooperated in that regard?

17   A.   In that regard he did, yes.

18   Q.   Now, do you know anybody named Terence Blackett?

19   A.   Yes, there are emails from Mr. Blackett --

20   Q.   Okay.

21   A.   -- in the computer.

22   Q.   By "emails" you're talking about emails on his computer?

23   A.   Yes, I believe there's some correspondence.  I'd have to

24   review it again.

25   Q.   I'm going to show you what's marked as Defendant's

SHERMAN   -   CROSS

1    Exhibit 1, 2, 3.  And the last exhibit, 3, actually contains,

2    including the pages itself, four pages -- I take that back,

3    five pages.  And they are in reverse chronological order.  So

4    I'm probably going to be talking about them with Defendant's

5    Exhibit 4 first.  I just want you to look at them; okay?

6    A.   Yes.

7    Q.   Okay.  Through with them all?  Okay.  Thank you.

8         Now, these defense exhibits that I've shown you, they

9    are from a Terence Blackett and they're actually to Kevin Xu

10   at the same email number that you used when you were

11   corresponding to and from Mr. Xu; correct?

12   A.   That's correct.

13   Q.   These come from Mr. Xu's computer?

14   A.   That's correct.

15   Q.   He consented for you to look in that computer and

16   actually gave you password to access it?

17   A.   Could you repeat that?

18   Q.   Yes, he allowed you to access his computer and gave you

19   password for his account?

20   A.   That's correct.

21        MR. AMANN:  All right.  Your Honor, I'm going to -- I

22   can do it one at a time or I can do it all together but I'm

23   going to offer Defendant's Exhibit 1 through 4.

24        MR. LOUIS:  Objection.  Lack of foundation in this

25   witness, hearsay as well.

Jeanette Byers, CSR, RPR (713)250-5087

1              THE COURT:  Seems to me they're clearly hearsay.

2              MR. AMANN:  Judge, if -- first of all, I'm not

3      offering them for the truth.

4              THE COURT:  What are you offering them for?

5              MR. AMANN:  I'm offering them to show what impact

6      they had on Mr. Xu's state of mind.

7              THE COURT:  He had no knowledge of Mr. Xu's state of

8      mind.

9              MR. AMANN:  But these emails create an inference of

10     what Mr. Xu was thinking at the time relevant to --

11             THE COURT:  I disagree.  That's clearly a hearsay

12     purpose.  The objection is sustained unless you can lay a

13     proper predicate.

14             MR. AMANN:  And certainly not to quarrel with the

15     Court, but the Court understands that I'm not offering them

16     for the truth.

17             THE COURT:  You say that, but the stated purpose

18     really is to show how Mr. Xu perceived them.

19             MR. AMANN:  Right.

20             THE COURT:  If that's the purpose, then these

21     documents would not show that, only Mr. Xu would be able to

22     show that.  For the same reason I've not allowed other people

23     to speculate about Mr. Xu's state of mind, it would be

24     improper to allow a document to testify about his state of

25     mind.

1        MR. AMANN:  May I make another argument as well?

2        THE COURT:  Sure.

3        MR. AMANN:  May I approach, Your Honor?

4        THE COURT:  Yes.

5        (A bench conference was held outside the presence of

6    the jury.)

7        MR. AMANN:  Judge, I'm not offering them for the

8    truth.  But the affect of -- what the Government is alleging

9    is that Mr. Xu had the specific knowledge that the product he

10   is dealing in was counterfeit.  These emails show that Mr. Xu,

11   whether they're true or not, from Mr. Xu's perspective had a

12   reasonable expectation that he may have been dealing directly

13   with somebody who was dealing with the manufacturer and,

14   therefore, the product would not have been counterfeit.  And

15   it strikes at the very heart of his intent.  If they're not

16   offered for the truth, they certainly can be offered to show

17   Mr. -- how it would have affected Mr. Xu in his actions and it

18   rebuts the inference that the Government's trying to create

19   that he knew all of that.

20       THE COURT:  What's your response?

21       MR. LOUIS:  How can he do that when he knows the very

22   nature of his state of mind and what he knew.  I mean, it's

23   clear --

24       THE COURT:  I'll tell you what, the trial's not going

25   to be over in the next hour.  You find some law to support it

 1   and I'll consider it.  Right now my objection, you got plenty

 2   of time, you've got two people sitting at your table, if you

 3   can find some law -- I understand your purpose.

 4          MR. AMANN:  Judge I'm finished with this witness.

 5   Will I be permitted to --

 6          THE COURT:  You can call him back if you can find

 7   some law to support it.  I've read the documents.  I

 8   understand.

 9          MR. AMANN:  Okay.

10          THE COURT:  But I just want some law that you can

11   prove through this witness.

12          MR. LOUIS:  From introducing emails or --

13          THE COURT:  Have a seat.

14          (Bench conference concluded.)

15          THE COURT:  Ladies and gentlemen, there's nothing

16   wrong with the lawyers wanting to approach the bench.

17   Sometimes -- how many football fans do we have?  Sometimes in

18   a football game the referees will throw down those flags and

19   people get penalized.  I've made some rulings dealing with

20   evidentiary issues and the lawyers know that rather that

21   running a risk of me throwing down the yellow flag in the

22   middle of a trial, the safest thing is to come to the bench

23   and find out how I'm going to rule in advance.  So we don't do

24   it very often, but in certain situations they want to come to

25   the bench and get a ruling.  It's perfectly appropriate.

SHERMAN   -   CROSS

```
 1        Go ahead.
 2            MR. AMANN:  Thank you, Your Honor.  May I have just a
 3  moment?
 4            THE COURT:  Yes, of course.
 5  BY MR. AMANN:
 6  Q.  Mr. Sherman, you created a report throughout the course
 7  of your investigation?
 8  A.  Yes, sir.
 9  Q.  Do you have that report with you?
10  A.  There's a binder of reports, yes, sir.
11  Q.  I just noticed you had something in your pocket.  Is that
12  a copy of this or --
13  A.  No, it's not, it's my work product.
14  Q.  I'm sorry?
15  A.  It's a timeline.
16  Q.  It's your timeline?
17  A.  Yes.
18  Q.  And do you use that to help you refresh your
19  recollection?
20  A.  Because there's so many chain of custody numbers and
21  dates so I can put them together.
22  Q.  All right.  May I see that, please, sir?  And, sir, while
23  I'm looking at this, if you could just browse through these
24  documents, I just want to make sure we got everybody's report
25  covered.
```

1   A.   I don't know what specific report -- there's a lot of

2   reports here.  I don't know what -- Is There a specific report

3   you want to look at?

4   Q.   No.  I just want to make sure that the reports that you

5   created, the ones that you were responsible for creating --

6   A.   I believe they're all here.

7   Q.   They're all here.  Did you create any other tape

8   recordings or videotapes other than the ones that we've

9   already seen here in Court and heard here in Court?

10  A.   No, I don't believe I did.

11  Q.   Thank you.  Do you know, Mr. Sherman, if Mr. Xu ever

12  ordered any prescription medication from Eli Lilly?

13  A.   Not that I'm aware of.

14  Q.   Do you know if Mr. Xu ever dealt directly with any

15  manufacturers when placing his orders that were eventually

16  destined for you?

17  A.   I have no knowledge of that.

18  Q.   Would that be something that would be important for you

19  in terms of the investigation you did?

20  A.   Well, let me be more specific in my answer.  I apologize.

21  Inquiries made with the security division said that he was

22  never a client or -- of the respective companies that are

23  involved in this case.

24  Q.   Okay.  So the inquiries that you made said that he was

25  never a client or never involved with any of the manufacturers

SHERMAN    -    CROSS

1    in this case; right?

2    A.    Said he was not -- he was not -- did not have a

3    commercial relationship with them.

4    Q.    So you're saying he did not have any kind of commercial

5    relationship with anybody from Eli Lilly?

6    A.    That's a different question.

7    Q.    Is Eli Lilly the drug manufacturer -- is Eli Lilly a drug

8    manufacturer --

9    A.    It is a drug manufacturer, yes.

10    Q.    -- of some of the drugs that we're talking about here

11    today?  And we have to try not to talk over each other because

12    of --

13    A.    I'm sorry.

14    Q.    -- this lady right here -- thank you.  And I'll try.

15         Is Eli Lilly one of the drug manufactures that

16    manufactured some of the drugs that we're talking about here

17    over the past couple of days?

18    A.    Yes, sir.

19    Q.    And you testified that you checked with Eli Lilly and

20    they told you that Mr. Xu had no kind of commercial

21    relationship with them; is that what you're saying?

22    A.    That's correct.

23    Q.    May I approach, Your Honor?

24         THE COURT:  Sure.

25         (There was a bench conference held outside the

 1    presence of the jury.)

 2            MR. AMANN:  Judge, for purposes of impeachment he had

 3    said he checked with Eli Lilly and that Mr. Xu had no personal

 4    relationship with him.  For purposes of impeachment and not

 5    offered for the truth of the matter asserted, I would renew my

 6    request to the Court.

 7            THE COURT:  Go ahead.

 8            MR. LOUIS:  The indictments don't show Mr. Xu ever

 9    had any relationship.  The indictments don't say that.

10            THE COURT:  You need to show that Mr. Sherman was

11    aware of this document.  They're not relevant to impeach

12    Mr. Sherman.

13            MR. AMANN:  I apologize for approaching, Your Honor.

14            THE COURT:  That's okay.

15            (Bench conference concluded.)

16            MR. AMANN:  I will pass the witness Your Honor.

17            THE COURT:  Okay.  Mr. Lewis, do you have any

18    redirect of Mr. Sherman?

19            MR. LOUIS:  Just a little Your Honor.

20                        REDIRECT EXAMINATION

21    BY MR. LOUIS:

22    Q.  Agent Sherman, Mr. Amann asked you about reviewing or

23    obtaining bank information, cell phone information.  Do you

24    remember those questions?

25    A.  Yes, I do, sir.

1  Q.   Is that information relevant if you're trying to

2  determine who it is that you're dealing with?

3  A.   Perhaps the identity but if I know who they are already,

4  I don't need that.

5  Q.   And did you -- by meeting Mr. Xu in March 6 of '07, what

6  was the purpose of that meeting?

7  A.   The purpose of that meeting was to put a face to the

8  individual, to negotiate directly with him rather than any

9  type of industry, intermediary and affect purchases and

10 ascertain whether those are counterfeit drugs and ascertain

11 his true identity.

12 Q.   At the conclusion of that meeting, were you discussing a

13 legal business venture or illegal business venture?

14 A.   It was an illegal business venture.

15 Q.   And what was said during that meeting that led you to

16 conclude that this was an illegal business venture?

17 A.   A variety of things, but one, the issue of no written

18 contract.

19 Q.   Anything else?

20 A.   The fact of the packaging, the issues discussing the

21 packaging, the ability to produce packaging or provide

22 packaging from different markets, which is highly unusual.

23 And, also, there was an extraordinary breadth of products

24 available, every kind of product across the spectrum.  That's

25 highly unusual for an individual to provide that much.

1  BY MR. LOUIS:

2  Q.   Do you recall if Mr. Xu mentioned, "I don't know," "you

3  don't know," "we don't know"?

4  A.   In the context of the meeting, which was memorialized on

5  the tape in the Bangkok meeting, he provided a very, very

6  detailed scenario for entering these pharmaceutical products

7  into the United States.  Pharmaceutical products are not

8  included -- legitimate pharmaceutical products are not

9  included concealed under a fresh protect pack under chemicals

10  mis-described in violation of the law as another item.  They

11  were being smuggled into the United States.  That is not

12  consistent with the legitimate and legal importation of

13  pharmaceutical products.

14  Q.   At the meeting, the July 24th meeting, you made certain

15  statements to Mr. Xu about you have the -- making it and

16  selling it.

17  A.   Yes.

18  Q.   When you were talking about making it, what were you

19  referring to?

20  A.   I was talking about Mr. Xu's role in this transaction.

21  Q.   Did Mr. Xu at any point in time indicate he had to get

22  the drugs from another source?

23  A.   No.  In fact, he responded to the contrary.

24  Q.   You mentioned sample run.  Can you explain to us what you

25  meant by the "sample run"?

1    A.    Okay.    The term "sample" may be a little confusing.

2    Usually when an individual buys pharmaceutical products and

3    they ask for samples -- first of all, when you do legitimate

4    products, you don't ask for samples.    If it's a legitimate

5    product and you want legitimate Lipitor, you order the

6    Lipitor, you don't order samples because you don't have to

7    examine it and make sure the box is right, make sure the

8    tablets are the right color, to make sure the blister pack is

9    perfect and it has the right color and shading.    You don't do

10   that because it's legitimate product.    In this particular case

11   we ordered samples to make sure that the quality was

12   consistent, which is highly unusual, and that he would be able

13   to provide it.    And when I say "samples" in this specific

14   scenario, usually when an individual orders samples of any

15   product, any commodity, they order a small amount.    This was a

16   very large amount for samples.    This is not a large amount

17   because Mr. Xu conveyed to me that he could do 5,000 to

18   10,000 boxes per order.    We wanted to express interest in

19   doing that, but we work for the United States Government and

20   we can't spend taxpayers' money on buying a couple of hundred

21   thousand dollars worth of product so we represented these as

22   large samples to provide to our client.

23   Q.    Now, during the meeting, the July 24th meeting, do you

24   recall if Mr. Xu mentioned he had what's called a HPLC test?

25   A.    Yes, he had access to HPLC and they did testing.

SHERMAN  -  REDIRECT

1  Q.   And why was Mr. Xu telling you he had access to an

2  HPLC --

3           MR. AMANN:  Speculation.  I object, Your Honor.

4           THE COURT:  Sustained.

5  BY MR. LOUIS:

6  Q.   Did Mr. Xu indicate where he obtained that HPLC machine?

7  A.   I believe from Germany.

8           MR. LOUIS:  I pass the witness.

9           THE COURT:  Mr. Amann, anything else?

10           MR. AMANN:  May I, Your Honor?

11                       RECROSS-EXAMINATION

12  BY MR. AMANN:

13  Q.   Is Mr. Xu charged with illegally smuggling prescriptions

14  into the United States?

15  A.   I'd have to look at the indictment again, the initial

16  charges.  I'm not sure there's a 545 charge on there.

17  Q.   Well, if I tell you he's not, would that surprise you?

18  A.   That would surprise me.

19  Q.   All right.  Is it against the law to bring real

20  pharmaceuticals into the United States from another country?

21  A.   No, it's not.

22  Q.   It's not illegal to ship Eli Lilly's product from France

23  into the United States without Eli Lilly being aware of it?

24  A.   That, I don't know.

25  Q.   If Eli Lilly and other drug manufacturers that we're

SHERMAN  -  REDIRECT

1    talking about, is it fair to say, sir, that they want to

2    market their product here in the United States at the price

3    they deem appropriate for the United States?

4    A.    Yes, I guess you can say that.

5    Q.    Is it also fair to say that if -- if other legitimate Eli

6    Lilly product comes into the United States, it is going to

7    dilute the amount of money that Eli Lillie will make, won't

8    it?

9    A.    If it's legitimate product, it could, yes.

10   Q.    So if you have -- I'm going to define the word

11   "legitimate product" as real prescriptions manufactured by Eli

12   Lillie in the United States.  That's my definition of

13   legitimate product.  Okay?

14   A.    May or may not be correct because I don't know where they

15   manufacture.

16   Q.    This is my hypothetical.

17   A.    Okay.  I'll give you a hypothetical answer then.

18   Q.    Okay.  That's fine.  That would be lovely.

19          You've got legitimate Eli Lilly product in the United

20   States.  If Eli Lilly product comes into the United States

21   that is real, that is genuine, but it's imported from another

22   country at a lesser price, it takes away from the profit that

23   Eli Lilly makes, doesn't it.

24   A.    Depends to which network it's distributed and sold

25   through.  And that's an economic and marketing issue that I'm

1  not qualified to answer.

2  Q.   Okay.  You certainly see how it could though?

3  A.   I'm not qualified to answer that question.

4  Q.   All right.  If legitimate product existing in the United

5  States is mixed with genuine product, genuine prescriptions

6  that come in from Europe, the product itself is not thereby

7  rendered counterfeit; is it?

8         MR. LOUIS:  Objection.  Calls for legal conclusion on

9  behalf of this witness.  He's not competent to answer that

10  question.

11         THE COURT:  I'm going to sustain it because it's

12  beyond the scope of redirect.  We're really getting --

13         MR. AMANN:  Okay.

14         THE COURT:  It's the tautological question.  The

15  argument is, if you import drugs, it's not illegal.  Well,

16  that's obvious.  So let's move on to something else.

17         MR. AMANN:  Okay.

18  BY MR. AMANN:

19  Q.   We talked about it on redirect, the Government asked you

20  about bank information and cellphone information as part of

21  your investigation.  It's important to you, sir, isn't it, to

22  not just investigate instances of misconduct but also to

23  verify if conduct is legal?

24  A.   That's correct.

25  Q.   Because it's not your job to convict, it's your job to

1   conduct an investigation and be fair, isn't it?

2   A.   Yes, sir.

3   Q.   All right.  So in being fair, you want to pursue every

4   possible investigative trail you can to make sure that the

5   person you're charging is the right person to be charged;

6   right?

7   A.   Yes, sir.

8   Q.   All right.  Mr. Lewis talked about the absence of a

9   written contract again.

10  A.   Yes, sir.

11  Q.   We went over all of that.  I just want to ask this

12  question again to make sure it's clear:  You never put a piece

13  of paper in front of Mr. Xu and said, "here's our deal, I want

14  you to sign it," did you?

15  A.   No, he told me not to.

16  Q.   He asked you not to?

17  A.   He said he wanted an oral contract so that would be

18  tantamount to telling me he didn't want a written contract,

19  sir.

20  Q.   And you were going to do what he wanted; right?

21  A.   If he was involved in an illegal enterprise, I was going

22  to follow his lead, yes, sir.

23  Q.   As far as the packaging goes -- and there's been a lot

24  said about the packaging.  And let me try to give a visual

25  example to you.  Government's Exhibit 21.

1   A.   Could I look at that for a moment, please?

2   Q.   Oh, sure.

3   A.   This is in the wrong box.  This has nothing to do with

4   this exhibit.

5   Q.   I tell you what, it's Government's Exhibit 6 and it will

6   serve for purposes of my illustration.  As we've talked about

7   packaging and how important packaging is; right?

8   A.   Yes, sir.

9   Q.   And you claim that there's some evidence that Mr. Xu knew

10   the stuff was counterfeit simply because -- and let's use this

11   as an example -- sometimes it came in just pills --

12   A.   Yes.

13   Q.   -- and sometimes it came together with the packaging

14   without the pills being in the packaging?

15   A.   That's correct.

16   Q.   All right.  Now, if you're dealing in the European

17   market, for example -- I'm pulling something right now for the

18   record out of Government's Exhibit No. 6, which is a box of

19   Plavix that clearly the packaging is in French, isn't it?

20   A.   That's correct, sir.

21   Q.   Now, he couldn't -- he sent this to you?

22   A.   Yes, he did.

23   Q.   All right.  So he sent you packaging that was in French?

24   A.   That's correct, sir.

25   Q.   That demonstrated to you, did it not, sir, that this

1    stuff was coming from a European market?

2    A.    No, it did not.

3    Q.    There's certainly some indication, isn't it?

4    A.    The -- the language on the box is irrelevant to the

5    source of production.  Any language could be put on that box.

6    Q.    Any language could be put on that box.  Are you telling

7    me, sir, that the language, since it is in French in this case

8    is no indication whatsoever that this stuff came from France?

9    A.    I see -- it's interesting you selected that particular

10   box.

11   Q.    My question is --

12   A.    Okay.

13   Q.    -- is that is the fact that it's in French from your

14   perspective --

15   A.    From my perspective.

16   Q.    -- that's no -- and this is a statement I'm trying to get

17   you to agree to, if you will --

18   A.    Okay, sir.

19   Q.    -- it's no indication whatever that this came from

20   France?

21        MR. LOUIS:  Objection.  This question has been asked

22   and answered previously.

23        THE COURT:  Overruled.  You can answer it one more

24   time.

25   A.    I can't conclude where it came from just based upon the

 1  language on the box.

 2  BY MR. AMANN:

 3  Q.  All right.  You cannot conclude; right?

 4       And if this product was coming to be -- or had to be

 5  repackaged for distribution in the United States, it certainly

 6  would make sense, wouldn't it, sir, that you would receive

 7  pills on the one hand and then the packaging on the other,

 8  wouldn't it, because it has to be packaged to suit the U.S.

 9  market?

10  A.  If it's going to be repackaged to the U.S. market, why

11  would they even send me the French packaging, sir?  I can't

12  understand that.

13  Q.  Okay.  You can't understand that.  And one of the reasons

14  you can't understand it is that if Mr. Xu had the ability to

15  print anything he wanted, what you can't is, why would he send

16  you packaging that was clearly marked in French?

17  A.  Is that a question or a statement, sir?

18  Q.  That's confounding to you, isn't it?

19  A.  Is that a question or a statement, sir?

20  Q.  Is that confounding to you?

21  A.  No, it's not.

22  Q.  That doesn't make sense to you?

23  A.  No.  It's --

24  Q.  I'm not trying to play lawyering games.

25       THE WITNESS:  I don't want to confuse it.  There's a

 1   question in there on what it is, Your Honor.

 2   BY MR. AMANN:

 3   Q.   Well, then you just tell me to fix it and I'll try to.

 4   A.   Please fix it.

 5   Q.   If Mr. Xu had the ability to print anything he wanted, it

 6   is that fact -- if you assume that fact -- and you're assuming

 7   that fact, aren't you?

 8   A.   Based upon statements he made to me that he had ability

 9   to, yes.

10   Q.   Because of statements he made --

11   A.   Yes, sir.

12   Q.   -- you're assuming that fact.  It is inconsistent for him

13   to have mailed you something that was in French packaging,

14   isn't it, that fact alone is inconsistent with his ability to

15   produce U.S. packaging.  That's the question.

16   A.   No, it's not.

17   Q.   Okay.  You disagree with me?

18   A.   And I can explain.

19   Q.   Go ahead.

20   A.   These were representative samples.  These are the early

21   stages of negotiations.  As agents of the United States

22   Government we have a dilemma.  If he was going to make a copy

23   of an American packaging and wanted us to provide it, we could

24   not provide him legitimate packaging because we would be

25   facilitating a crime and they would be able to produce that

1    packaging after the fact.

2    Q.   So what you're saying then is that Government can't

3    facilitate crime; right?

4    A.   No, we cannot facilitate a crime.

5    Q.   All right.  Did you give Mr. Xu $5,000 to send you this

6    stuff?

7    A.   Yes, we did.

8    Q.   In your opinion it was crime; right?

9    A.   Yes, it was.

10   Q.   That facilitated the commission of a crime, didn't it?

11   A.   That was a criminal investigation, no, it did not.  He

12   was committing a crime.

13   Q.   Did you help facilitate the commission of a crime by

14   giving him 5,000 plus dollars so he would send you product?

15          MR. LOUIS:  Objection.  Argumentative.

16          THE COURT:  Overruled.

17   A.   We paid him for receipt of the counterfeit merchandise so

18   we could ascertain whether it was, indeed, counterfeit.

19   BY MR. AMANN:

20   Q.   Yes or no?

21          THE COURT:  He's answered the question.

22          MR. AMANN:  Thank you.

23   BY MR. AMANN:

24   Q.   Another shipment, 28-B, Plavix.

25   A.   Yes, sir.

1   Q.   The pills are in the box; right?

2   A.   Yes, sir.

3   Q.   The box is in French; right?

4   A.   Yes, sir, that's correct.

5   Q.   Do we have examples, sir, of any product not coming from

6   France?

7   A.   I believe the Tamiflu had English writing on it.  I would

8   have to look through all the exhibits.

9        MR. AMANN:  Maybe the Government can help us out over

10  here.

11  BY MR. AMANN:

12  Q.   While Mr. Lewis is working or helping me find that, one,

13  two, three, four, five, six, seven, eight shipments of

14  product; right?

15  A.   Yes.

16  Q.   Out of those eight shipments of product, how many were in

17  French and how many were in English?  You can check your log

18  please, sir.

19  A.   I would have to look at the individual -- I believe the

20  only one that was in English was the Tamiflu, but that was

21  after the box -- I'd have to get down and look at the

22  exhibits, if you want me to do that.

23  Q.   Sure.

24       MR. AMANN:  With the Court's permission.

25       THE COURT:  We'll take our recess a little bit early

SHERMAN  -  REDIRECT

1    so we don't waste the jury's time while he's looking at

2    exhibits.

3         Let's take a 15-minute recess, ladies and gentlemen.

4         (There was a recess taken.)

5         (Outside the presence of the jury.)

6         THE COURT:  Here are copies of the proposed charge.

7         MR. AMANN:  May I approach.

8         THE COURT:  Yes, I don't want to have to toss them to

9    you.

10        Look over them.  At the end of the day I'll entertain

11   any objections you have.  I know the evidence hasn't

12   concluded.  I think the element that the defense wants on the

13   third construction is adequately covered by the definition of

14   counterfeit mark, which requires that its use likely confuse,

15   cause mistake or deceive, so I'm not giving the fifth element

16   requested by the defendant on Counts 5 through 9.

17        MR. AMANN:  Judge, with respect to the definition of

18   "counterfeit," that comes right out of the statute.  We had

19   requested that itself is the --

20        THE COURT:  Yes.  We're going to have the objections

21   later today.

22        MR. AMANN:  Okay.  I'm sorry.

23        THE COURT:  Where is Mr. Xu?

24        MS. KETTERMAN:  They took him back.

25        THE COURT:  We'll just wait for him.

1          Do you have your next witness available?

2          MR. LOUIS:  Yes, Your Honor, I do.

3          (Jury comes in.)

4          THE COURT:  Be seated, please Mr. Amann, you may

5   conclude.

6          MR. AMANN:  Thank you, Your Honor.

7   BY MR. AMANN:

8   Q.   Before the break I believe you said that Tamiflu that was

9   sent to you by Kevin was in English.  We have, during the

10  break, tried to gather up all of the Tamiflu that was sent to

11  you.  I want you to look at it, if you would please.

12  A.   Yes, sir.

13  Q.   Okay.  Is that one of them?

14  A.   Yes, it is.

15  Q.   Can you pull that one out?

16          Are all of these going to be the same?

17  A.   Yes, they're all the same.

18  Q.   Can we open -- are all of these without -- I'm not going

19  to go through every exhibit, try to make things easier -- with

20  respect to all of the Tamiflu that was sent to you, you're

21  claim is that it was in English; right?

22  A.   That was what I believe, yes.

23          MR. AMANN:  All right.  Judge, may I use the Elmo?

24          THE COURT:  Sure.

25          MR. AMANN:  Thank you.

1    BY MR. AMANN:

2    Q.   Okay.  This is the Tamiflu that we're talking about;

3    right?

4    A.   Yes, sir.

5    Q.   And that's -- the one I've got here up on the Elmo now,

6    that's how every single one of these Tamiflus --

7    A.   Yes.

8    Q.   -- in the various exhibits looked; right?

9    A.   Yes.

10   Q.   Now, on the back we have the word "Tamiflu"; right?

11   A.   That's correct.

12   Q.   All right.  Tamiflu's going to be spelled the same way in

13   English, French, it is what it is, Tamiflu; right?

14   A.   Yes.

15   Q.   All right.  And Roche at the top there, R-o-c-h-e, are

16   those the people that make Tamiflu?

17   A.   Yes, that's correct.

18   Q.   All right.  Their name is going to be spelled the same in

19   French, English, German, Italian; right?

20   A.   That's correct.

21   Q.   All right.  Now, below the Tamiflu, we have the word that

22   I'm hesitant to try to pronounce, oseltamivir, is that the

23   chemical name for Tamiflu?

24   A.   That's correct.

25   Q.   All right.  And that's a peculiar chemical name that just

SHERMAN  -  REDIRECT

1    describes that particular drug, isn't it?

2    A.    That's correct.

3    Q.    All right.  And that's going to be spelled the same way

4    in French, English, German, Italian, isn't it?

5    A.    That's correct.

6    Q.    All of this Tamiflu we're talking about could well have

7    come from the European market; right?

8              If I put these back into a particular bag --

9    A.    Are you speaking hypothetically or these particular ones?

10   Q.    These particular ones could have come from the European

11   market?

12   A.    It's unlikely, but --

13   Q.    These -- oh, you have one under here too.

14   A.    Yeah.

15   Q.    These could have come from the European market; right?

16   A.    There's no indication that they have.

17   Q.    There's no indication that they haven't --

18   A.    Yes, there are.

19   Q.    -- based on the printing?

20   A.    Based -- if you want to limit it to just the printing?

21   Q.    Yes, I want to limit it to how it showed up when you got

22   it.

23   A.    Based on the printing, it could have come from anywhere.

24         MR. AMANN:  Okay.  I'll pass the witness, Your Honor.

25         THE COURT:  Anything else, Mr. Louis?

1          MR. AMANN:  May I return these?

2          THE COURT:  No, I take it by your silence.

3          All right.  Call your next witness.

4          MR. LOUIS:  Next witness is Mike Dalton.

5          THE WITNESS:  May I return to my seat?

6          THE COURT:  Sure.

7          THE WITNESS:  Thank you, Your Honor.

8          THE COURT:  Please come around, sir, and be sworn as

9   a witness.

10                        MICHAEL DALTON

11  having been first duly sworn, testified as follows:

12          THE COURT:  Be seated, please.

13          Mr. Louis, you may proceed.

14          MR. LOUIS:  Thank you, Your Honor.

15                      DIRECT EXAMINATION

16  BY MR. LOUIS:

17  Q.   Please state your name and spell your last name for the

18  benefit of the ladies and gentlemen of the jury.

19  A.   Michael Patrick Dalton, D-a-l-t-o-n.

20  Q.   How are you employed, Mr. Dalton?

21  A.   I work for Eli Lilly Company, a pharmaceutical company in

22  Indianapolis, Indiana.

23  Q.   What's your position with Eli Lillie?

24  A.   I'm the team leader of the global product protection

25  technical team.

1    Q.   And what does that mean?  What does a team leader do?

2    A.   I supervise the group who conducts all of the physical

3    and chemical analysis on all of the suspect products that are

4    submitted to my laboratory for analysis.

5    Q.   Does that mean that you have some background in

6    chemistry?

7    A.   I do.

8    Q.   Would you please tell the ladies and gentlemen of the

9    jury what your background is in chemistry?

10   A.    From an education standpoint my college degree is a

11   bachelor of science in biology and I have a minor in

12   chemistry.  I've also worked at Lilly as a -- in the

13   laboratory performing chemical analysis as well.

14   Q.   And how long have you done that for Eli Lilly?

15   A.   I've worked for Lilly for 16 years.

16   Q.   Prior to joining Lilly, did you work in any other

17   capacity as a chemist or in the field of chemistry?

18   A.    Prior to working at Lilly?

19   Q.   Yes.  Did you have any other employment?

20   A.   No, I've worked at Lilly my entire career.

21   Q.   All right.  Now, did -- in your capacity as a team

22   leader, do you have an occasion to receive samples from

23   outside sources to determine whether or not a sample product

24   or trademark product is authentic or counterfeit.

25   A.   Yes, I do.

1  Q.   Do you do that on few or many occasions?

2  A.   Very many occasions.

3  Q.   Did you receive, in connection with this case, certain

4  samples to conduct an analysis?

5  A.   Yes, sir.

6  Q.   Did you, in fact, conduct an analysis?

7  A.   I was a part of conducting the analysis, yes.

8  Q.   All right.  I've got several exhibits.  Let me go in

9  order.  Let me first hand you what I have marked as

10 Government's Exhibit No. 52 and ask you to look at that

11 exhibit.  And are you familiar with that exhibit?

12 A.   Yes, I am.

13 Q.   And did you conduct an analysis of that exhibit?

14 A.   Yes, sir.

15 Q.   Did you write a report of your analysis of that exhibit?

16 A.   Yes, sir.

17 Q.   For the record, what is in Government's Exhibit No. 52?

18 A.   There is a blister card containing seven tablets and a

19 carton and a package insert.

20 Q.   All right.  Do you have some -- what's called a log that

21 references a case number that would indicate who submitted the

22 sample to you?

23 A.   Yes.

24 Q.   And can you tell us what number's associated with the

25 case number?

1   A.    The ICE number is 2866085.

2   Q.    All right.  Now, once a sample is submitted to Eli Lilly

3   for analysis, what's the first thing that happens?

4   A.    Well, the first thing we do is we establish chain of

5   custody.  So we will evaluate what is submitted to us and make

6   sure that all of the contents and counts of the tablets are

7   accurate.  We will then log that sample into our database so

8   that we have a record of that sample.  We will record basic

9   information during our initial visual analysis of that

10  product.  We will evaluate what questions are being asked

11  about that product from the submitter, whether it's for

12  authenticity or to determine what the chemical composition of

13  the product is.  We will develop a protocol to analyze the

14  product to answer those questions, execute that protocol,

15  evaluate the data, verify it and write a report and submit

16  that back to the submitter of the sample.

17  Q.    All right.  And have you identified that as a sample that

18  you examined and did analysis of?

19  A.    Yes, sir.

20  Q.    Did you provide that yesterday or the day before to me

21  when you arrived?

22  A.    Yes.

23        MR. LOUIS:  At this time I move for the admission of

24  Government's Exhibit No. 52.

25        MR. AMANN:  Just one quick question, Your Honor, if I

DALTON   -   DIRECT

1   can.

2          Are there -- do you have some initials on here that

3   show you're the one that did the analysis and so forth?  Is

4   There some kind of marking I can look for?

5          THE WITNESS:  The sample number is referenced here

6   and it is also referenced on the report --

7          MR. AMANN:  Oh, okay.

8          THE WITNESS:  -- that's generated.  That's --

9          MR. AMANN:  And you match up the numbers.

10          THE WITNESS:  Yes, sir.

11          MR. AMANN:  Okay.  I have no objection, Your Honor.

12          THE COURT:  All right.  Government's Exhibit 52 is

13   admitted.

14   BY MR. LOUIS:

15   Q.   Now, if you could go ahead and open Government's 52 and

16   when you received this, tell the ladies and gentlemen of the

17   jury what it is that you received that's Government's

18   Exhibit 52.

19   A.   I have a carton labeled as Zyprexa 10 milligrams.

20   There's a patient leaflet or insert.  And there is a blister

21   card containing seven tablets also labeled an a Zyprexa 10

22   milligrams.

23   Q.   All right.  And what's the first -- one of the first

24   things that you did in reference to doing your examination?

25   A.   One of the first things we typically do is look at the

1   batch numbers that are on the packaging through our batch

2   number database.  And the batch number on the carton, which is

3   A202503 was indicated early on to not be a Zyprexa

4   10-milligram batch number assigned by Lilly.  It is --

5   Q.   Say that one more time slower.

6   A.   Okay.  The batch number on the carton, which is --

7   Q.   Where is that batch number located?

8   A.   It is stamped or imprinted here on the end of the carton.

9   Q.   I'm going to show you what's been already marked and

10   admitted into evidence as Government's Exhibit 60, Photograph

11   No. 26.  Is this what you are looking at right now?

12   A.   That is a different batch number than what I'm looking

13   at.

14   Q.   Different batch number.  What's the batch number you have

15   there?

16   A.   202503.

17   Q.   Okay.  Looking at this batch number -- now, where is the

18   batch number?

19   A.   It's right next to the word "lot."

20   Q.   Okay.  So is lot and batch the same thing?

21   A.   Lot and batch are synonymous, yes.

22   Q.   Okay.  And the number there, if I can read it and

23   highlight it, is 202503; is that right?

24   A.   The letter "A" is the prefix there.

25   Q.   Now, you said that was not associated with what?

DALTON  -  DIRECT                                    315

1    A.    That is a batch number when we did the search in our

2    batch numbering database at Lilly that is associated with a

3    5-milligram Zyprexa.  It is a valid Zyprexa batch number, but

4    for 5 milligrams, not 10 milligrams.

5    Q.    So it is -- so that's one indication that this may not be

6    a Eli Lilly product because it's got the wrong batch number

7    for the wrong milligram?

8    A.    Correct.

9    Q.    Anything else that you can tell us that you looked at

10   that was of some concern?

11   A.    There were other observations made about the printing

12   quality by the packaging experts.  The -- some of the fonts

13   were not consistent with Lilly printing practices.  There

14   are -- there's a printer's mark on the -- one of the flaps.

15   Q.    Okay.  I'm going to turn it and you can tell me which

16   one.

17   A.    Slide down, if you would please.  Can you flip that over?

18   Q.    All right.

19   A.    Flip the carton on the other side.

20   Q.    Like this?

21   A.    No, the --

22          THE COURT:  Turn it over.

23   A.    Turn it over.  There you go.  Yeah, right there where it

24   says "FB" on the bottom right side of the screen, that is the

25   printer's mark that is put on there by the company who

1   actually prints the cartons.  And that was inaccurate as far

2   as the design.  The board stock was also something that the

3   packaging experts noticed was not consistent with the board

4   stock, the thickness and weight of the board paper that we

5   use.

6   BY MR. LOUIS:

7   Q.   All right.  So visual inspection of a carton raises some

8   concerns that you've indicated.  What's the next thing that

9   was examined and looked at to determine whether it's authentic

10  or counterfeit?

11  A.   Well, the next thing we looked at was the blister card.

12  Again, looking at the batch number first, the batch number in

13  this case is a valid Zyprexa 10-milligram batch number.  So

14  that was accurate.  However --

15  Q.   Let me stop you.  Are you telling me the batch number on

16  the carton and the batch number on the actual foil is

17  different?

18  A.   Yes.

19  Q.   And just quickly, if I can see here, do I have it the

20  right way, right side or different side?  Should it go the

21  other way?

22  A.   Yeah, that's the correct side.  It should be the correct

23  side.

24  Q.   Okay.  I don't know if I'm going to be able to do any

25  better than that.  But why don't you just read it for us so

1   it's in the record.

2   A.   Okay.  The batch number on the blister is A229505

3   imprinted here and an expiration day of 03-2009.

4   Q.   All right.  So hold on right there.  Read that for us one

5   more time on the blister foil?

6   A.   On the blister foil, A229505.

7   Q.   And do you see that on this exhibit I have on this Elmo

8   screen, which is 60 -- which is Picture No. 26, do you see

9   that?

10  A.   Yes, sir.

11  Q.   So that's the same thing that's on that blister foil?

12  A.   Correct.

13  Q.   Now, after inspecting and finding that the lot number was

14  a valid lot number assigned to that milligram, what was the

15  next thing that was done?

16  A.   Well, we noticed that that the batch number, although it

17  is accurate, is stamped onto the blister incorrectly.  If you

18  notice on this, it is actually upside down --

19  Q.   That's why I couldn't read it.

20  A.   -- and backwards.  So to actually read it left to right,

21  you read it from the foil side.  But authentic packaging is

22  stamped on the printed side and it's read left to right

23  looking at it from this side.

24  Q.   All right.  So the positioning of the batch number is

25  incorrect on the blister foil?

1    A.    That's correct.

2    Q.    What's the next thing that was done in connection with

3    the analysis of the packaging and the sample?

4    A.    We also looked at the package insert and, again, there

5    were differences in printing that were observed in the stock

6    of the paper.

7    Q.    All right.  Now, with respect to the chemical analyses,

8    what's the first type of analysis that's done?

9    A.    As far as Zyprexa, the first thing we do would be a

10   visual analysis of the tablets before we would chemically

11   analyze it to make sure the tablets look consistent with

12   authentic.  And then we would proceed with the chemical

13   analysis.

14   Q.    With respect to this particular sample, was it consistent

15   or not?

16   A.    From a physical standpoint?

17   Q.    Yes.

18   A.    Physically, no.  The tablets were kind of creme color,

19   off white color.  Authentic Zyprexa tablets are white.  The

20   imprint on the tablets was also of poor quality, and in some

21   cases, a different color of ink for the imprint than authentic

22   tablets.

23   Q.    All right.  Now, during -- conducting the chemical

24   analyses itself, what's the first test that you do and, would

25   you tell the ladies and gentlemen of the jury, why you do this

DALTON - DIRECT

1    test?

2    A.    Okay.  For Zyprexa there were two chemical analysis that

3    we conducted.  One was a potency analysis to determine what

4    the potency of the active ingredient was.  The second analysis

5    was an impurity analysis so that we could assess what

6    degradation products and impurities were present that we would

7    typically see in authentic Lilly manufactured material.  And

8    both of those analysis are conducted using what's called an

9    HPLC or high performance liquid chromatography, common

10   laboratory instrument in most labs.

11   Q.    How expensive, if you know, is an HPLC machine or

12   equipment?

13   A.    They can vary, but from my experience it's anywhere from

14   80 to $100,000 is probably a common range.  There's many

15   different types and models and manufacturers.  So 80 to 100 is

16   what I've experience that my laboratory has actually

17   purchased.

18   Q.    Now, did -- what was the result of the HPLC test that was

19   done on this sample, Government's Exhibit 52?

20   A.    I don't have the report in front of me, but I do recall

21   that each -- I don't know the exact potency value in front of

22   me for this one.

23   Q.    Let me hand you a document --

24   A.    Thank you.

25   Q.    -- and see if that purports to be your report.

1    A.    Yes.  Based on the potency analysis, the result was that

2    this was a subpotent tablet.  The result was 8.2 milligrams

3    per tablet.  And this was a 10-milligram tablet.  Lilly has

4    established specifications in the United States that our

5    tablets must meet and that is 9.2 to 10.5 milligrams per

6    tablet.

7    Q.    And that's established because that's the information

8    that's provided to the Food and Drug Administration in being

9    able to get this tablet, Zyprexa, being able to manufacture

10   and market it.

11   A.    Correct, that's a registered commitment.

12   Q.    So it's subpotent.  What about any impurities?

13   A.    Yes, we also analyzed it for the related substances or

14   impurity profile.  And in this particular case it did also

15   fail the largest individual which means that as we're

16   evaluating the impurity profile, there cannot be one impurity

17   that is above a certain threshold.  And our limit for that, I

18   believe, is .5 percent.  And in this case -- I'm sorry, not

19   more than 2 percent is what I have here.  And the largest

20   individual is .84 so it was four times the regulatory

21   commitment there.  Aside from that, there were impurities and

22   other components present that are not typically seen in

23   authentic Lilly manufactured material.

24   Q.    Does that mean -- are you able to, when you do these

25   tests, isolate and indicate what those impurities are or not?

1    A.   We are capable, but we did not do that for these samples.

2    Q.   Okay.  Now, during the visual inspection, if you took an

3    authentic sample and a sample that you've identified as

4    counterfeit based on your analysis, and did a side-by-side

5    comparison, could someone who's not as knowledgeable as you

6    know which one is authentic and which one is not?

7    A.   I suppose if the differences are extreme enough someone

8    would notice there's a difference.  But if someone did not

9    have prior knowledge of Lilly manufactured Zyprexa at all the

10   various manufacturing sites that we have around the world, one

11   would not know the variability seen in our own product that is

12   within acceptable limits.  But in looking at the suspect

13   sample against the controlled sample used here, there are

14   obvious differences that somebody would notice.

15   Q.   All right.  Now, did you record those in your report?

16   A.   Yes.

17   Q.   Okay.  And do you have a nice graph of that as part of

18   Page 2 of your report?

19   A.   Yes.

20   Q.   All right.  I'm going to mark that as part of

21   Government's Exhibit, which I'm going to offer later,

22   Government's Exhibit 52-A.  Right now let me hand you what

23   I've marked as Government's Exhibit No. 52-A and ask you to

24   look at these and see if there's an excerpt from all of the

25   analysis that you performed in the reports of those analysis?

DALTON  -  DIRECT

322

1   A.   I believe there was one more.

2   Q.   All right.

3   A.   2319.

4   Q.   I'll have to find that one.

5   A.   Okay.

6   Q.   2319?

7   A.   Yes, sir.

8   Q.   Take a look and see if that's the report you're

9   referencing?

10   A.   Yes.

11        MR. LOUIS:  All right.  At this time I'm going to

12   offer Government's Exhibit 52-A.

13        MR. AMANN:  I have no objection, Your Honor.

14        THE COURT:  You'd better clip all of that together so

15   we can keep it --

16        MR. LOUIS:  I'm going to staple it.  I'll put a paper

17   clip on it right now.

18        THE COURT:  Okay.  52-A is admitted.

19   BY MR. LOUIS:

20   Q.   All right.  Looking at the report, this outlines the

21   packaging and then the comparison of the pills; is that right?

22   A.   Yes, sir.

23   Q.   And it's hard to kind of see on this one, but you're

24   saying there was a substantial difference in appearance?

25   A.   There was a difference in appearance compared with the

DALTON - DIRECT                                    323

1   authentic, yes.  It was an off white to cream-colored tablet.

2   And it's difficult to see there, but the print quality of the

3   imprint on the tablet, which were a 10-milligram tablet is

4   Lilly, L-i-l-l-y, in all capital letters 4117, which is the

5   item code, but there was differences.

6   Q.   All right.  And your conclusion was that the packaging

7   and the actual tablet or the pill was what?

8   A.   That they were not authentic.

9   Q.   Okay.  Now, let's look at the next sample, which I have

10  marked as Government's Exhibit -- part of Government's

11  Exhibit 52 as well.  Tell us if this sample was received at

12  the same time as you received what I've already marked as

13  Government's Exhibit 52.

14  A.   They were received within a couple of weeks of each

15  other.

16  Q.   Were they tested at the same time or do you know?

17  A.   That, I don't know if they were tested on the exact same

18  sample run or not but close in proximity.

19  Q.   Is this the sample that you did the testing on?

20  A.   Yes.

21       MR. LOUIS:  I think I'm going to mark this as a

22  different one.  I'm going to mark this as Government's

23  Exhibit 52-I.

24       THE COURT:  52-I.

25       MR. LOUIS:  I have some others that I've already

```
 1   marked.

 2             THE COURT:  I don't have them on your exhibit list.

 3             MR. LOUIS:  I'll do a revised exhibit list, Your

 4   Honor.

 5   BY MR. LOUIS:

 6   Q.  So for the record, again, this is a sample that you did

 7   the analysis on?

 8   A.   Yes.

 9             MR. LOUIS:  At this time I offer Government's

10   Exhibit 52-I.

11             MR. AMANN:  I have just one question, Your Honor.

12             These markings right there, did you make those?

13             THE WITNESS:  No.

14             MR. AMANN:  Do you know who made those markings?

15             THE WITNESS:  I do not know.

16             MR. AMANN:  Are those markings that would have been

17   made at the time the stuff was packaged or does that look like

18   the marking was made after it was packaged?

19             THE WITNESS:  It would be a mark after it's been

20   packaged.  I've seen marks like that on -- being submitted to

21   us before.  Sometimes agents or investigators from our side

22   will sign off.

23             MR. AMANN:  Okay.  I have no objection.

24             THE COURT:  52-I is admitted.

25
```

1    BY MR. LOUIS:

2    Q.   And now we're going to go through the same with respect

3    to this particular packaging.  Can you read the batch number

4    for us?

5    A.   Sure.  It is -- the batch number on the carton is

6    A202503.

7    Q.   Is that consistent or inconsistent with that particular

8    milligram of Zyprexa?

9    A.   It is, again, the 5 milligram, not the 10 milligrams as

10   indicated on the carton.

11   Q.   All right.  And then just looking at the actual chemical

12   analysis that was performed of this sample -- well, first of

13   all, was the imprint of the batch number on the sealed foil,

14   was it positioned correctly or incorrectly?

15   A.   Incorrect.  This particular foil is similar to the prior

16   sample.  It's A229505.  So they do not match.  And, again,

17   it's in the incorrect orientation.

18   Q.   All right.  Did you also do the same type of test that

19   you mentioned earlier?

20   A.   Yes.

21   Q.   HPLC test?

22   A.   Yes, sir.

23   Q.   Any other test that you performed?

24   A.   No.  Identical process.

25   Q.   With respect to this sample, did you also prepare a

1    report that corresponds to that sample, which is -- you have

2    ID No. 2319?

3    A.   Yes, sir.

4    Q.   And it says Lilly product and has Zyprexa.  What's that

5    little symbol that's next to Zyprexa?

6    A.   The registered trademark symbol.

7    Q.   Now, on this one you did a larger scale of the comparison

8    of the pill; right?

9    A.   Yes.

10   Q.   Is that the differences that you were talking about?

11   A.   Yes, you can see in the upper left-hand quadrant the

12   imprint on the tablet should be, as you can see on the right

13   hand, the authentic Zyprexa table, Lilly 4117, and that is the

14   imprint on one side in blue ink.  You can see it's a faint --

15   more faint imprint on the left and some of the letters are

16   smudged.

17   Q.   Now, could that simply be caused because the pill has

18   been degraded?  Could it have been authentic and the pill has

19   just simply been degraded by handling?

20   A.   It's not typically seen.  There is some variation in the

21   Lilly process itself when you see that.  However, that is an

22   extreme case of where it's not consistent with what we've seen

23   in our process.

24   Q.   And then based upon the HPLC test, what were your

25   findings as to whether or not it contained -- what it said it

1    contained?

2    A.   I believe -- and, again, if I can see the report it would

3    be helpful.

4    Q.   Sure.  First of all, is this your report?

5    A.   Thank you.  Yes, it is.

6    Q.   Minus the page that's on the screen?

7    A.   Minus the page on the screen.  The product was confirmed

8    to contain olanzapine, the active ingredient in Lilly's

9    Zyprexa, but both the packaging component and tablets were

10   determined to be non-authentic.

11   Q.   All right.  And I believe you have that in this -- on

12   this page; is that right?

13   A.   Yes, the potency value in this case was 7.54 milligrams

14   per tablet.

15   Q.   And what is the acceptable range?

16   A.   The U.S. regulatory limits are 9.20 to 10.50 milligrams

17   per tablet.  So it's approximately 75 percent potent.

18   Q.   And any impurities that were found?

19   A.   Yes, the related substances or impurities were 1.64

20   percent.  I believe the registered limits are not more than

21   1.5 percent.  And, again, the largest individual, 1.8 -- or

22   1.08, so significantly elevated.

23   Q.   All right.  Let's move on to -- let me hand you what's

24   marked as Government's Exhibit No. 52-B and ask you to take a

25   look at this sample and first identify what is the drug that's

DALTON  -  DIRECT

```
 1   part of the sample?

 2   A.   Again, it Zyprexa.

 3   Q.   Did you do an analysis of this sample?

 4   A.   Yes, sir.

 5   Q.   Did you bring that with you when you traveled to Houston?

 6   A.   Yes, sir.

 7   Q.   And the same analysis of this sample that you did with

 8   two previous samples?

 9   A.   Everything's identical.  The batch number on the carton

10   is identical as the previous two and the batch number on the

11   foil is identical.

12         MR. LOUIS:  At this time I'd move for the admission

13   of Government's Exhibit No. 52-B.

14         MR. AMANN:  No objection, Your Honor.

15         THE COURT:  All right.  It is admitted.

16   BY MR. LOUIS:

17   Q.   And looking at this particular sample, can you tell us if

18   the packaging issue or packaging batch number is the same as

19   the previous two packages that you looked at?

20   A.   It is, yes.

21   Q.   And did you do the same type of testing with respect to

22   the sample?

23   A.   Yes.

24   Q.   And let me see, that would correspond -- if you would

25   double check for me --
```

```
 1   A.   2699.

 2   Q.   Yes.  Would you see if this is a report that corresponds

 3   to your analysis of that sample.

 4   A.   Yes.

 5   Q.   For time's sake, is this the summary of your report with

 6   respect to this sample?

 7   A.   Yes.

 8   Q.   So you have the carton, front and back; is that correct?

 9   A.   Yes.

10   Q.   And would you just read for the record what the batch

11   number that's on this carton.

12   A.   The batch number on the carton was A202503.  And the

13   batch number on the blister foil was A229505.

14   Q.   All right.  And then looking at this particular picture,

15   is that a better view of the pills that you were talking

16   about?

17   A.   Yes.

18   Q.   For the record, what is the difference between these two,

19   the reference sample and the pill that was submitted for

20   analysis?

21   A.   In this case, again, the pills were an off white -- the

22   tablets were an off white color, similar to the prior samples.

23   The imprint quality on this tablet is better than the prior

24   two, however, the color of the imprint is a much darker ink, a

25   dark blue to a black colored ink as compared with the blue
```

1   imprint of Lilly 4117 in the authentic tablets photo.

2   Q.   And now, what was the potency of this sample that you

3   analyzed?

4   A.   7.25 milligrams per tablet.

5   Q.   Again, subpotent?

6   A.   Yes, sir.

7   Q.   As far as the impurities, what did you determine?

8   A.   The, again, the largest individual impurity exceeded the

9   limit of not more than .2 percent.  It was .73 percent.  In

10  this case the related substances did meet the specifications.

11  However, there were impurities present that are not typically

12  observed in authentic Lilly product.

13  Q.   All right.  Okay.  Let's look at the next exhibit that's

14  marked Government's Exhibit 52-C.  And, again, is this a

15  sample of Zyprexa carton and the pill that you conducted an

16  analysis?

17  A.   Yes, sir.

18  Q.   Did you bring that with you today when you traveled --

19  A.   Yes, sir.

20  Q.   -- to Houston?

21  A.   Yes, sir.

22          MR. LOUIS:  At this time I move for the admission of

23  Government's Exhibit 52-C.

24          THE COURT:  "C" as in Charles?

25          MR. LOUIS:  "C" as in Charles.

 1          MR. AMANN:  If I may have a moment, Judge, I think

 2    there's a bag inside a bag.  I just want to --

 3          Sir, this -- what's marked as Government's 52-C is a

 4    bag and inside it is a bag and there's something inside that

 5    bag.  Is that all --

 6          THE WITNESS:  That's the original evidence bag that

 7    the sample was sent in.

 8          MR. AMANN:  Okay.  So it's the original evidence bag

 9    that you put it in.

10          THE WITNESS:  Correct.

11          MR. AMANN:  Okay.  I have no objection to 52-C.

12          THE COURT:  It's admitted.

13    BY MR. LOUIS:

14    Q.   Again, with respect to 52-C, would you read what the

15    batch number is on the carton.

16    A.   A202503.

17    Q.   Is that the same batch number for the other cartons that

18    you've inspected?

19    A.   Yes.

20    Q.   All right.  Then looking at the summary of your report

21    that's on the screen, is this a sort of, like, a caption of

22    all the tests that you performed that has ID -- I'm sorry,

23    2730?

24    A.   Yes.

25    Q.   And that's the sample you have there, 2730?

1    A.   Correct.

2    Q.   And, again, looking at the comparison of the pills, is

3    this the same difference that you indicated in the previous

4    sample that you looked at?

5    A.   Correct?

6    Q.   And just quickly for the record, what is that?

7    A.   Difference in the white coloring of the tablet.  It's

8    more of an off white.  And, again, the color of the imprint

9    was darker than authentic.

10   Q.   Was there any issues with the imprint or the writing on

11   the foil?

12   A.   There is a difference with this sample from the other two

13   in that the batch number on the foil in this case is the same

14   as that on the carton.  And that is the 5-milligram batch

15   number.

16   Q.   Then what was the potency of this particular sample?

17   A.   6.49 milligrams per tablet.

18   Q.   And then what was the impurities?

19   A.   In this case the impurities did meet the United States

20   registered specifications.  However, the largest individual

21   impurity exceeded the limit.  And, again, the impurity profile

22   was not consistent with Lilly manufactured Zyprexa.

23   Q.   All right.  Now, I'm going to hand you what's marked as

24   Government's Exhibit 52-E and I'll ask you to take a look at

25   that and determine if that is a sample that you also conducted

DALTON - DIRECT

1    an analyses.

2    A.   Yes, it is.

3    Q.   And is that a sample of carton Zyprexa?

4    A.   It's just a single blister.

5    Q.   Okay.  Did you do a report of that analysis?

6    A.   Yes.

7         MR. LOUIS:  At this time I move for the admission of

8    Government's Exhibit No. 52-E.

9         MR. AMANN:  No objection, Your Honor.

10        THE COURT:  It's admitted.

11   BY MR. LOUIS:

12   Q.   Looking at this sample, did you do an HPLC test?

13   A.   Yes, sir.

14   Q.   And looking at part of Government's Exhibit 52, is this

15   the sample that you analyzed identified --

16   A.   Yes.

17   Q.   -- as Sample 2731?

18   A.   Yes, sir.

19   Q.   All right.  And then, again, is it the same difference in

20   the coloration of writing that's on the pill?

21   A.   Yes.

22   Q.   Based upon that, did you do an analysis of the potency?

23   A.   Yes.

24   Q.   And what was that?

25   A.   5.90 milligrams per tablet.

DALTON  -  DIRECT

334

1    Q.    And it's supposed to be what?

2    A.    Between 9.20 and 10.50.

3    Q.    Did you find any impurities that were not consistent with

4    authentic 10 milligrams Zyprexa?

5    A.    Yes.

6    Q.    Based upon that, did you make a determination that this

7    was counterfeit?

8    A.    Yes, sir.

9    Q.    I'll hand you what I marked as Government's Exhibit 52-D

10   and ask you to look at this sample and see if this is one that

11   you conducted an analysis of.

12   A.    Yes, it is.

13   Q.    How do you know that?

14   A.    I know that because I put the samples in this bag and

15   brought them with me.  And this is our sample number.

16          MR. LOUIS:  At this time I move for the admission of

17   Government's Exhibit 52-D.

18          THE COURT:  "D" as in delta?

19          MR. LOUIS:  "D" as in delta.

20          MR. AMANN:  No objection, Your Honor.

21          THE COURT:  It's admitted.

22   BY MR. LOUIS:

23   Q.    Looking at Government's Exhibit 52-D, did you inspect

24   packaging with respect to this exhibit?

25   A.    Yes.

1    Q.   And did you find the same batch number as the previous

2    cartons that you reviewed?

3    A.   In this case the batch number on the carton is the same

4    as what we've seen in the blisters previously.  It's A229505.

5    And that is the same batch number or the blisters.  So for

6    this sample the batch number is accurate on both the carton

7    and the blisters for Zyprexa 10 milligrams.

8    Q.   So that is a valid batch number for 10 milligrams?

9    A.   Yes, sir.

10   Q.   All right.  And what's the sample ID number?

11   A.   2732.

12   Q.   And is that summary of report --

13   A.   Yes.

14   Q.   -- of the sample that you analyzed?

15        And based upon review of the sample carton, did you

16   determine that carton to be authentic or --

17   A.   Counterfeit.

18   Q.   And then looking at the pill itself, did you find

19   problems with the imprint on the pill?

20   A.   Obviously in the picture the imprint is complete, it's

21   off center and it's not legible completely.

22   Q.   During the HPLC what was the potency of this suspect

23   sample?

24   A.   6.13 milligrams per tablet.

25   Q.   Is that less than the allowed amount given the protocol

1   of FDA and Eli Lilly?

2   A.   Yes.

3   Q.   And what was the impurities?

4   A.   In this case the related substances specifications were

5   met.  However, there were impurities observed not typically

6   seen in Lilly product.  So it was determined to not be Lilly

7   manufactured material.

8   Q.   All right.  Now, I believe this is the last one.  Looking

9   at --

10          MR. LOUIS:  Pass the witness.

11          THE COURT:  Okay.

12          MR. AMANN:  May I, Your Honor?

13          THE COURT:  You may proceed.

14          MR. AMANN:  Thank you.

15                    CROSS-EXAMINATION

16   BY MR. AMANN:

17   Q.   Mr. Dalton.

18   A.   Yes, sir.

19   Q.   Good morning still.

20   A.   Good morning to you.

21   Q.   My name is Colin Amann.  I'm one of the lawyers

22   representing Kevin Xu.  And I've got some questions for you

23   related to what the Government talked to you about.  And I

24   want to go through the exhibits and I think you've got them up

25   there with you.  Let's try to do this, try to put them

DALTON   -   CROSS

1    altogether.

2            Let's look at Government's Exhibit 52-D.  Would you

3    be able, if I ask you, sir, to go in there and pull out one of

4    the packages -- one of the cartons, I should say --

5    A.   Sure.

6    Q.   -- and also one of the blister packs for me please.

7    A.   I need scissors.

8    Q.   Oh, I'm sorry.

9            Okay.  Thank you very much.  Now, again, for the

10   record, 52-D you've taken out of a carton that says Zyprexa;

11   right?

12   A.   Yes, sir.

13   Q.   And the language below the Zyprexa is obviously in

14   French, isn't it?

15   A.   The --

16   Q.   If you know.  I mean, does that appear to be?

17   A.   It is French.  The purple lettering, the word olanzapine

18   directly below Zyprexa is not French.

19   Q.   Okay.  Is that word "olanzapine," is that way we might

20   refer to as the generic name of the drug?

21   A.   Yes, the active ingredient.

22   Q.   Okay.  The active ingredient is olanzapine and that's

23   going to be spelled the same whether it's in English, French,

24   German or whatever?

25   A.   I believe there are variations over how that is spelled

DALTON  -  CROSS
338

1    in some countries.

2    Q.   Okay.  Do you know for sure?

3    A.   No.

4    Q.   But that's the active -- I want to say ingredient --

5    that's the active chemical?

6    A.   Correct.

7    Q.   That's the chemical name.  Yes?

8    A.   Yes.

9    Q.   Okay.  And actually if we see where it's got the

10   little -- looks like a car.  See where I'm talking about?

11   A.   Yes.

12   Q.   A car in a red triangle, do you know what that means?

13   A.   I do not know.

14   Q.   Have no idea.  Okay.  Below that it says "France."

15   Correct?

16   A.   Yes.

17   Q.   And it says "Lilly France SAS."  What does the SAS stand

18   for, please, sir?

19   A.   I do not know.

20   Q.   Does Eli Lilly have manufacturing factories that

21   manufacture Zyprexa in France?

22   A.   I do not believe -- no, France is not a Zyprexa

23   manufacturing facility.

24   Q.   You do not have a facility in France?

25   A.   We do have a facility, but it does not manufacture

DALTON   -   CROSS

1    Zyprexa.

2    Q.   Does that facility market the Zyprexa?

3    A.   Yes.

4    Q.   You have a factory in France that doesn't make the drug,

5    but it markets the drug.

6    A.   Correct.

7    Q.   Do you have a facility in England, the United Kingdom

8    that -- well, let me ask you this instead of going country by

9    country and wasting time.  Tell us, if you would, sir, what

10   factories in what countries do you know of where Lilly

11   manufactures the drug.

12   A.   The ones that I know of are the United States, the UK,

13   and, I believe, Brazil and Mexico.

14   Q.   Brazil and Mexico.

15   A.   And I also believe Puerto Rico.  However, the plant in

16   the UK was recently shut down so the manufacturing for that

17   has moved to, I believe, Alcobendas in Spain.

18   Q.   All right.  Now, with respect -- and that's where the

19   drug -- the countries where it's manufactured.  Can you tell

20   us, please, sir, what countries, other than the United States

21   that Zyprexa or Eli Lilly, I should say, distributes the drug?

22   A.   It's everywhere globally, multiple countries globally.

23   Q.   And when we say "distribute the drug," we're talking

24   about a facility that does the packaging and so forth and then

25   sells on whatever particular market that factory is in?

DALTON  -  CROSS

1    A.    I don't understand your question.

2    Q.    Well, we've talked about factories that distribute in

3    other countries.  I'm trying to get at what the factories --

4    they don't make the chemical, but do they make -- create the

5    packaging and then put it out for distribution?

6    A.    The supply chain is very complicated from the time that

7    the tablets themselves are made at the manufacturing facility.

8    There are multiple packages and distributors globally that are

9    associated with that.

10   Q.    Okay.  Well, if you know, sir, you said the distribution

11   chain was pretty complicated.  How complicated is it?

12   Describe what you mean by "complicated."

13   A.    I can't tell you the details of every point and

14   wholesaler and packager that are associated with every

15   manufacturing site and every marketing affiliate.  I have seen

16   supply chain graphs at Lilly and I do know that they are

17   complicated, that product, depending on what country the

18   tablets are going into, are packaged by different packagers.

19   The distribution chains are different in one country to

20   another.  This is Lilly's top product so there is a large

21   volume of this that is distributed.

22   Q.    Do you have any idea, sir, on a given year how many

23   tablets of Zyprexa Eli Lilly distributes throughout the world?

24   A.    No, I don't.

25   Q.    Would you be comfortable in saying it was well over

1   several million?

2   A.   I think that's -- I think I could say that it's over

3   several million, but I don't know.

4   Q.   This is their top seller, isn't it, worldwide?

5   A.   Yes.

6   Q.   So there are a lot out there?

7   A.   Yes.

8   Q.   All right.  Now, we were talking about -- which one were

9   we on, 52, do you have that where we took these out of?

10   A.   52-D.

11   Q.   52-D.  Thank you.  52-B, now, we have the Lilly Zyprexa

12   10 milligrams and these words below the 10 milligrams, are

13   those the active ingredients, again, the chemicals?

14   A.   That's what I was referring to earlier when you asked me

15   about the spelling of olanzapine.  In different countries it's

16   spelled differently.

17   Q.   All right.  So on this one, we have the different

18   spellings that would relate to the different countries?

19   A.   Correct.

20   Q.   So, obviously, sir, wherever this was intending to go, it

21   was intending to reach a market where if it went to France,

22   the French version of the chemical would be there; if it went

23   to England, the English version would be there; if it went to

24   Germany, you would have a German spelling.  Do you see what

25   I'm getting at?

DALTON  -  CROSS

```
 1  A.   Uh-huh.

 2  Q.   Yes?

 3  A.   Yes.

 4  Q.   Okay.  You need to have an answer for the court reporter.

 5  I'm not --

 6  A.   I didn't know you asked me a question.  I'm sorry.

 7  Q.   So that concludes all the various and sundry ways of

 8  spelling it so no matter what country it ends up in, a person

 9  would be able to look at it and understand what the chemical

10  is?

11  A.   Yes.

12  Q.   Okay.  Now, are you familiar with the concept of parallel

13  importers.  Do you know what parallel importers are?

14  A.   I have heard of a parallel importer, yes.

15  Q.   All right.  And I'll give these back to you.

16  A.   Okay.

17  Q.   When -- parallel importer is somebody in the European

18  Union and in the European Union you are allowed to import

19  between the various and sundry countries without worrying

20  about the regulations of one country versus another; right?

21          MR. LOUIS:  Objection.  Calls for speculation unless

22  this witness has some knowledge about how that works.

23          THE COURT:  Sustained.

24  BY MR. AMANN:

25  Q.   Do you know?
```

DALTON  -  CROSS

1    A.   Do I know what?

2    Q.   Do you know how parallel importing works?

3    A.   I know it vaguely.  I've heard of it.  We've been

4    involved in some cases.  I do not understand the regulations

5    regarding the rules for getting it from one country to another

6    or what is required to do so.

7    Q.   All right.  Your vague understanding is that they are

8    allowed to go from one country to another?

9    A.   That would be correct.

10   Q.   Now, when a parallel distributor distributes your

11   product, isn't it true, sir, that on the batch number -- and

12   the batch number is the same as the lot number; right?

13   A.   Uh-huh.

14   Q.   They are required to put a prefix and that prefix they're

15   required to put on it is an "A"?

16             MR. LOUIS:  Objection unless this witness has -- he

17   has established that this witness has knowledge about that

18   process.

19             THE COURT:  I'll sustain the objection.

20   BY MR. AMANN:

21   Q.   Do you know, sir, whether or not -- have you examined few

22   or many samples that have been sent to you?

23   A.   I've examined thousands.

24   Q.   Thousands.  And in the course of your examination, have

25   you run across lot numbers or batch numbers that have a prefix

DALTON   -   CROSS

1    "A" to them?

2    A.   Yes.

3    Q.   And you certainly wanted to know what at that "A" meant,

4    didn't you?

5    A.   I know what the "A" means.

6    Q.   Okay.  What does the "A" mean?

7    A.   "A" is a prefix that's used in the batch numbering system

8    that Lilly uses to assign batch numbers.  That is a letter

9    that Lilly assigns, not a parallel importer.

10   Q.   All right.  So your testimony is that by the assigning of

11   the "A," that was not done by somebody who repackaged it, that

12   was done by Lilly?

13   A.   In this particular sample, this is a counterfeit carton

14   so Lilly did not apply this batch number to this carton.

15   However, the batch number value meaning the alpha-numeric

16   sequence and the format in which it's laid out is consistent

17   with the batch numbering system that Lilly uses.

18   Q.   Okay.  Does Lilly manufacture -- are you familiar with

19   examining products that have traveled throughout the European

20   Union between the various and sundry countries over there?

21   A.   Yes.

22   Q.   All right.  And in your examination of those products, do

23   they normally or have you seen the prefix "A" on batch numbers

24   and lot numbers.

25   A.   I don't always know when samples are sent to me, the

DALTON  -  CROSS

345

```
 1  reasoning for why they're sent, whether it's a parallel import
 2  sample, a sample that was obtained from some other source.
 3  But knowing that batch number format, that is a standard
 4  format used by Lilly.  It is assigned through our SAP
 5  database.  It's used -- beginning to be used globally.  That
 6  is a Lilly formatted batch number.
 7  Q.   Does Lilly publish its batch numbers --
 8  A.   I do not know.
 9  Q.   -- to the general public?
10  A.   I do not know.
11  Q.   You don't know.  So you just don't know if somebody could
12  find on a Lilly website or something what the batch numbers
13  were or uses, you don't know if they're published or not?
14  A.   I don't know.
15  Q.   All right.  Now, you work at a laboratory?
16  A.   Yes.
17  Q.   And you talked about the high performance liquid
18  chromatography machine.
19  A.   Uh-huh.
20  Q.   Pretty expensive to keep, pretty sophisticated machine.
21  A.   Yes.
22  Q.   And you use that machine to verify whether or not what is
23  submitted to you is real?
24  A.   Correct.
25  Q.   Because if you have a blister pack, such as one that I've
```

 1  taken out of Government's Exhibit 52-D, the only way to figure

 2  out what's in here is to pop it out and put it in the HPLC;

 3  right?

 4  A.   Correct.

 5  Q.   All right.  Now, on these blister packs for Zyprexa, you

 6  can't see the pill through the blister packs, can you?  Right?

 7  A.   Correct.

 8  Q.   You have to actually pop the pill out and then you pop

 9  out your reference pill and then you look at them side by

10  side?

11  A.   Correct.

12  Q.   All right.  Do you have -- I guess in your report you

13  have done that for us.  And I want to show the jury an

14  example.  In 52-A you've got the suspect sample on the left

15  and then the authentic on the right; correct?

16  A.   Correct.

17  Q.   Now, do you have that actual blister pack up there or

18  these pills up there with you?  Can we take them out and look

19  at them because here's what I want to do, Mr. Dalton:  On the

20  Elmo these things are magnified.  And I want to know -- I want

21  to see what they look like if I were just looking at them

22  without being magnified.

23       MR. LOUIS:  Your Honor, I would object to any

24  tampering with an exhibit that's already been admitted in its

25  form.

1          MR. AMANN:  Judge, may I respond briefly?

2          THE COURT:  Sure.

3          MR. AMANN:  Judge, what I want to do is publish to

4    the jury what they look like to the naked eye and not through

5    some kind of electronic enhancement.

6          THE COURT:  Well, they'll see the photographs.  The

7    exhibits -- they won't have the Elmo in the jury room.

8          MR. AMANN:  Okay.

9          THE COURT:  They're not going to be electronically

10   enhanced.

11         MR. AMANN:  All right.  That's the only thing I was

12   getting at, Judge.

13   BY MR. AMANN:

14   Q.   I believe you testified earlier that -- well, how much

15   training do you have or how many years of training do you have

16   in differentiating between what is real and what is not real?

17   A.   I've worked at Lilly for 16 years.  Nine of those years

18   have been involved in the product protection and the intake

19   counterfeiting initiative so pretty much every sample -- every

20   sample that's come through in the past nine years I've been

21   involved with in some way.

22   Q.   Somebody has trained you how to do it?

23   A.   There has been training involved.  And some of it has

24   been on-the-job experience and learning and developing the

25   skills to identify what's consistent with and not consistent

1   with authentic.

2   Q.   And there is certainly a level of sophistication that

3   goes along with that training; true?

4   A.   True.

5   Q.   The average person may be able to differentiate between

6   what is real and not real and maybe not?

7   A.   Correct.

8   Q.   Fair statement?

9   A.   Fair.

10  Q.   And certainly if you don't have something to compare it

11  to, your job would be very hard to do indeed, wouldn't it?

12  A.   Yes.

13  Q.   You need to have that reference sample to make sure that

14  your comparison is valid, is that a fair statement?

15  A.   I think in some cases even if you had a comparison it

16  would be difficult.

17  Q.   Okay.  Even with the comparison it would be difficult?

18  A.   Right.

19  Q.   Now, you talked about these pills, when you did the

20  analysis they met specifications in the United States market.

21  Is There any -- or are there any different specifications for

22  what those prescriptions have to contain in other European

23  markets?

24  A.   Yes.

25  Q.   All right.  So if -- and you just did an analysis based

DALTON  -  CROSS

1   on what's applicable in the United States?

2   A.   Our standard process is to utilize the specifications in

3   the country in which the product was obtained.  And these were

4   obtained in the U.S. so that is the specification that we

5   applied it to.

6   Q.   Do you know, sir, what specifications apply in -- let's

7   use the country France because this packaging is in French?

8   A.   I don't know the exact specifications.

9   Q.   So when you do the chemical analysis, you don't know --

10  you can't compare it to what specifications are allowed for in

11  France; right?

12  A.   I can.

13  Q.   You can, but you didn't in this case?

14  A.   We did not.  However, I can say that I'm certain that the

15  subpotent values on these did not meet the specifications.

16  And when I say that I don't know the exact specifications,

17  they don't shift by much.  But in the United States, I

18  mentioned earlier, the potency spec was ninety-two to ten

19  point five.  Another country might be ninety-five to a hundred

20  and five.  So the variabilities are just a couple of

21  percentages either way.  I don't know why that is, but in each

22  of these cases the potency values would not have met the

23  specifications of any other country anyway, no matter what

24  country, correct.

25  Q.   That certainly is fair.  Are you familiar with how Eli

1    Lilly conducts their quality control management in France, for

2    example.

3    A.    I worked in the quality control laboratories for six

4    years.  But I've never been to Lilly France.  We all follow

5    the same quality systems, but I'm not familiar with the France

6    affiliate.

7    Q.    In your quality control laboratory, would it be fair to

8    say that it's a pretty sophisticated laboratory that takes a

9    lot of personnel and a lot of money to run and maintain?

10   A.    Yes.

11   Q.    If you have any personal knowledge, do you know about how

12   much money on a yearly basis?

13   A.    It's kind of a vague question.  Are you referring to one

14   site, globally, all the quality control laboratories?

15   Q.    Just pick America, for example.  Let's narrow it down.

16        MR. LOUIS:  Objection.  That assumes the witness has

17   financial knowledge of --

18        THE COURT:  Do you know the answer?

19        THE WITNESS:  No, I don't know the exact number.

20        THE COURT:  Move along.

21        MR. AMANN:  Thank you, Judge.

22   BY MR. AMANN:

23   Q.    On one of the cartons we had we determined -- I think you

24   showed us -- and I don't know if this is -- maybe you can show

25   me on this one where there's a printer's mark that identifies

1  the company that did the printing.

2  A.  Here.

3  Q.  Okay.  Again, we're talking out of --

4  A.  52-D.

5  Q.  -- 52-D.  Thank you.  A carton of Zyprexa out of 52-D,

6  and that little mark there is a printer's mark.  And a

7  printer's mark is a mark that's unique to every printer.  That

8  basically tells the world, I'm the company that did that

9  printing; correct?

10  A.  Correct.

11  Q.  And you can look up those marks and find out who did the

12  printing -- those are registered; right?

13  A.  That, I don't know.

14  Q.  You don't know.  Did you make, or anybody that you know

15  of, make any attempt to try to corollate or match that

16  printer's mark to determine where these cartons had been

17  printed?

18  A.  I believe the "FB" stands for Field Boxmore.

19  Q.  I'm sorry?

20  A.  Field Boxmore, I believe.

21  Q.  Field Boxmore.  What is Field Boxmore, sir?

22  A.  The printer.

23  Q.  Are they -- it's a company then -- are they global?

24  A.  I don't know.

25  Q.  All right.  When you examined these samples -- and I tell

1   you what, let's put these back so we don't get them all over

2   the place.  When you received, let's see, 52-D, the -- you

3   received it just like this, this is the evidence bag it came

4   in and -- or didn't come in, you obviously had to open

5   something to do the examination -- but is that a fair

6   representation of how you received it?

7   A.   Actually the 52-D is involved -- there were three samples

8   that we split out to separate because of different batch

9   numbers.  We analyzed them separately.

10  Q.   Okay.

11  A.   So for the reports 2730, 31 and 32, I believe we received

12  them collectively and then analyzed them because of the

13  different batch numbers to get a representative sample so --

14  Q.   I guess my question to you, sir, I apologize, it was not

15  artfully phrased.  When you receive the samples for analysis,

16  the blister packs were not in the cartons, were they?

17  A.   I don't remember how they were packaged.

18  Q.   Okay.  So if -- when they were packaged when you received

19  them, the blister packs were not already in the cartons, then

20  certainly there may have been some mix up in the packaging

21  such that that batch number from the blister pack didn't match

22  the batch number on the carton; right?

23  A.   It's possible.

24  Q.   All right.  Do you know that printing company, Field

25  Boxmore, are they located in the United Kingdom?

DALTON  -  CROSS

1  A.   I already answered I don't know.

2  Q.   I'm sorry.  I thought that might help to refresh your

3  recollection.  With respect to the Zyprexa and the color

4  differences, do you have -- where did I put your report -- you

5  talked about the color differences between the sample versus

6  the authentic.  Does -- do you know whether the color of

7  Zyprexa is the same in every international market that it is

8  distributed.

9  A.   Every one that I'm aware of.

10  Q.   Every one that you're aware of, that color stays the

11  same, that color does not change?

12  A.   It is possible for the color to change if subjected to

13  the right environmental conditions.  That's one of the reasons

14  why Lilly packages it the way we do in the foil container to

15  prevent that from happening.

16  Q.   Right.  Okay.  Thank you, sir.  With respect to 52-B, do

17  you have the report here you can look at?

18  A.   Right here.

19  Q.   All right.  On 52-B, you did the analysis of the

20  10-milligram Zyprexa.  And I believe you testified it was

21  within the accepted value with respect to impurities, it met

22  the standards?

23  A.   Correct.

24  Q.   It met the U.S. standards?

25  A.   Correct.

DALTON   -   CROSS

354

1   Q.   But you just noticed some impurities there that were not

2   inherent with Eli Lilly products?

3   A.   Correct.

4   Q.   But the impurities themselves were within specification;

5   correct?

6   A.   The collective quantitative value of the impurities was

7   within the percentage specification, yes.

8   Q.   Okay.  Thank you.  The same is true with respect to

9   Exhibit No. 52-C?

10   A.   52-C is Sample 2730.  I have the report here.  That is

11   correct, it does meet the specifications, quantitative

12   specifications.

13   Q.   All right.  Now, you talked about storage.  Is it

14   important to keep these stored -- and I guess the best

15   reference is what we agreed on -- all of our medications

16   stored at room temperature or cool places or something like

17   that, are there any specific storing conditions that are

18   peculiar to Zyprexa that you should observe to avoid

19   degradation of the product?

20   A.   I'm not a product expert.  I believe most of that

21   information is contained within the package insert that's

22   provided with the product.

23   Q.   Do you have any package inserts?

24   A.   Only the counterfeit ones.

25   Q.   Do you have package inserts that were provided to you for

DALTON  -  CROSS

1    analysis -- I mean for inspection?

2    A.    Yes, the counterfeit package inserts.

3    Q.    You did look at some inserts then?

4    A.    Yes.

5    Q.    The samples that were submitted to you they were inserts

6    as well as -- because I didn't see any up here.

7              THE COURT:  Haven't we covered all this?  What's the

8    relevance of all this?

9              MR. AMANN:  I was just going to get to the storing,

10   if the product had not been stored adequately.

11             THE COURT:  How would that affect the quality of the

12   drug itself?

13             MR. AMANN:  It might.  My question -- my followup

14   questions --

15             THE COURT:  Well, let's find out that.

16             Would storage affect the active ingredient level in

17   the drug?

18             THE WITNESS:  Yes, it would.

19             THE COURT:  How would that work?

20             THE WITNESS:  It would decrease the potency.  But

21   Lilly has done stress degradation studies where the product's

22   been stored at various environmental conditions to keep light,

23   moisture and we're well aware of how our product behaves under

24   those conditions.  And that is the basis for our conclusion is

25   that these impurities we're observing aren't indicative of

1   anything we're familiar with seeing in our marketed product

2   now or any stress degradation studies we've done in the past.

3           THE COURT:  Ask your next question.

4           MR. AMANN:  Just a followup on your one question, if

5   I may, Your Honor.

6           THE COURT:  All right.

7   BY MR. AMANN:

8   Q.  Would the degradation studies also take into account

9   color, how the color of the product was affected?

10  A.  I don't know.

11          MR. AMANN:  All right.  I pass the witness, Your

12  Honor.

13          THE COURT:  Anything else, Mr. Louis?

14          MR. LOUIS:  Yes, just one question.

15                  REDIRECT EXAMINATION

16  BY MR. LOUIS:

17  Q.  Mr. Amann asked you about Lilly batch numbers.  Is that a

18  number -- what is the purpose of batch numbering?

19  A.  Batch numbers are a unique identifier giving -- given to

20  each batch of Lilly products that goes out into the market so

21  that it can be tracked and distributed and know which market

22  the batch is going to go to.  It also -- it's sort of a

23  license plate to indicate when the product was manufactured,

24  when it would expire and for traceability reason to know if

25  there's any issue with a particular batch after it gets into a

1    patient's hands.

2    Q.    That's unique to Lilly?

3    A.    No.  Every pharmaceutical company, to my knowledge,

4    applies batch numbers to every --

5    Q.    A particular batch number that's assigned to Lilly would

6    be unique to Lilly, would that be accurate?

7    A.    I don't know how other companies assign their batch

8    numbering system.

9    Q.    Okay.  Well, let's talk about -- the batch numbers that's

10   on these drugs, would you expect some other individual to have

11   the batch number that's assigned in use that's on part of --

12   all the exhibits we've talked about?

13   A.    No.

14           MR. LOUIS:  No further questions.

15           MR. AMANN:  Just one quick one, Your Honor, I forgot

16   to ask.

17                      RECROSS-EXAMINATION

18   BY MR. AMANN:

19   Q.    In a given batch number, how many pills are produced that

20   have that batch number on it?

21   A.    It can vary.  There are smaller batches up to very large

22   batches.  It's not -- I wouldn't say it's a consistent number.

23   Every batch is "X" number of tablets or packages.

24   Q.    Did you check this batch number to see how many pills

25   containing this particular batch number were out there?

1   A.   I did not.

2   Q.   Cold you give us an estimate on an average batch drug?

3   A.   I don't know that information.

4   Q.   Would it be in the millions?

5   A.   I don't know.  I'm not in manufacturing.  I don't know.

6            MR. AMANN:  Thank you, Your Honor.  Pass the witness.

7            THE COURT:  May the witness be excused?

8            MR. LOUIS:  Yes, Your Honor.

9            MR. AMANN:  Yes, Your Honor.

10            THE COURT:  Thank you.  You're excused, Mr. Dalton.

11            The Government may call its next witness.

12            MR. LOUIS:  The Government calls JaCinta Batson to

13   the stand.

14            THE COURT:  I need an amended exhibit list for those

15   52 exhibits.

16            MR. LOUIS:  Yes, Your Honor.

17            THE COURT:  Please come around, ma'am, and be sworn

18   as a witness.

19            Can you move all those other exhibits away from where

20   the witness is.

21            MR. LOUIS:  Yes, Your Honor.

22                          JaCINTA BATSON

23   having been first duly sworn, testified as follows:

24            THE COURT:  Please be seated.

25            You may proceed, Mr. Louis.

1          MR. LOUIS:  Thank you.

2                    DIRECT EXAMINATION

3     BY MR. LOUIS:

4     Q.   Place state your name and spell your last name for the

5     benefit of the ladies and gentlemen of the jury and the court

6     reporter.

7     A.   JaCinta Batson, B, as in boy, a-t-s-o-n.

8     Q.   And Miss Batson, how are you employed?

9     A.   I'm employed with the United States Food and Drug

10    Administration Forensic Chemistry Center.

11    Q.   And where is that located?

12    A.   Cincinnati, Ohio.

13    Q.   How long have you been employed with the Forensic

14    Chemistry Center?

15    A.   Over six years.

16    Q.   What is your title there?

17    A.   I'm a forensic chemist.

18    Q.   How long have you been employed as a forensic chemist?

19    A.   About six years.

20    Q.   Briefly tell the ladies and gentlemen of the jury your

21    educational background.

22    A.   I have a bachelor's of science and chemistry from Wright

23    State University.  I also have a Master's of science and

24    chemistry from Wright State University.

25    Q.   And was employment at the FCC your first job out of, I

1   guess, master's -- after getting your master's degree?

2   A.   No.

3   Q.   Where else did you work?

4   A.   I was also employed with the Brim Laboratory as

5   analytical chemist there.

6   Q.   What is the Brim Laboratory?

7   A.   The Brim Laboratory works with the EPA for sample

8   preparation.  We do a lot of -- we did a lot of analysis for

9   samples that were in violation for the EPA.

10   Q.   All right.  So total, how many years of experience do you

11   have as a forensic chemist?

12   A.   About ten years.

13   Q.   All right.  And does the Forensic Chemistry Center on a

14   regular basis receive samples for analysis?

15   A.   Yes.

16   Q.   And in reference to this case, did the Forensic Chemistry

17   Center receive several samples for analysis?

18   A.   Yes.

19   Q.   And did you have some connection in reference to those

20   analysis?

21   A.   Yes.

22   Q.   I'll try to start with Government's Exhibit -- let's

23   first look at Government's Exhibit 52-A and ask you to take a

24   look at this exhibit.

25   A.   Okay.

1   Q.   And what is that exhibit?

2   A.   This is -- this is the remainder of the sample that -- of

3   one of the samples that we received by the FCC.

4   Q.   All right.  Did you do a report with respect to your

5   analysis of that sample?

6   A.   Yes.

7   Q.   Is this the report that you prepared?

8   A.   Yes.

9        MR. LOUIS:  All right.  At this time I move for the

10  admission of Government's Exhibit 56 -- or pardon me.

11  BY MR. LOUIS:

12  Q.   Are your initials also on the bag here?

13  A.   Yes.

14       MR. LOUIS:  All right.  At this time I move for the

15  admission of Government's Exhibit 56-A.

16       THE COURT:  56-A?

17       MR. LOUIS:  Yes.

18       THE COURT:  I don't have that on my list either.

19       MR. LOUIS:  I'll revise the list after lunch.

20       MR. AMANN:  I have no objection.

21       THE COURT:  It's admitted.

22  BY MR. LOUIS:

23  Q.   All right.  Is There a particular procedure that's

24  utilized once a sample is submitted for analysis?

25  A.   Yes.

```
 1  Q.   What is that procedure?

 2  A.   Once a sample is submitted to our laboratory, our sample

 3  custodian receives the sample and they log it into the system

 4  at our facility.  That sample is kept under lock and key until

 5  it's ready for analysis.

 6  Q.   Now, what's the date on your report there?

 7  A.   The date I submitted the report?

 8  Q.   Yes, what's the date on your report that you submitted?

 9  A.   June 8th, 2007.

10  Q.   Now, is that the date that an analysis was first

11  performed or done?

12  A.   No.

13  Q.   And do you typically do an initial analysis?

14  A.   Yes.

15  Q.   Was that done in this case?

16  A.   Yes.

17  Q.   All right.  Now, what's your reference sample, the number

18  that you assigned to this particular sample that was submitted

19  for analysis?

20  A.   The sample number is 405479.

21  Q.   Say it one more time.

22  A.   405479.

23  Q.   And also there is another number what is noted with "CIE"

24  I believe; is that right?

25  A.   Yes, sir.
```

BATSON  -  DIRECT
363

1   Q.   And what is that number?

2   A.   That number is 132863.

3   Q.   And what is the significance of that last number?

4   A.   The last number is the number that is assigned by the OCI

5   portion.  And then we get it and we have to assign another

6   number for us in house.

7   Q.   OCI, does that stand for Office of Criminal

8   Investigation?

9   A.   Yes.

10  Q.   Some agency submitted it for analysis?

11  A.   Yes.

12  Q.   And looking at -- could you open it up just briefly so we

13  can see what's inside?

14  A.   We need scissors or something to open it.

15  Q.   Okay.  Let me see if I can help you.

16        Now, within the bag that I just tore was another bag;

17  is that right?

18  A.   Yes.

19  Q.   And what bag is that?

20  A.   This is the bag that we received from OCI.

21  Q.   All right.  Now, what is it -- what is Government's

22  Exhibit No. 56-A?  What was submitted for analysis?

23  A.   We received one blister pack that was labeled, in part,

24  Zyprexa 10 milligrams.

25  Q.   So once you received the blister pack, what's the very

1    first thing that you did to conduct an analysis to determine

2    whether it's authentic or counterfeit?

3    A.    The very first thing we do is, once we receive the

4    sample, we have to log the information, the actual seal on

5    this sample.  We also have to record the date we received it,

6    the title of the seal and we also have to -- there's also a

7    case name that's associated with it -- with each sample.

8    Q.    All right.  Now, this is a sample of Zyprexa; is that

9    right?

10   A.    Yes.

11   Q.    Did you have to obtain a reference sample, authentic

12   known sample of Zyprexa to conduct the analysis?

13   A.    Yes, but we already had authentics in house.

14   Q.    Now, what's the first thing you do to make the comparison

15   between the authentic reference sample and then suspect sample

16   that you receive.

17   A.    The first thing we do is we do a visual observation where

18   we just visually compare the suspect sample to the known

19   authentic sample.

20   Q.    And so you did that in this case?

21   A.    Yes.

22   Q.    And what did you find?

23   A.    We found that visually that the two samples were

24   consistent with each other.

25   Q.    After looking at the -- inspecting it visually, what's

BATSON  -  DIRECT
365

1   the next thing you do?

2   A.   The next thing that we did was we weighed the sample.  We

3   weigh individual tablets of the sample and we took the average

4   of the suspect sample and we compared it to the average of the

5   known authentic sample.

6   Q.   All right.  Was that consistent or inconsistent?

7   A.   That was not consistent.

8   Q.   And not to go into too much detail, does weighing it give

9   you any indication as to whether the components of it are

10  authentic or not?

11  A.   Yes.

12  Q.   Explain that for us.

13  A.   Well, for most -- well, all drug companies, they have

14  specific ranges that they use for weights and other analysis.

15  And the weight of these samples were completely off from the

16  known authentic.

17  Q.   And just for the record, what was the weight of this

18  sample?

19  A.   I don't have it in front of me.

20  Q.   All right.  Now, after doing the weight comparison, what

21  type of chemical test did you do?

22  A.   We did Fourier transform infrared spectroscopy or FTIR

23  spectroscopy.

24  Q.   Spell that for the court reporter, please.

25  A.   Okay.  F-o-u-r-i-e-r, transform, t-r-a-n-s-f-o-r-m,

BATSON  -  DIRECT

1    infrared, i-n-f-r-a-r-e-d, and spectroscopy, s-p -- oh, that's

2    okay?  Okay.

3    Q.   But the first word, Fourier, but it's FTIR, is that the

4    acronym for that?

5    A.   Yes, yes.

6    Q.   What's the purpose of that test?

7    A.   The purpose of that test, we -- it's analytical technique

8    used in forensic science to identify chemicals and also to

9    differentiate between products.

10   Q.   All right.  And performing this test on Government's

11   Exhibit 56-A, Zyprexa -- is that 10 milligrams?

12   A.   Yes.

13   Q.   What was the result of that test?

14   A.   The result of the test was that the coatings and cores

15   were not consistent with authentic Zyprexa 10-milligram tablet

16   coatings and cores.

17   Q.   Do you do an examination, chemical examination of the

18   coating, which is outside?

19   A.   Yes.

20   Q.   And was that consistent or not?

21   A.   No.

22   Q.   And what specific, if you can tell us, what was the

23   difference?

24   A.   I'm not sure.  I don't have my report in front of me.

25   Q.   All right.  What do you have there?

1   A.   This?

2   Q.   Is that your report?

3   A.   This is my lab worksheet.

4   Q.   Now, with respect to the core, the core is the active

5   ingredient and filler; would that be correct?

6   A.   Yes.

7   Q.   And when you did the test of the active ingredient -- can

8   you tell us, what is the active ingredient for Zyprexa?

9   A.   The active ingredient for Zyprexa is olanzapine.

10  Q.   All right.  You did the testing.  What was the result of

11  the test?

12  A.   The initial test by FTIR we could not determine that the

13  active ingredient was present.  Additional tests needed to be

14  performed to determine the presence of olanzapine.

15  Q.   Did that happen?

16  A.   Yes.

17  Q.   Is that part of the report that you have there?

18  A.   Yes, part of the report.

19  Q.   And what was the result of that?

20  A.   The result showed that olanzapine was present in the

21  suspect sample.

22  Q.   Do you know the amount?

23  A.   Yes.  The amount was equivalent to 68 percent of the

24  declared 10 milligrams per tablet of olanzapine concentration.

25  Q.   Do you know whether or not that is within acceptable

BATSON - DIRECT

1  tolerance for an authentic Zyprexa or not?

2  A.  I know that it's not, but I don't have my worksheet.

3  Q.  All right.  Now, within Government's Exhibit 56-A -- just

4  so the jury can see -- are, to do this quickly, series of --

5  forgot the term I was going to use.  But, what are these?

6  What do you call these?

7  A.  Petri dishes.

8  Q.  Petri dishes.  Thank you.  Then you have markings here;

9  is that right?

10 A.  Yes.

11 Q.  So you took portions of the pill and then you conducted

12 the analysis; is that right?

13 A.  Yes.

14 Q.  And you have several ones.

15 A.  Uh-huh.

16 Q.  And so we can actually see -- let me try to look at this

17 one right here.  Is this the authentic sample?

18 A.  No, that's the suspect sample.

19 Q.  How do you know that's the suspect sample?

20 A.  It has the sample number associated with it.

21 Q.  All right.  Then what about this one?

22 A.  That is also a suspect sample.

23 Q.  Okay.  So you would do a review of all the suspect

24 samples?

25 A.  Yes.  We only use -- we want to keep some tablets intact

BATSON   -   DIRECT
369

```
 1   just in case further analysis is requested by another

 2   laboratory.

 3   Q.   All right.  And then you also have a vial?

 4   A.   Yes.

 5   Q.   What is in the vial?

 6   A.   In the vial is the remainder of the sample that was not

 7   used in the analysis.

 8   Q.   All right.  Lastly, there is a number on this plastic

 9   bag.  What is that number?

10   A.   That is our in-house fax number.

11   Q.   Why is your in-house fax number on the sample?

12   A.   Again, once the sample custodian receives it, they have

13   to assign a number so we need to know what the sample number

14   is going to be for them to log it in.

15   Q.   Now, let me show you another sample.  I hand you what's

16   marked as Government's Exhibit 56-B and ask you is this

17   another sample that was submitted for analysis?

18   A.   Yes.

19   Q.   How do you know that?

20   A.   Because it has our fax sample number on it.

21   Q.   And do you have your signature, initials anywhere on the

22   sample?

23   A.   Yes.

24   Q.   Where is that?

25   A.   It's on the bag and also on the seal.
```

1          MR. LOUIS:  All right.  At this time I move for

2    admission of Government's Exhibit 56-B.

3          MR. AMANN:  I have no objection, Your Honor.

4          THE COURT:  All right.  56-B is admitted.

5    BY MR. LOUIS:

6    Q.   Looking at Government's Exhibit 56-B, what was the

7    particular pharmaceutical product that was submitted for

8    analysis?

9    A.   Plavix.

10   Q.   All right.  Can you tell us, what is the number that was

11   assigned -- that you assigned to this exhibit?

12   A.   The number we assigned was 412489.

13   Q.   Then what is the number that was assigned by the Office

14   of Criminal Investigation who submitted it to you for

15   analysis?

16   A.   132868.

17   Q.   All right.  So this is Plavix; is that correct?

18   A.   Yes.

19   Q.   Any other pharmaceutical products in the sample?

20   A.   No, just Plavix.

21   Q.   All right.  When you do an analysis, do you also do an

22   analysis of the carton itself?  Do you have any reference

23   samples for that?

24   A.   We do, but we didn't do it in this analysis.

25   Q.   Okay.  And looking at the actual pill itself, did you do

1  the same FTIR test?

2  A.   Yes.

3  Q.   And did you do the core and coatings?

4  A.   Yes.

5  Q.   What was the result of the examination -- chemical

6  examination of this sample?

7  A.   The FTIR spectra, the suspect tablets coatings and cores

8  were not consistent with authentic Plavix.

9  Q.   All right.  Moving over here, what was the actual potency

10 of this sample?

11 A.   It's not on this report.

12 Q.   All right.  Is There another report that might have it on

13 there?

14 A.   Yes.

15 Q.   Okay.  It's -- what is it?  What's the potency?

16 A.   For authentic tablets it's supposed to be 75 milligrams

17 per tablet.  For the suspect tablets I can't state what it was

18 because I don't have the report in front of me.

19 Q.   All right.  In the report that would have that on there,

20 is that a report that you brought with you today or not?

21 A.   No, I didn't bring it with me.

22 Q.   Okay.  Just so we know, these are the samples that you

23 tested?

24 A.   Yes.

25 Q.   All right.  And just so the record's clear, what were

1   your findings, authentic or not authentic?

2   A.   They were not authentic.

3   Q.   All right.  And this is contained in the package -- is

4   that 28 milligrams or do you know?

5   A.   75 milligrams this was labeled.

6   Q.   Okay.  Let's now look at Government's Exhibit 56 -- let's

7   look at Government's Exhibit 56-C.  Pretty big bag, is it not?

8   A.   Yes.

9   Q.   Looking at Government's Exhibit 56-C, is that also

10  pharmaceutical products that were submitted to the Forensic

11  Chemical Center for analysis?

12  A.   Yes.

13  Q.   And how do you know it was submitted?

14  A.   It has our fax number on it and also has my initials and

15  my signature.

16  Q.   All right.  And can you tell us what date that was

17  submitted for analysis?

18  A.   05-04-2007.

19  Q.   Then what is the number that was assigned to that sample

20  by your lab?

21  A.   421819.

22  Q.   Then what was the number that was assigned by the Office

23  of Criminal Investigations?

24  A.   132874.

25          MR. LOUIS:  All right.  At this time I move for the

1    admission of Government's Exhibit No. 56-C.

2              THE COURT:  What's the drug name in that sample?

3              MR. LOUIS:  It's various samples in there.

4              MR. AMANN:  Seems to be quite a lot here.

5    BY MR. LOUIS:

6    Q.   Just for the record, can you look at the report and tell

7    the different pharmaceutical products that were submitted as

8    part of Government's Exhibit 56-C?

9    A.   Yes, Tamiflu 75-milligram capsules, Zyprexa 10-milligram

10   tablets, Plavix 75-milligram tablets and Casodex 50-milligram

11   tablets.

12   Q.   Okay.

13             MR. AMANN:  I don't have any objection, Your Honor.

14             THE COURT:  All right.  56-C is admitted.

15             This would be a good time to take our noon recess.

16   We'll stand in recess until 1:00 o'clock.

17             (There was a lunch recess taken.)

18             THE COURT:  Good afternoon, ladies and gentlemen.

19             You may proceed.

20             MR. LOUIS:  Thank you, Your Honor.

21   BY MR. LOUIS:

22   Q.   Miss Batson, before the break, I believe I had tendered

23   to you Government's Exhibit 56-C.

24   A.   Yes.

25   Q.   Looking at this exhibit, does it contain multiple

1    pharmaceutical products that were submitted for analysis?

2    A.    Yes.

3    Q.    And I think I tore this a little bit -- are there eight

4    items that comprise this exhibit?

5    A.    Yes.

6    Q.    Okay.  Now, you've got quite a bit up there so let's take

7    one of them, one on the top.

8    A.    Okay.

9    Q.    Tell us what the pharmaceutical product was that was

10   submitted?

11   A.    Zyprexa and Tamiflu.

12   Q.    Okay.  So you got Zyprexa and Tamiflu in that one bag

13   there?

14   A.    Yes.

15   Q.    You have a number also on that; is that right?

16   A.    Yes.

17   Q.    You call it a fax number?

18   A.    Yes.

19   Q.    What's the fax number on there?

20   A.    421819.

21   Q.    Okay.  Is that going to be the same number that's

22   consistent with all the items that were submitted for analysis

23   with this Exhibit 56-C?

24   A.    Yes.

25   Q.    Now, in looking at those samples -- let's take out one

BATSON  -  DIRECT

1   first -- and could you give us the date that that was

2   submitted to the lab for analysis?

3   A.   Submitted 05-04-2007.

4   Q.   All right.  And did you do an analysis, the FTIR test, on

5   this sample as well?

6   A.   Yes.

7   Q.   And is that the core and coatings that you talked about

8   earlier?

9   A.   For the Tamiflu, since they're capsules, only the capsule

10  contents.

11  Q.   So what you have that you pulled out, is that Zyprexa or

12  Tamiflu?

13  A.   This one is Tamiflu.

14  Q.   Okay.  All right.  So for the Tamiflu, how many capsules

15  did you review for the -- to do the chemical analysis?

16  A.   Two.

17  Q.   How many is left in that blister foil there?

18  A.   This is just empty.

19  Q.   Okay.  And are they in the Petri dishes?

20  A.   Yes.

21  Q.   All right.  And in conducting the analysis of the

22  contents of the Tamiflu capsules, what was the result of the

23  FTIR test?

24  A.   The FTIR spectra, the suspect capsule contents were not

25  consistent with authentic Tamiflu 75-milligram capsule

1    contents.

2    Q.   Were you able to determine what the actual percentage of

3    the -- first of all, what's the active ingredient in the

4    Tamiflu?

5    A.   Oseltamivir phosphate.

6    Q.   Oseltamivir phosphate?

7    A.   Uh-huh.

8    Q.   What was the amount of the active ingredient that was

9    found in the sample that was submitted for analysis?

10   A.   The amount of active ingredient was 53.0 milligrams per

11   capsule which is equivalent to 71 percent of the declared

12   75 milligrams per capsule.

13   Q.   All right.  Now, looking at the Zyprexa that you have

14   there, did you also do the FTIR test for that?

15   A.   Yes.

16   Q.   And what was the active ingredient for that?

17   A.   Olanzapine.

18   Q.   And what was the percentage of olanzapine in the sample

19   that you performed an analysis of?

20   A.   For one of the tablets the percentage was 69 percent.  An

21   additional tablet was analyzed and that one had 72 percent of

22   olanzapine.

23   Q.   So you received a -- was that a seven-tablet blister

24   strip?

25   A.   Yes.

BATSON  -  DIRECT
377

1    Q.    And how many tablets were actually analyzed?

2    A.    I believe six.  Yes.

3    Q.    And of the two that you have the results for, what was

4    that again?

5    A.    Two of them were used for FTIR and then additional two

6    were used for a concentration.  And the percentage for one of

7    them was 69 percent and the other one was 72 percent.

8    Q.    Okay.  So you did separate tests on separate samples; is

9    that right?

10   A.    Yes.

11   Q.    Okay.  And in all the tests that were performed, the FTIR

12   test, was that consistent with authentic Zyprexa?

13   A.    No.

14   Q.    All right.  And then the testing that you did to

15   determine the amount of the active ingredient, was that

16   consistent with the amount that's declared -- is that 75

17   milligrams?

18   A.    Yes.

19   Q.    What was present?

20   A.    For which -- excuse me, for which one again, for the

21   Tamiflu or the Zyprexa?

22   Q.    Zyprexa.

23   A.    Zyprexa is 10 milligrams.

24   Q.    10 milligrams?

25   A.    Yes.  And for one of the tablets it was 6.9 milligrams

1  per tablet.  And that was the one that was 69 percent.  The

2  other tablet was 7.2 milligrams per tablet.  And that was

3  72 percent equivalent of the 10 milligrams.

4  Q.  All right.  So we don't get confused, put those back in

5  its packaging.

6  A.  Okay.

7  Q.  Now, on your report does it indicate what the -- I think

8  you told us what the number was for the Office of Criminal

9  Investigation, what number they assigned to that.  What number

10  is that again?

11  A.  That number is 132874.

12  Q.  Okay.  Now, let me pull that aside.  Would you take a

13  look at the next sample that is part of Government's

14  Exhibit 56-C.  And what pharmaceutical drug was submitted for

15  analysis in this sample?

16  A.  Tamiflu.

17  Q.  And again, is this 75 milligrams?

18  A.  Yes.

19  Q.  And what type of test was done on this sample?

20  A.  The same test, FTIR spectroscopy.

21  Q.  And how many capsules on the blister pack?

22  A.  This originally contained ten.

23  Q.  And did you take all of them out and put them in the

24  Petri dishes?

25  A.  Yes.

1   Q.   How many were analyzed?

2   A.   Five.

3   Q.   And what was the result of the analysis with respect

4   to -- we won't go into all five of them, but did any of them

5   have the amount of the active ingredient that would add up to

6   75 milligrams?  I guess for the record you need to tell us

7   what they are.

8   A.   Okay.  The Tamiflu -- for this item, the Tamiflu was 53.0

9   milligrams per capsule, which is equivalent to 71 percent of

10  the declared 75 milligrams per capsule.

11  Q.   Is that the only pharmaceutical product that was in that

12  package?

13  A.   Yes.

14  Q.   Okay.  There's some writing on there.  Is that writing --

15  whose name is on that bag?

16  A.   The name on this bag is Doug Mason.

17  Q.   Did you write that or is that how it was received?

18  A.   This is how it was received.

19  Q.   Let me take that sample from you.  And if you would look

20  at the next bag and tell us what pharmaceutical product was

21  submitted for analysis?

22  A.   Plavix and Zyprexa.

23  Q.   And let's talk about the Plavix first.

24  A.   Okay.

25  Q.   Is that the seven count or how many tablets in this

BATSON  -  DIRECT

1    Plavix?

2    A.    28.

3    Q.    How many of the pills were analyzed?

4    A.    I believe, nine.

5    Q.    All right.  And what was -- you did a FTIR test again?

6    A.    Yes.

7    Q.    And what was the result of that test on the Plavix pills?

8    A.    The tablets coatings and cores were not consistent with

9    authentic Plavix.

10   Q.    In addition, did you determine what the amount of the

11   active ingredient was in the samples that were analyzed?

12   A.    Yes.

13   Q.    What was that?

14   A.    53.7 percent.

15   Q.    Of the declared amount?

16   A.    Yes.

17   Q.    So it did not have the amount of the active ingredient?

18   A.    Correct.

19   Q.    You also analyzed Zyprexa?

20   A.    Yes.

21   Q.    After doing the test on Zyprexa, what was the result of

22   the coatings and cores test -- or test on the coatings and

23   cores?

24   A.    The coatings and cores were not consistent with authentic

25   Zyprexa.

BATSON  -  DIRECT

381

1    Q.   What was the amount of the active ingredient present when

2    the test was done?

3    A.   The amount is 72 percent of the declared 10-milligram

4    tablets.

5    Q.   And then you have something in a vial.  What is this?

6    A.   This is the remainder of sampling that was not used.

7    Q.   All right.  Let's put those back.  Let's move to the next

8    part of Government's Exhibit 56-C.  Does that also have the

9    name Doug Mason on the bag that was submitted for analysis?

10   A.   Yes.

11   Q.   Looking at that portion sample, what was being

12   analyzed -- or what was analyzed?

13   A.   Plavix, Zyprexa and Casodex.

14   Q.   Okay.  For the Plavix, did you do -- now, do you ever do

15   an analysis of the packaging yourself?  I mean, does the FCC

16   do analysis of the packaging?

17   A.   Yes, we do.  In this case we did not.

18   Q.   All right.  In looking at the Plavix, did you do the FTIR

19   test?

20   A.   Yes.

21   Q.   Was that consistent or inconsistent with authentic

22   Plavix?

23   A.   It was not consistent.

24   Q.   And what's the milligrams, for the record?

25   A.   75 milligrams.

BATSON - DIRECT

1    Q.    And then the amount of the active ingredient in the

2    sample that was tested?

3    A.    52.1 percent of the declared 75 milligrams.

4    Q.    All right.  And then let's move next to the Zyprexa.

5    A.    Okay.

6    Q.    Were the coatings and cores consistent with authentic

7    Zyprexa?

8    A.    No, they were not consistent.

9    Q.    Then what was the amount of the active ingredient

10   present?

11   A.    69 percent of declared 10 milligrams per tablet.

12   Q.    69 percent of the -- so that was subpotent -- it would be

13   subpotent then?

14   A.    Yes.

15   Q.    Then looking at the Casodex, was the coatings and cores

16   consistent or inconsistent with authentic Casodex?

17   A.    The coatings and cores were not consistent.

18   Q.    What is the active ingredient in Casodex?

19   A.    Bicalutamide.

20   Q.    Okay.  Then what was the amount of the active ingredient

21   of that API?

22   A.    That ingredient wasn't recorded on this report.

23   Q.    Okay.  Let's move to the next one.  Do you have another

24   report that has this one?

25   A.    No.

1  Q.   Is that all of --

2  A.   Yes.

3  Q.   Now, within that were all these bags; is that right?

4  A.   Yes.

5  Q.   All right.  Let's move to the next exhibit, Government's

6  Exhibit 56.  Looking at this exhibit, was it also submitted to

7  the FCC, Forensic Chemical Center for analysis?

8  A.   Yes.

9  Q.   And what was the date that it was submitted?

10  A.   It was submitted December 27, 2006.

11  Q.   What product was submitted?

12  A.   Tamiflu.

13  Q.   Is your initial on that sample?

14  A.   Yes.

15       MR. LOUIS:  At this time I move for the admission of

16  Government's Exhibit 56.

17       THE COURT:  56 is Tamiflu only?

18       MR. LOUIS:  Tamiflu only.

19       MR. AMANN:  No objection, Your Honor.

20       THE COURT:  Government's Exhibit 56 is admitted.

21  BY MR. LOUIS:

22  Q.   And the Tamiflu, that is in capsule form; is that right?

23  A.   Yes.

24  Q.   Is that 75 milligrams?

25  A.   Yes.

BATSON  -  DIRECT

1  Q.   And did you do an analysis of the powder of the Tamiflu

2  capsule?

3  A.   Yes.

4  Q.   And what was the amount of the active ingredient that was

5  present?

6  A.   71 percent of the declared 75 milligrams per capsule.

7  Q.   How many capsules were analyzed?

8  A.   Seven.

9  Q.   And was it part of a blister strip, is that what you

10  received?

11  A.   Yes.

12  Q.   And how many are contained in the blister strip?

13  A.   Ten.

14  Q.   Now, let me show you what's marked as Government's

15  Exhibit No. 56-D.

16           THE COURT:  56-B, as in boy?

17           MR. LOUIS:  56-D as in David.

18  BY MR. LOUIS:

19  Q.   And, again, is that a sample that was submitted to the

20  Forensic Chemistry Center for analysis?

21  A.   Yes.

22  Q.   What's the date that that was submitted for analysis?

23  A.   June 18th, 2007.

24  Q.   And did you conduct an analysis of this exhibit?

25  A.   Yes.

1    Q.   Are your initials on the exhibit?

2    A.   Yes.

3    Q.   At this time I move for the admission of Government's

4    Exhibit 56-D.

5            MR. AMANN:  I have no objection, Your Honor.  I guess

6    56-D is Aricept and Plavix.

7            THE COURT:  All right.  It's admitted.

8    BY MR. LOUIS:

9    Q.   Looking at Government's Exhibit 56-D, was it also

10   submitted in an evidence envelope submitted by Doug Mason?

11   A.   Yes.

12   Q.   All right.  Government's Exhibit 56-D, what were the

13   pharmaceutical products that were submitted for analysis?

14   A.   Aricept, Plavix and Tamiflu.

15   Q.   Looking first at the Aricept, did you receive it in the

16   packaging?

17   A.   Yes.

18   Q.   And is it blister strips?

19   A.   Yes.

20   Q.   How many blister strips did you receive.

21   A.   Two.

22   Q.   And how many count -- how many pills in the blister

23   strips?

24   A.   14.

25   Q.   Then what was the milligrams that's supposed to be per

BATSON  -  DIRECT

1    each tablet?

2    A.    10 milligrams.

3    Q.    And during the FTIR analysis, was it consistent or

4    inconsistent with authentic Aricept?

5    A.    It was not consistent.

6    Q.    And what is the active ingredient in Aricept?

7    A.    Donepezil.

8    Q.    Say that one more time.

9    A.    Donepezil.

10    Q.    How do you spell that?

11    A.    D-o-n-e-p-e-z-i-l.

12    Q.    All right.  Thanks.  What was the amount of the active

13    ingredient that was found when the test was performed?

14    A.    It was 8.15 milligrams per tablet.

15    Q.    Does that mean it was subpotent?

16    A.    Yes.

17    Q.    And then did you do also an analysis of the Plavix that

18    you received?

19    A.    Yes.

20    Q.    Same test, FTIR test?

21    A.    Uh-huh.

22    Q.    And how many pills of the Plavix were analyzed?

23    A.    Six.

24    Q.    And of the six that were analyzed, what was the result of

25    doing the FTIR test?

BATSON  -  CROSS

1  A.   The tablet coatings and cores were not consistent with

2  authentic Plavix 75-milligram tablets.

3  Q.   And did you do a test for the active ingredient?

4  A.   Yes.

5  Q.   And what was the percent of the active ingredient found

6  when that sample was tested?

7  A.   62 percent of the declared 75 milligrams per tablet.

8  Q.   And then, lastly, you have there Aricept, Plavix and what

9  else?

10  A.   Tamiflu.

11  Q.   Tamiflu.  Of the 75 milligrams of Tamiflu, the active

12  ingredient of Tamiflu, what was determined when you did a test

13  on the sample?

14  A.   69 percent of the declared 75 milligrams per capsule.

15  Q.   Of all the samples that we have gone over, Government's

16  Exhibit 56, 56-A, B and C, I believe D, did you find any of

17  the samples to be consistent with the authentic pharmaceutical

18  product?

19  A.   No.

20          MR. LOUIS:  At this time I pass the witness.

21          MR. AMANN:  May I, Your Honor?

22          THE COURT:  Yes, you may proceed to cross-examine the

23  witness.

24          MR. AMANN:  Thank you.

25

BATSON  -  CROSS

388

CROSS-EXAMINATION

BY MR. AMANN:

Q.   Is it Miss Batson?

A.   Yes.

Q.   Miss Batson, good afternoon.  My name is Colin Amann.

A.   Good afternoon.

Q.   You have been a forensic chemist for six years.  Let's talk about -- let's try to work -- since we've got them in a pile up here, they're probably in reverse order.  I just want to ask you a few questions.

     With respect to Government's 56-D, did you at any time -- I'm pulling out the cartons for Plavix and the cartons for Aricept -- did you at any time do a visual inspection with -- between these cartons and what you knew to be real cartons?

A.   No.  Our main focus was specifically on the product.

Q.   All right.  These boxes, the language there, if you know, does it appear to be French?

A.   Yes.

Q.   All right.  With respect to the pills, did you analyze these pills, the Tamiflu, the Aricept, did you do a visual inspection -- let's say, for example, the Tamiflu that was submitted to you and what you knew to be real Tamiflu?

A.   Yes.

Q.   Do you have that real Tamiflu example here with you

BATSON  -  CROSS

1    today?

2    A.    No.

3    Q.    Do you have the real Aricept sample?

4    A.    No.

5    Q.    All right.  And let's just speed things up.  With respect

6    to all of the Government's exhibits that were submitted to you

7    for analysis, do you have here with you today the actual

8    reference samples that you used?

9    A.    No.

10   Q.    But you did perform a visual inspection, did you say?

11   A.    Yes.

12   Q.    All right.  And that -- you don't have any reference for

13   any of the Government's exhibits that we talked about or that,

14   I believe, are 56-B, C, and -- I think that's it.

15   A.    For the authentics?

16   Q.    Yes.  You don't have the authentics here?

17   A.    No.

18   Q.    All right.  Now, you are a chemist; right?

19   A.    Yes.

20   Q.    Are you familiar with the chemical composition of

21   Tamiflu?

22   A.    Somewhat.

23   Q.    Do you know what's in it?

24   A.    Yes.

25   Q.    Do you have any idea how it's made?

1   A.   No.

2   Q.   Do you know -- did you say the major component was

3   oseltamivir --

4   A.   Yes.

5   Q.   -- right?

6        Am I saying that even close?

7   A.   You're close.

8   Q.   Okay.  I'm going to show you just for demonstrative

9   purposes to see if you understand it, it's not an exhibit per

10  se.  Do you recognize any of those chemicals listed on that

11  sheet?

12  A.   I recognize a couple of them.  But in reference to

13  Tamiflu, no, I'm not sure.

14  Q.   You're not sure?

15  A.   Yes.

16  Q.   Does this appear to you to be the process that is

17  necessary to actually make the drug?

18  A.   I'm not sure.

19  Q.   Not sure?

20  A.   Yes.

21  Q.   Okay.  Fair enough.  Do you know where or do you know

22  if -- let's take Tamiflu again for example.  Who is the

23  manufacturer for Tamiflu?

24  A.   Roche.

25  Q.   Roche.  Do you know if Roche has a manufacturing facility

 1   across the world?

 2   A.    I'm not sure.

 3   Q.    Do you know where -- do you know why the drug Tamiflu was

 4   developed?

 5   A.    Yes.

 6   Q.    Why was that?

 7   A.    Because of bird flu.

 8   Q.    Bird flu originated where, if you know?

 9   A.    I'm not sure.

10   Q.    Not sure.  Now, with respect to Government's

11   Exhibit 56-C -- I think that's the one that had a bunch of

12   things in one bag.  Let's see if you can find the Casodex out

13   of here for me.

14   A.    This one isn't the right sample.

15   Q.    Let me grab another one of these.  Maybe this is it.  Is

16   that the one that has the Casodex?

17   A.    Yes.

18   Q.    Pull that out for me, please.

19         All right.  You -- and this is the only -- well,

20   there was Casodex in there and there was also Plavix as well;

21   right?

22   A.    Yes.

23   Q.    And when you were doing the separate samples and

24   analyzing them, you kept them separate by the individual

25   numbers that you have on your Petri dishes?

1   A.   Yes.

2   Q.   So you knew what was what?

3   A.   Uh-huh.

4   Q.   The Casodex again appears to be in French?

5   A.   Yes.

6   Q.   Now, I believe in your report -- do you know what -- when

7   I say "API," do you know what that is?

8   A.   Yes.

9   Q.   What does that mean?

10  A.   Active pharmaceutical ingredient.

11  Q.   The active pharmaceutical ingredient.  And that's what

12  you were checking for, the active pharmaceutical ingredients

13  in all of these?

14  A.   Yes.

15  Q.   Now, with respect to the Casodex, I'm wondering if I

16  heard you right.  Did you say that you did not test for the

17  API or it just -- it was not recorded?

18  A.   We did test for API.  It was the amount of API that we

19  did not test for.

20  Q.   The amount of API is what you're trying to determine

21  though; correct?

22  A.   No.

23  Q.   All right.  Do you know what the API is for Casodex?

24        And while you're looking for that, let me ask you an

25  intermediate question.  When you are -- you have published

BATSON   -   CROSS

```
 1   values for all of these APIs somewhere or do you actually take

 2   what you know to be a genuine pill and analyze it at the same

 3   time that you're analyzing the sample?

 4   A.   No.  We actually contact the pharmaceutical companies and

 5   they send us authentic samples.  For the FTIR analysis, we

 6   analyze them previously and we add them to our library.  So

 7   once we do a suspect comparison, it's based off of what we

 8   have in our library.  So it's not a direct comparison, just

 9   one tablet next to each other.

10   Q.   All right.  And what was the API for Casodex?  What is

11   that value?

12   A.   I don't have that value, the value of it.  I have the

13   name for it.

14   Q.   You have the name of the drug?

15   A.   Yes.

16   Q.   The guts of the drug; right?  What's the name of that?

17   A.   Bicalutamide.

18   Q.   All right.  And what was the -- that's the active

19   ingredient, that's what makes Casodex work?

20   A.   Yes.

21   Q.   And what was the recorded value when you tested the

22   sample that was submitted to you?

23   A.   The recorded value for --

24   Q.   The API.  How much of that, the guts of the stuff, was

25   there?
```

BATSON  -  CROSS

394

1   A.   On the actual box?

2   Q.   In the tablet.

3   A.   Well, I'm not understanding the question.

4   Q.   Okay.  I'm sorry if I'm not being clear.  You tested the

5   pills; right?

6   A.   Uh-huh.

7   Q.   And what you did is you popped one of these pills out and

8   put it into your machine and ran the machine and the machine

9   told you how much of the active ingredient was there?

10  A.   No.  The FTIR doesn't tell us how much Is There, it just

11  tells us that it's there.

12  Q.   All right.  So the FTIR --

13  A.   Yes.

14  Q.   -- that's a qualitative measurement and not a

15  quantitative?

16  A.   Exactly.

17  Q.   So it tells you what's there and doesn't tell you

18  qualitative versus how much Is There quantitative?

19  A.   Correct.

20  Q.   All right.  So we're not trying to figure out how much,

21  you were just trying to figure out if it was there?

22  A.   For this sample.

23  Q.   Yes.

24  A.   Yes.

25  Q.   Was it there?

1    A.    Yes.

2    Q.    Okay.  So the guts of the drug was there?

3    A.    Uh-huh.

4    Q.    The real chemical was present?

5    A.    The chemical -- the chemical that drug active was

6    present.

7    Q.    You just don't know whether it matched up to the value

8    quantitatively that it was supposed to be?

9    A.    Yes.

10   Q.    All right.  So you just don't know?

11   A.    Yes, we didn't run a test for that one.

12   Q.    All right.  That's Casodex.

13            MR. AMANN:  May I have just a quick moment, Your

14   Honor?

15            THE COURT:  Yes.

16   BY MR. AMANN:

17   Q.    What, again, is the active ingredient for Tamiflu?

18   A.    Oseltamivir phosphate.

19   Q.    And do you know how that active ingredient is harvested

20   or obtained, from what plant, from what chemical synthesis, do

21   you have any idea?

22   A.    No.

23            MR. AMANN:  Pass the witness, Your Honor.

24            THE COURT:  Anything else?

25            MR. LOUIS:  One question.

Jeanette Byers, CSR, RPR (713)250-5087

BATSON   -   REDIRECT

1                      REDIRECT EXAMINATION

2    BY MR. LOUIS:

3    Q.   When you performed the test on the Casodex, did you do

4    the testing for the coatings and the cores?

5    A.   Yes.

6    Q.   And was it consistent or inconsistent with Casodex?

7    A.   It was not consistent.

8              MR. LOUIS:  No further questions.

9              THE COURT:  May this witness be excused?

10             MR. AMANN:  Yes, sir.

11             THE COURT:  Thank you, ma'am, you're excused.

12             The Government may call its next witness.

13             MR. LEWIS:  The United States now calls Clint Jones,

14   Your Honor.

15             MR. BUCKLEY:  Your Honor, if it's all right with you,

16   I'll be taking this witness on cross.

17             THE COURT:  So we're changing teams here.  Okay.

18             MR. AMANN:  He's on my team, Judge.

19             THE COURT:  Well, we're substituting.

20             Call your next witness.

21             MR. LEWIS:  Thank you, Your Honor.

22             THE COURT:  Please come around, sir, and be sworn as

23   a witness.  Please raise your right hand and be sworn.

24                        CLINT JONES

25   having been first duly sworn, testified as follows:

1          THE COURT:  Be seated.

2          Mr. Lewis, you may proceed.

3          MR. LEWIS:  Thank you very much, Your Honor.

4                    DIRECT EXAMINATION

5    BY MR. LEWIS:

6    Q.   Mr. Jones, please state your full name and spell your

7    last name for the benefit of the members of the jury and the

8    court reporter.

9    A.   My name is Alistar Clinton Jones.  J-o-n-e-s is how you

10   spell my surname.

11   Q.   And how are you employed, sir?

12   A.   I'm currently employed by the MHRA, who are the medical

13   health care products side of regulatory agency in the UK.  And

14   basically is part of the Department of Health.

15   Q.   Part of the Department of Health?

16   A.   Correct, sir, yes.

17   Q.   And how long have you been employed by the MHRA?

18   A.   Two years.

19   Q.   And where did you work before you were hired by the MHRA?

20   A.   Prior to that I worked with law enforcement for 27 years.

21   I was a detective with Scotland Yard.  I worked on numerous

22   drug squads, national crime squad where I investigated serious

23   and organized crime internationally and nationally.

24          THE COURT:  Would you pull the microphone to you,

25   please, so we can hear you a little bit better?

JONES  -  DIRECT

```
 1            THE WITNESS:  Yes, sir.

 2            THE COURT:  Thank you.

 3   A.   My final post within the police was in touch with the

 4   drug squad with Customs officers in the metropolitan police

 5   and Scotland Yard.

 6   BY MR. LEWIS:

 7   Q.   Is it fair to say that you have quite a bit of law

 8   enforcement experience?

 9   A.   I do, sir, yes.

10   Q.   Did you retire from Scotland Yard?

11   A.   Yes, I did, 27 years service.

12   Q.   What is the your current position with the MHRA?

13   A.   I'm an investigator with the MHRA.

14   Q.   And what are your general responsibilities and duties as

15   an investigator?

16   A.   The MHRA is governed by the Medicines Act which regulates

17   the issue of licenses, the manufacture and distribution of

18   medicines and any breaches of the manufacture, the

19   distribution or license breaches, the investigation department

20   where I work we investigate it and prosecute, if necessary.

21   Q.   And what geographic region is the MHRA responsible for?

22   In other words, is the MHRA responsible for a city, for a

23   town, for a country, can you tell us what geographic region

24   the MHRA is responsible for?

25   A.   It would be the UK, England, Wales, Scotland, Ireland.
```

JONES  -  DIRECT

1  Q.   And tell us, once again, the countries that are in the

2  UK.

3  A.   England, Wales, Scotland and Northern Ireland.

4  Q.   And do you as an investigator for the MHRA, can you

5  travel throughout the entire UK to do your investigation as

6  necessary?

7  A.   Yes, I can, sir.

8  Q.   How many other investigators are employed by the MHRA?

9  A.   18 total.

10 Q.   You're part of the 18, you're one of the 18?

11 A.   I am, sir, yes.

12 Q.   Do you know what a recall notice is as it pertains to the

13 MHRA and pharmaceutical drugs?

14 A.   Yes, I do.

15 Q.   Does the MHRA issue recall notices from time to time?

16 A.   Yes, they do.

17 Q.   What is a recall notice that is issued by the MHRA, why

18 might the MHRA issue a recall notice?

19 A.   Recall notices are graded from 1 to either 3 or 4, 3 or 4

20 being the less serious, 1 being the most serious.

21        For example, if a recall notice was issued for a

22 recall of just 1, that would be an instruction to remove

23 straight away products from supply chain, from market because

24 seriousness to public health.

25        2 would be a lesser risk for public health.  And on

1    occasion give people 48 hours to remove stock or quarantine

2    medicines.

3         And 3 may be a breach, maybe packaging or something

4    similar, which is obviously, nothing serious as 1, which would

5    be counterfeit medicines, remove now from the market, don't

6    supply and quarantine.

7    Q.   And how is a recall notice posted by the MHRA?  How does

8    an individual or how does a pharmaceutical industry learn that

9    a recall notice has been issued by the MHRA?

10   A.   They're issued -- posted on the MHRA website and also

11   verbally to industry.

12   Q.   In the year 2007 or prior to 2007, did there come a point

13   in time when you learned of a breach of the medical --

14   pharmaceutical supply chain, in other words, that a recall

15   notice or more than one recall notice was issued in the past

16   two years?

17   A.   That's correct, sir, yes, in May 2007 was the last

18   serious recall that I'm aware of.

19   Q.   Let me show you what's already been admitted into

20   evidence as Government's Exhibit No. 32 and ask you have you

21   seen these documents before.  These are copies of the recall

22   notices.  Let me ask you to take a look at those and ask if

23   you've seen these documents before.

24   A.   Yes, I have.

25   Q.   Are these recall notices that were issued by the MHRA in

1  the year 2007?

2  A.   That is correct, yes.  These are recalls -- this is for

3  the most serious breach.  These are recall notices, basically,

4  remove from the market immediately and quarantine.

5  Q.   Let's take a look at -- I'm going to publish this for the

6  benefit of the jury.  This is the page -- the first page in

7  Government's Exhibit No. 32.  This says "Drug Alert."  Can you

8  see that, sir?

9  A.   I can, yes.

10  Q.   Do you see the date on this recall notice?

11  A.   24th of May.

12  Q.   What drug is being recalled pursuant to this recall

13  notice dated may 24th, 2007?

14  A.   This refers to the drug Zyprexa.

15  Q.   And do you see the dosage amount, 10 milligrams?

16  A.   10 milligrams.

17  Q.   And if you look at the first paragraph, you'll forgive my

18  highlighting, but do you see the manufacturer of the drug

19  Zyprexa that's listed here on this recall notice?

20  A.   Yes, I do.  It's Eli Lilly, sir.

21  Q.   Eli Lilly?

22  A.   That's correct.

23  Q.   And do you see the lot numbers that are associated with

24  the recall?

25  A.   My eyesight's not too good.  I believe that says 505 at

1  the end.

2  Q.   And do you see that before that recall notice -- I'm

3  sorry, that lot number, there are two other numbers.

4  A.   I can't, sir, I can't read the numbers from here.

5  Q.   Okay.  Let me hand this to you and see if you can read

6  it.

7  A.   Yes, I can.

8  Q.   What are the two numbers that precede the last lot

9  number?

10 A.   These are A200127, A216454.

11 Q.   Let me ask you my next question.  Let me show you the

12 documents, then I'll publish it to the jury.  On Page 2 of

13 this recall notice, if you can read this to the members of the

14 jury, there's a paragraph that is with a title, with a heading

15 "Actions Required."  And then it begins, "We regret."  Can you

16 read it out loud for the members of the jury?

17 A.   "We request," sir.

18 Q.   Yes.

19 A.   This states, "We request that all stock of the attached

20 lot number and variants be returned to Eli Lilly for

21 examination and suggest you keep full details of any returns.

22 Please telephone the Customer Services Team at Eli Lilly" and

23 there's a phone number given.

24 Q.   Why would the MHRA request that a person receiving the

25 drugs that are subject to the recall return those drugs to the

1   manufacturer?

2   A.   The manufacturer, obviously, would be able to establish

3   almost immediately if the drugs were counterfeit or not.

4   Q.   And let me ask you another question about this particular

5   notice.  On the third page near the bottom there is a question

6   in bold and I'll read the question and then I'd like you to

7   read what follows.  The question in bold is:  "Why have you

8   requested that all stock goes to Lilly for examination?"  Can

9   you read the stated answer by MHRA?

10  A.   Yes.  The MHRA states:  "Although there are visual

11  differences between genuine and counterfeit stock some are

12  subtle and we do not feel the recipients should be asked to do

13  this work.  In addition, we need to obtain as much information

14  as possible about this problem."

15  Q.   So in that paragraph is the MHRA telling the public that

16  the public or the person receiving the drug shouldn't make an

17  attempt on their own to determine whether they are authentic

18  or counterfeit and that that responsibility lies with the MHRA

19  and manufacturer; is that what that paragraph states?

20  A.   That is also correct, yes.

21  Q.   When you learned that there were certain drugs subject to

22  the recall, did you begin an investigation into where those

23  drugs originated, where they came from?

24  A.   Yes, we did, yes.

25  Q.   Did you learn during your investigation of a gentleman or

```
 1   person by the name of Kevin Xu?

 2   A.   Yes, that's correct, sir.

 3   Q.   And what did you learn about Mr. Xu?

 4   A.   As a result of --

 5           MR. BUCKLEY:  Object to hearsay.

 6           THE COURT:  You're going to have to show the

 7   foundation for his knowledge to be sure that it's based on

 8   admissible evidence.

 9   BY MR. LEWIS:

10   Q.   In the course of your investigation, did you have contact

11   with officials from the United States Immigration and Customs

12   Enforcement Agency?

13           THE WITNESS:  That is correct, Your Honor, yes.

14   BY MR. LEWIS:

15   Q.   Did you request a copy of the images and documents on

16   Mr. Xu's computer?

17   A.   We did, yes.

18   Q.   And was that provided to you?

19   A.   It was, sir, yes.

20   Q.   Was that provided you by agents with the U.S. Customs and

21   Immigration Enforcement Agency?

22   A.   Yes, it was.

23   Q.   Did you review the documents and the images on Mr. Xu's

24   computer?

25   A.   Yes, I did.
```

1    Q.   In reviewing those images, did you find photographs on

2    Mr. Xu's computer of pharmaceutical drugs that were the same

3    as the pharmaceutical drugs that are listed in the recall

4    notices?

5    A.   Yes, we did.  On the computer it's quite clearly seen the

6    three products under our investigation was images of

7    documents -- of the products, sorry.  And it also shown the

8    same lot numbers from our recall on the computer.

9    Q.   So in your investigation you discovered images of Zyprexa

10   on Mr. Xu's computer?

11   A.   That's correct, yes.

12   Q.   And you also discovered images of Plavix?

13   A.   That's correct, sir, yes.

14   Q.   Plavix is another one of the pharmaceutical drugs listed

15   in the recall notice?

16   A.   Yes.

17   Q.   And the date of the recall notice for the Plavix is May

18   25th, 2007; is that correct?

19   A.   That's correct, sir.

20   Q.   And what is the lot number -- well, let me hand it to you

21   so you can see it up close.  There are two lot numbers for the

22   Plavix that was recalled.  Can you read to the jury the two

23   lot numbers?

24   A.   The lot numbers are 3098 and 6Y098.

25   Q.   Thank you.  Let me next show you the recall notice for

JONES  -  DIRECT

1   Casodex.  Can you see the date of this recall notice?

2   A.   1st of June, sir.

3   Q.   June 1st, what year?

4   A.   2007.

5   Q.   And the dosage amount of the Casodex tablets listed in

6   the recall notice, is it 50 milligrams?

7   A.   Yes, sir.

8   Q.   Let me hand you this recall notice and ask you the name

9   of the manufacturer as stated in the recall notice and the lot

10  number for the Casodex?

11  A.   Lot number for the Casodex is 65520.  And AstraZeneca is

12  the manufacturer.

13  Q.   So for the three drugs that are listed in the recall

14  notices, the Casodex, Plavix and the Zyprexa, you found

15  imaging of all three of these on Mr. Xu's computer with the

16  lot numbers associated with the recall notices; is that

17  correct?

18  A.   That is correct, yes.

19  Q.   Are recall notices issued by the MHRA on a frequent basis

20  for counterfeit pharmaceuticals; is that a common occurrence

21  or uncommon occurrence?

22  A.   It's extremely rare for the MHRA to issue such a high

23  Level 1 recall for counterfeit medicines.

24  Q.   Why do you believe it is so rare?

25  A.   Because the MHRA have strict regulations in the issue of

JONES  -  DIRECT

407

1  licenses and control of the medicines.  It's a very rare

2  happening, it's very -- the opportunity for it to happen is

3  small so it becomes very rare.

4  Q.   Pharmaceutical drugs are highly regulated within the UK;

5  is that correct?

6  A.   Strictly and highly regulated, controlled by licenses and

7  other conditions.

8  Q.   Have you heard of the term "parallel importing"?

9  A.   I have, sir, yes.

10  Q.   Explain to the members of the jury and to the Court what

11  parallel importing is as it's your understanding?

12  A.   Within Europe products can be moved from one country to

13  another.  Europe is licensed the same throughout.  So, for

14  example, if a French-labeled product was in France, someone

15  from the UK, a wholesaler, licensed wholesaler, could lawfully

16  purchase the French product.  The reason for doing that would

17  be that the French product would be a lot cheaper to buy in

18  France so the UK wholesale dealer, licensed, would make money

19  by buying that product.  However, what he would have to do is

20  bring the product to the UK and then relabel and repackage the

21  item so it could be suitable for sale within the UK.  It would

22  have French packaging and French writing on it, inside the

23  packet there's a thing called a patient information leaflet.

24  That's in French.  So when the product's purchased, they'll

25  take that out in the UK and they'll put an English patient

1    information leaflet inside there.  They have the option then

2    of changing the package on the outside to an English package

3    or purely put the label affixed and glued to the outside of

4    the package in English explaining the dosage and medicines,

5    directions for use, et cetera, basically imaging what the

6    French say in English.

7            Practically speak, something most licensed dealers

8    would use, the sticky label on the outside of the French

9    packaging because, obviously, it's more profitable to them.

10   There's no lawful requirement for them to throw away the

11   package, purely sticking the label on is sufficient.  But that

12   would then legitimize the drug to be sold within the UK.

13   Q.   Okay.  You said quite a bit of information there.  Let me

14   see if I can break it down and ask you a few questions.  If a

15   company were to engage in parallel importing within the UK,

16   would that company have to be licensed in order to do so?

17   A.   It would, sir, yes.

18   Q.   And is that license issued by the MHRA?

19   A.   That's correct.

20   Q.   Is Mr. Kevin Xu licensed as a parallel importer with the

21   MHRA?

22   A.   No, he's not.

23   Q.   The company, Orient Pacific International, is that

24   company licensed with the MHRA as a parallel importer?

25   A.   No, there's no license.

1  Q.    If a company is engaged in parallel importing within the

2  UK and they are taking a product, a pharmaceutical product and

3  they are repackaging or relabelling the product, you say the

4  product that's being repackaged or relabeled, is that product

5  required to be authentic, in other words, non-counterfeit?

6  A.    That is correct, sir, yes.

7  Q.    So whether it is the original manufacturer's carton or

8  whether it is parallel importer's carton, the product itself,

9  the contents of the carton must be authentic, non-counterfeit;

10 is that correct?

11 A.    That is correct, sir.

12 Q.    Let me show you what's already been admitted into

13 evidence, a few exhibits.  The first exhibit I will show you

14 is Government's Exhibit 37-A, which is an evidence bag

15 containing several cartons of Plavix.  I will show you one

16 carton and I want to ask you a few questions.  So I'll take

17 one carton out of the bag, hand it to you, show you the front

18 and the back.  On the back of that carton, do you see the word

19 "France"?

20 A.    Yes, I do, sir, yes.

21 Q.    And does the language that appears on the carton, does

22 that language appear to be French?

23 A.    Yes, that's correct.

24 Q.    For the members of the jury, I'll show the front of the

25 box, 75 milligrams, and I'll show the side of the box.  And,

1   again, that language appears to be French, sir?

2   A.   That's correct, sir, yes.

3   Q.   Are you familiar with the term, "vignette, "as it

4   pertains to your pharmaceutical drugs and the packaging for

5   pharmaceutical drugs?

6   A.   Yes, yes.

7   Q.   What is a vignette?

8   A.   A vignette is something that's unique in the French

9   market for drugs.  When pharmaceuticals are produced in France

10  and sold in the French market, such as this Plavix for

11  example, if this is being sold in the French market or was

12  available in the French market, it would have a sticky label

13  attached to it.  The sticky label is called a vignette.  It is

14  roughly the same size as that bar code that can be seen on the

15  packing.  The vignette itself has the appearance of a bar

16  code.  As I say, it's removable when it's stuck to a package.

17  And the purpose for having a vignette on the package is purely

18  for the French market and it's for tax reasons and for

19  reimbursement of funds.  When pharmacists are involved in the

20  sale, the vignette comes into play.  The vignette gets removed

21  and money is claimed within the French system.  It's purely

22  unique to the French market.  So any drugs coming out of

23  France, for example, on a parallel import, which we discussed

24  earlier, would have a vignette affixed to it.

25  Q.   So if this Plavix that you have in front of you that's

1  being displayed to the jury, if this Plavix were purchased in

2  France, it would -- should have a vignette or a label or

3  sticker attached to it that's required by the French

4  Government; is that correct?

5  A.   That's correct, it would have a label, a vignette label,

6  on it.

7  Q.   And where would that label appear on a carton such as

8  this one?

9  A.   It would appear on the back on the wide side.

10  Q.   On the box that you have and the box that's being

11  displayed to the jury, do you see a vignette on either of the

12  two boxes?

13  A.   No, there's no vignette on this box or any of the boxes.

14  Q.   In the evidence bag that's in front of you, can you take

15  a moment and look through the bag and see if you see vignettes

16  on any of these cartons?

17  A.   There's no vignette displayed on any of these packages.

18  Q.   Thank you.  I will next show you what's already been

19  admitted into evidence as Government's Exhibit No. 25-B, as in

20  boy.  And this is an evidence bag containing several boxes of

21  Casodex.  I'm going to ask you the same type of question.  Let

22  me display this box for the members of the jury.  Mr. Jones,

23  do you have that box in front of you?

24  A.   Yes.

25  Q.   Is that a box of Casodex -- or what purports to be a box

1   of Casodex?

2   A.   Yes.

3   Q.   50 milligrams, is that what's on front of the box?

4   A.   Yes, sir.

5   Q.   And the manufacturer at the bottom right-hand corner is

6   AstraZeneca?

7   A.   Yes, sir.

8   Q.   If you look at the front above the name Casodex, does it

9   appear to have French language at the top of the box?

10  A.   That's also correct, sir, yes.

11  Q.   I'm going to turn the box over and I'll ask that you do

12  the same with the box that you have.  And do you see a red box

13  surrounding some white spaces in the back of the box?

14  A.   Yes, sir.

15  Q.   Do you see -- take a moment and examine the box.  Do you

16  see a bar code on the side of the box that you have in front

17  of you?

18  A.   Yes, I do.

19  Q.   Is that a vignette there?

20  A.   No, it's not.

21  Q.   Well, look at the entire box, front, back and all the

22  sides and tell me if you see a vignette anywhere on the box

23  that's in front of you.

24  A.   No, there's no vignette.  The vignette is a completely

25  separate sticky label.

JONES  -  DIRECT

1   Q.   Is it a label that is affixed after the box has been

2   made; is that correct?

3   A.   That is correct.  It would also have the amount of money

4   that the French Government want to claim actually written on

5   the vignette.

6   Q.   If you can briefly explain the significance of the

7   vignette.  What does that mean to someone buying

8   pharmaceutical drugs that are made in France?  What does a

9   vignette represent?

10  A.   It is a way of the French government taxing money as a

11  result of the sales of medicines.  The vignette creates that

12  money for the pharmacists.  And on the vignette itself it will

13  dictate exactly how much money is to be claimed by the

14  pharmacist for tax purposes.  I don't fully understand the

15  exact reason for it, but what I do know is that it's unique to

16  the French market.  And any products that are in France for

17  sale have a vignette on it.  Any products coming out of France

18  being on the French market or being available to be on the

19  French market will have a vignette on it.

20  Q.   If I am a parallel importer or a consumer in France, what

21  is the significance of the vignette concerning the

22  authenticity of the product?

23  A.   It shows that the product was -- originated or was on the

24  market for sale in France.

25  Q.   Let me ask you to take a moment and look through the

 1   entire evidence bag of Government 25-B containing several

 2   boxes of Casodex and tell me if you find any boxes that has a

 3   vignette attached.

 4          THE COURT:  For purposes of time, I assume you've

 5   already looked at them; is that correct, Mr. Lewis?

 6          MR. LEWIS:  Yes, I have, Your Honor.

 7          THE COURT:  And there are no vignettes?

 8          MR. LEWIS:  That's correct.

 9          THE COURT:  All right.  Let's -- does the defense

10   think there are any vignettes in the box?

11          MR. AMANN:  We have no objection to --

12          THE COURT:  All right.

13          MR. AMANN:  I'm sorry.

14          THE COURT:  Sorry, Mr. Buckley, you can't cross him.

15   BY MR. LEWIS:

16   Q.   Finally, Mr. Jones, let me show you what's been admitted

17   into evidence as Government's Exhibit No. 4, the evidence bag

18   containing several empty cartons of Zyprexa.  I'm going to

19   leave one copy with you and I'm going to display one copy for

20   the members of the jury.  And you see this says Zyprexa.

21   Who's the manufacturer, according to this carton, sir?

22   A.   This is Eli Lilly.

23   Q.   And what is the dosage amount on the front of the carton?

24   A.   Let's see, it's 10 milligrams, sir.

25   Q.   Does this language also appear to be French?

JONES  -  DIRECT

1    A.    That's also correct, sir, yes.

2    Q.    Looking at the back of the carton, do you see a red box

3    and white spaces enclosed within the red box?

4    A.    Yes, I do, sir.

5    Q.    And if you look at the side, all sides of the carton

6    that's in front of you, do you see a vignette on the box

7    that's in front of you?

8    A.    There's no vignette on this box.

9    Q.    Finally, Mr. Jones, let me show you what's been admitted

10   into evidence, Government's Exhibit No. 31.  This is the

11   bottom right-hand corner of Government's Exhibit No. 31.  It

12   is a series of emails on a Yahoo account.  Turning to the

13   third page of Government's Exhibit 31, let me ask you -- let

14   me hand it to you to make it easier.  There are two dates on

15   Page 3 for these two emails.  Let me ask you if you can read

16   to the members of the jury the two dates that appear on this

17   third page of the emails?

18   A.    This is the 25th of May 2007.

19   Q.    And what's the date at the top?

20   A.    Also 25th of May 2007.

21   Q.    Okay.  Thank you.  If you can read along with me,

22   Mr. Jones, I have a question for you.

23   A.    The bottom email says:

24              "Hello Kevin:

25              "One of my customers called and said there is a

JONES  -  DIRECT

1  recall of Zyprexa in Europe with the same lot number.  I am

2  trying to find out more on the internet.  Have you heard

3  anything?  We will cancel Zyprexa order until we find out the

4  problem lot number.  Please inform me if you find something."

5        Sir, the date of that email is May 25th, 2007; is

6  that correct?

7  A.   That is correct, sir, yes.

8  Q.   Then at the top there's a response by Kevin Xu also dated

9  May 25th, 2007, where he states:

10       "Hello Kevin:

11       "Okay, no problem.  I do not think this will impact

12  us because we have not sold to europe per your request.  I

13  will let u know if I hear more and will you please do the

14  same."

15       Let me next show you the recall notice, Government's

16  Exhibit No. 32, for Zyprexa, the same drug that's discussed in

17  the email.  What is the date of this recall notice, sir?

18  A.   24th of May 2007.

19  Q.   That is one day before May 25th, 2007, this email traffic

20  between Mr. Xu and the undercover agent in this case; is that

21  correct?

22  A.   That's correct.

23       MR. LEWIS:  I pass the witness at this time.

24       THE COURT:  Mr. Buckley, you may proceed.

25       MR. BUCKLEY:  Thank you, Your Honor.

JONES  -  CROSS

```
 1                        CROSS-EXAMINATION
 2   BY MR. BUCKLEY:
 3   Q.   Good afternoon, Mr. Jones.
 4   A.   Good afternoon.
 5   Q.   My name is Sean Buckley.  I'm one of Mr. Xu's lawyers.
 6   You spoke briefly, Mr. Jones, about parallel trading and how
 7   it works in and out of the UK.  You're aware that parallel
 8   trading is something that operates in the entire European
 9   economic area; correct?
10   A.   That's correct, sir, yes.
11   Q.   And do you know off the top of your head how many
12   countries are in the European economic area?
13   A.   I'd be guessing, sir.
14   Q.   If I show you a list to refresh your recollection?
15             MR. BUCKLEY:  May I approach, Your Honor?
16             THE COURT:  Sure.
17   BY MR. BUCKLEY:
18   Q.   I don't want to suggest to you that these are the
19   countries, but if you would look and, based on your
20   independent knowledge, if you could tell me if that list is
21   correct.
22   A.   Most of those countries, definitely in the European
23   community, yes.
24   Q.   That's, approximately, 20 or 25 countries in there?
25   A.   Yes, correct.
```

JONES  -  CROSS

1    Q.    Thank you, sir.  Now, the regulations that apply to

2    distribution of pharmaceuticals within the UK do not

3    necessarily apply, do they, to distribution of pharmaceuticals

4    in other EEU countries; is that correct?

5    A.    That's not correct, sir, no.

6    Q.    Okay.

7    A.    The guidelines and the regulations and the issuance of

8    licenses are all very similar throughout Europe, hence, the

9    countries would trade with each other.

10   Q.    Now, in the -- in the recall reports I know that y'all

11   did a -- whether it's a market analysis or part of your

12   investigative effort that identified the parallel importers or

13   the parallel marketers that were involved with each of the

14   drugs; is that --

15   A.    I wasn't the one to do the actual recall.  I can't really

16   assist you.

17   Q.    Okay.  Well, do you know from your own knowledge whether

18   there were in about May of 2007 approximately 40 UK parallel

19   distributors who were handling Zyprexa?

20   A.    I don't.

21   Q.    Okay.  Do you have any knowledge of how many parallel

22   distributors would handle Zyprexa over the whole European

23   economic area?

24   A.    I don't, sir, no.

25   Q.    But if an individual was distributing a particular

1    pharmaceutical in the UK, for example, that wouldn't

2    necessarily mean they would be distributing all over the EEU?

3    A.    That's correct.

4    Q.    Okay.  In the overall parallel trading, parallel

5    distribution model, because of, perhaps, economic inequities

6    among the countries, one can pluck pharmaceuticals from the

7    supply chain, perhaps, from any country and then under the

8    right set of circumstances move it and market it in another

9    country within the EEU; is that the basic premise of how this

10   works?

11   A.    If they're licensed in the correct manner, yes.

12   Q.    So it is -- and my understanding, also, is that you no

13   longer have to parallel market or parallel distribute from a

14   common source since 2004.  Do you know?

15   A.    I don't fully understand the question, sir.

16   Q.    I think my question is -- and I'm not an expert -- is

17   that in order to distribute a particular pharmaceutical around

18   the EEU as a parallel distributor, you're not required to --

19   for all the parallel distributors to get the pharmaceutical

20   from the same source; is that fair to say?

21         MR. LEWIS:  I'm going to object to that, Your Honor,

22   given that he hasn't established that this witness has

23   expertise in parallel importers outside of the UK.  He

24   certainly is familiar with the procedures and the legal

25   requirement within the UK.  He's asking about the entire --

JONES  -  CROSS

 1         THE COURT:  See if you can establish a foundation for

 2    the witness to respond.

 3         MR. BUCKLEY:  Yes, Your Honor.

 4    BY MR. BUCKLEY:

 5    Q.   In your responsibilities as an -- in an investigative

 6    capacity, you have been educated and trained in the workings

 7    of parallel distribution within the EEU in general terms;

 8    correct?

 9    A.   Yes, sir.

10    Q.   And that training and that education is geared towards

11    being an effective investigator within the UK and

12    understanding how all this works in a broader scheme?

13    A.   That is also correct, yes.

14    Q.   And based on that knowledge and understanding, it is then

15    your observation, based on your personal knowledge, of how

16    parallel distribution works in the EEU that one does not have

17    to get their product to distribute it from a common source,

18    one could, say, pluck out of the supply chain, say, out of

19    Romania and then market in Finland; is that fair to say?

20    A.   I don't really think that is fair to say, no.

21    Q.   What is your understanding of how -- of the limitations

22    of parallel distribution in terms of where you can source the

23    material from and how far you can distribute it?

24    A.   Well, initially you can only purchase drugs, say, from

25    France, as I mentioned earlier, if you have correct licenses

JONES  -  CROSS

421

```
1   within the UK and also current licenses in France.  So if
2   neither is in place, then it can't be completed.
3   Q.   Now, your understanding, though, is that, nevertheless, a
4   French product could, under some circumstances, be parallel
5   marketed or parallel distributors in other countries within
6   the EEU, not just the UK; correct?
7   A.   That's correct, yes, sir.  My department of MHRA is
8   purely investigation.  So I'm making observations on what
9   you're saying regarding that.  I can't be completely sure, but
10  it does sound as though you're probably correct, yes.
11  Q.   I understand.  Do you know a man named Terrence Blackett?
12  A.   I heard that name, yes.
13  Q.   What is your knowledge of who Mr. Blackett is?
14  A.   Someone being in touch with Mr. Xu on email.
15  Q.   Is he, to your knowledge, an employee of a pharmaceutical
16  company or do not know?  If you don't know, that's okay.
17  A.   I don't know.  From the inquiries made, Mr. Buckley,
18  prior to coming to this Court, I believe he's not a license
19  holder.
20  Q.   Now, in these recalls that we've discussed, who requested
21  the recall, was it the manufacturer or was it an agency such
22  as your agency?
23  A.   The MHRA.
24  Q.   Now, you had mentioned observing some photographs that
25  were taken from Mr. Xu's computer.
```

1  A.   Yes.

2  Q.   In the course of your investigation, did you undertake to

3  try to determine the original source of those photographs?

4  A.   That is part of an ongoing investigation.

5  Q.   But at this point you still have not identified with

6  certainty the source of those photographs?

7  A.   No.  They're on the laptop.

8  Q.   And in connection with that, you don't know one way or

9  the other whether those photographs originated on Mr. Xu's

10 laptop or whether they came from some other source, perhaps

11 electronically transmitted?

12 A.   I haven't examined the laptop myself in that depth.  I

13 believe they were attachments to emails.  Whether they were in

14 or outside, I can't recall.

15 Q.   We talked about -- or you testified about the lot numbers

16 that were specified in the recall notices.  In connection with

17 your investigation, did you identify the number of pills

18 associated with each respective lot number in the marketplace

19 per the manufacturer, if you understand my question?

20       MR. LEWIS:  I'm going to object because I don't

21 understand it.

22       THE COURT:  I don't understand it either.

23       MR. BUCKLEY:  Thank you, Your Honor.  I will do my

24 best to simplify.

25

JONES  -  CROSS

1    BY MR. BUCKLEY:

2    Q.   In connection with your investigation and your work with

3    the manufacturers, did you investigate how -- what the volume

4    of each particular lot number was in the marketplace?

5    A.   What I can say, sir, is that it was 70,000 packs in total

6    of the three drugs involved, of which 30,000 to go to the

7    pharmacy, but to split them into three, I can't give you exact

8    figures.

9    Q.   And there's no real indication, is there, about the

10   geographic spread of these products, for example, which EEU

11   countries they may have ended up in or flowed through, Is

12   There?

13   A.   I think they were made in the UK.

14   Q.   Made in the UK?

15   A.   Mainly just made in the UK.

16   Q.   Do you know as a result of the recall how many

17   distributors worldwide were affected?

18   A.   I don't, sir, no.

19   Q.   You testified about the vignettes on the French products.

20   And my understanding is that the vignette is applied via

21   sticker --

22   A.   That's correct.

23   Q.   -- is that correct?

24          And this is not embossed into the product box or

25   anything like that?

JONES  -  CROSS

424

1  A.   It's not.

2  Q.   So it can be removed?

3  A.   Yes, with difficulty.

4  Q.   And the vignette system began in 1997 or do you know?

5  A.   I don't know, sir.

6  Q.   Okay.  Do you know if, in general practice, whether

7  materials or pharmaceuticals which are produced in France that

8  then went to parallel distributed in various other countries,

9  in the course of doing that, those vignette labels could be,

10  as a matter of course, from some distributors removed?

11  A.   My understanding is different, sir.  My understanding is

12  that if the vignette is on the package shows that the drugs

13  originated from France.  If the vignette was not on the

14  package, it couldn't be established.

15  Q.   Now, if a parallel distributor is taking the French

16  products in the French box with the French vignette and which

17  is to remarket, for example, in Romania, the person would

18  usually undertake some form of repackaging; correct?

19  A.   Yes.  The normal practical way in the UK, for example,

20  would be to stick the sticky label I mentioned earlier, which

21  outlines the tablets and directions for use actually on top of

22  the vignette.

23  Q.   And the reason for -- well, the reason for repackaging,

24  in any event, would be that if you introduce into the

25  marketplace of one country with one language a product that

JONES  -  CROSS

425

1    was developed and marketed in a different country with a

2    different language, you wouldn't really be able to access the

3    marketplace very well, would you?  In other words, the

4    customer probably would not want to buy in Romania a product

5    that was written in Dutch that had the instructions and the

6    labels in Dutch; fair to say?

7    A.   Well, of course one would have to understand what one was

8    reading on the leaflet.

9    Q.   And also understand what it was they were purchasing in

10   the store?

11   A.   Yes.

12   Q.   And whereas there are common standards in the EEU for

13   parallel distribution, each country may have their own

14   particular practices as to how this is done or what is

15   tolerated and what is not tolerated; fair to say?

16   A.   It's fair to say that all countries are fully aware of

17   any products France would have vignettes on them and would not

18   purchase a product without a vignette.

19   Q.   Okay.  Of course, you can't speak to the particular

20   normal practices of the market, the consumer market in

21   Romania, can you?

22   A.   I can't make comments on that at all.

23            MR. BUCKLEY:  May I have a moment, Your Honor?

24            THE COURT:  Yes.

25            MR. BUCKLEY:  Thank you, Mr. Jones.  Pass the

 1  witness.

 2          MR. LEWIS:  A couple of questions, Your Honor.

 3                      REDIRECT EXAMINATION

 4  BY MR. LEWIS:

 5  Q.  Mr. Jones, did I understand your testimony correctly that

 6  of the three drugs that are listed in the recall notices

 7  roughly 70,000 of those packages or packs were entered into

 8  the legitimate drug supply in the UK; is that correct?

 9  A.   That is correct, yes.

10  Q.  And if I heard you correctly, roughly 30,000 of those

11  packs want to pharmacies within the UK.

12  A.   That's also correct, yes.

13          MR. LEWIS:  No further questions.  Thank you.

14          THE COURT:  May the witness be excused?

15          MR. LEWIS:  He may, Your Honor.

16          MR. BUCKLEY:  Yes.

17          THE COURT:  Thank you, Mr. Jones.

18          Counsel, approach the bench.

19          (A bench conference was held outside the presence of

20  the jury.)

21          THE COURT:  How many more witnesses do you have?

22          MR. LOUIS:  Two or three people.

23          THE COURT:  Are they all drug people.

24          MR. LOUIS:  Two are drug people and one is an agent

25  on the issue of wholesaling.

1          THE COURT:  The issue of what?

2          MR. LOUIS:  Wholesaling.

3          THE COURT:  Okay.  So we might -- are you ready to

4    start this afternoon?

5          MR. AMANN:  I don't think my witness is getting into

6    town until late this evening.

7          THE COURT:  You said you had four people.

8          MR. AMANN:  I think out of those four we're probably

9    just going to have one.

10          THE COURT:  Is Mr. Xu going to testify?

11          MR. AMANN:  At this point I would say no.

12          THE COURT:  All right.

13          (Bench conference concluded.)

14          THE COURT:  We'll take a 15-minute recess, ladies and

15    gentlemen.  We'll stand in recess until 2:40.

16          (A recess was taken.)

17          MR. LEWIS:  The United States calls Dr. Christin

18    Nielsen.

19          THE COURT:  Come around, ma'am, to be sworn as a

20    witness.

21                        DR. CHRISTIN NIELSEN

22    having been first duly sworn, testified as follows:

23          THE COURT:  Be seated, please.

24          All right.  Mr. Lewis, you may proceed.

25          MR. LEWIS:  Thank you, Your Honor.

NIELSEN  -  DIRECT

```
 1                        DIRECT EXAMINATION

 2    BY MR. LEWIS:

 3    Q.    Good afternoon.  Could you please state your full name

 4    and spell your first name and last name for the members of the

 5    jury, please.

 6    A.    Yes.  My full name is Christin Feretta Nielsen.  My first

 7    name would be C-h-r-i-s-t-i-n.  My last name is N-i-e-l-s-e-n.

 8    Q.    How are you employed?

 9    A.    I'm a pharmacist and I'm employed at Hoffmann-La Roche

10    Pharmaceutical Company.

11    Q.    Can you spell the name of the company that you work for?

12    A.    R-o-c-h-e.

13    Q.    And I believe you mentioned Hoffmann Roche; is that

14    correct?

15    A.    Hoffmann-La Roche, yes, that's correct.

16    Q.    La Roche.  And can you spell Hoffmann, please?

17    A.    H-o-f-f-m-a-n-n.

18    Q.    What type of company is Roche?

19    A.    It is a pharmaceutical company.

20    Q.    Where is your office located?

21    A.    My office is locate in Kaiseraugst in Switzerland.

22    Q.    Can you spell Kaiseraugst, please.

23    A.    K-a-i-s-e-r-a-u-g-s-t.

24    Q.    How long have you worked for Roche?

25    A.    I have worked for Roche for approximately five years,
```

1    since 2003.

2    Q.   Can you tell us briefly about your education?  Did you

3    attend university?

4    A.   Yes.  I have a degree in pharmacy from the University of

5    Bologna in Italy, yeah.

6    Q.   And are you considered a -- to be a Ph.D. or doctor in

7    the field of biology or chemistry?

8    A.   Yes, I've a doctorate in pharmacy and I have specialized

9    in applied biochemistry, microbiology and applied analytical

10   chemistry.

11   Q.   So it is appropriate if I were to refer to you as

12   Dr. Nielsen; is that appropriate?

13   A.   Yes, it is.

14   Q.   Tell us your position, please, with Roche.

15   A.   I am working as a complaint manager.  We are coordinating

16   the negotiations of technical complaints from the market and

17   also investigations of suspected counterfeits where they use

18   the same structures because we have connections with the

19   laboratories and all the other departments.

20   Q.   Just by way of example, if a suspected counterfeit sample

21   is sent to you, what's the process?  What do you do with that

22   sample?

23   A.   The sample is sent directly to me.  I open the sample, I

24   look at it, I -- the first thing I do, I check the variable

25   data on the sample, which would be only on it if we've got the

1    packaging material, variable data would be the lot number of

2    the product, the manufacturing date and the expiry date of the

3    product.  So I see if the lot number on the material, if we

4    have an original product with the lot number.  And I also

5    check if the manufacturing date and expiry date corresponds to

6    the manufacturing date and expiry date of the original

7    product.

8    Q.   A sample, a suspected sample of a counterfeit product,

9    who would send that sample to you, where does it come from?

10   A.   It comes from another country, from our affiliate in the

11   country where it was found.

12   Q.   And let me show you what's been marked for identification

13   purposes as Government's Exhibit 54, actually two plastic bags

14   that have been stapled together and let me ask you, have you

15   seen the contents of these two plastic bags prior to today?

16   A.   Yes, I have.

17   Q.   And what's contained in those two plastic bags?

18   A.   Each of the plastic bags contain one blister card with

19   inside some capsules.  That seems to be Tamiflu, which is our

20   product.

21   Q.   Tamiflu is a product of Roche?

22   A.   Yes, it is.

23   Q.   It's a product that's manufactured and made by Roche; is

24   that correct?

25   A.   Yes, it is .

1   Q.   Were those samples sent to you, sent to Roche for

2   investigation?

3   A.   They were.

4   Q.   Were those samples received by you?

5   A.   Yes, they were.

6   Q.   And how do you know that they were received by you?

7   A.   Because when I receive a sample I -- what we do, also,

8   for investigation, we log the case into a database so it has a

9   number.  And I put the sticker on the sample, writing the

10  number, the registration number, the date when I received the

11  sample and I signed with my signature on the label.  And I see

12  that here.

13  Q.   Okay.  And there are two bags.  Do you see two stickers,

14  one for each bag?

15  A.   Yes, I do.

16  Q.   And those are stickers that you placed on the bags when

17  you received these samples; is that correct?

18  A.   Yes, they are.

19  Q.   There appears to be some handwriting in addition to your

20  initials, there are numbers on each of the stickers.  What's

21  the top number for, the first sticker?

22  A.   The number on the first sticker, 36270.

23  Q.   And the sticker on the second bag, what is that number?

24  A.   That number is -- sticker on the second bag is 38120.

25  Q.   Is that a number that you placed on the sticker?

1    A.    Yes, it is.

2    Q.    And what is the importance or significance of those

3    numbers?

4    A.    Being able to track the investigation, the samples, where

5    they go.

6    Q.    Of those two bags, which one did you receive first?

7    A.    The one with the lowest number and I have the date on

8    them as well.  So it is the 36270.

9    Q.    And when did you receive it?  What is the date?

10   A.    The 10th of May 2007.

11   Q.    And what is the date on the second sticker?

12   A.    The 12th of June 2007.

13   Q.    Okay.  And these were sent to you to be tested to see if

14   they were authentic or counterfeit; is that correct?

15   A.    Yes, that's correct.

16          MR. LEWIS:  At this time the Government would offer

17   Government's Exhibit No. 54 into evidence.

18          MR. AMANN:  Just one quick question, if I could, Your

19   Honor.

20          THE COURT:  All right.

21          MR. AMANN:  Dr. Nielsen, where did you receive these

22   samples from, do you know?  Is there any piece of paper here

23   that says where they came from?

24          THE WITNESS:  There is not on there.  I received it

25   directly from our affiliate in Nutley.  It doesn't say on this

1    bag.

2            MR. AMANN:  It doesn't say where it comes from.  Do

3    you have a report that tells us where these samples came from?

4            THE WITNESS:  I have in my documentation a piece of

5    paper where it says where it comes from, who sent me the

6    sample.

7            MR. AMANN:  May I just speak with the prosecutor a

8    moment?

9            (Discussion was held off the record.)

10           MR. AMANN:  I have no objection, Your Honor.

11           THE COURT:  All right.  Government's Exhibit 54 is

12    admitted.

13    BY MR. LEWIS:

14    Q.   Dr. Nielsen, let me hand to you Government's Exhibit

15    No. 54 and ask you when you received these two samples -- and

16    we'll start with the lowest one first that has the No. 36270

17    on the sticker, what did you do with that sample when you

18    received it?  What's the first thing that you did?

19    A.   Well, I take the sample out and look at it and look at

20    the variable data.

21    Q.   The variable data?

22    A.   Yes.

23    Q.   What does that mean?  What did you look at?

24    A.   That says which lot number it is, it says the

25    manufacturing date of the product and the expire date of the

1  product.

2  Q.   When you received these samples, was there a carton or a

3  box or did you receive only the blister packs?

4  A.   No, we received only the blister pack.

5  Q.   Did the blister packs have the lot number, the

6  manufacturer and the expiration date, is that information

7  captured on the blister packs that you received?

8  A.   Yes.

9  Q.   And for the first sample, what was the lot number or what

10  is the lot number?  If you can't read it, we can take it out

11  of the bag.

12  A.   Yeah, it is quite hard readable, but I manage to read it.

13  It is B1117.

14  Q.   Is there an expiration date?

15  A.   Yes, there is.  It says 04-2010.

16  Q.   Is there information about who the manufacturer is, the

17  name of the manufacturer on the package?

18  A.   No, there's no -- it doesn't say who the manufacturer is.

19  Q.   Tell us what information, other than the expiry or the

20  expiration date and the lot number, what information can you

21  read from the blister pack?  Is the name of the drug there?

22  A.   Yes, I see also MFD, which would be manufacturing date.

23  But the date is not readable on this sample.  Then I see the

24  name Tamiflu --

25  Q.   Tamiflu is there.

1    A.    -- which is the name of our product.  Beneath that is

2    written oseltamivir, which would be the API in the product.

3    Q.    API is the active pharmaceutical ingredient?

4    A.    Correct, yes.  And then it says 75 milligrams, which

5    would be the strength.

6    Q.    How many tablets are contained or should be contained in

7    the blister pack that you have in front of you?

8    A.    There should be ten capsules in it, if it's complete.

9    Q.    So when you looked at the variable data, what did you

10   conclude, if anything, after you looked at the variable data

11   on the sample?

12   A.    I checked the data in the system and I saw it corresponds

13   to our original lot B1117 and that expiry date would be as the

14   original product.  Although the imprint embossing off the

15   expiry date, it seems strange to me because ours is more clear

16   and bigger so it's better readable.

17   Q.    Okay.  Anything else?

18   A.    Yes.  When I looked at the imprint of Tamiflu on the

19   blister foil, I see they are all -- the writing is all in one

20   line, on the same line, which I wasn't sure that that was

21   right because normally they are not on one line but one up,

22   the other down, next up.  So it's, like, on two lines like

23   this.

24   Q.    As you were doing your analysis, your visual analysis of

25   the sample, did you have a reference product or an authentic

NIELSEN  -  DIRECT

1    product blister pack to compare it against?

2    A.    Now, what we do to be sure -- that was just what I saw at

3    first glance.  When -- to be sure that it is original or not,

4    I forward the packaging material to our quality control

5    packaging material and ask them to compare the packaging

6    material with the packaging material of the original product.

7    So I send it to these experts and have them verify the

8    packaging material, compare to the original packaging

9    material.

10   Q.    Did you at some point in time on your own compare the

11   original packaging material with the sample?

12   A.    Yes, I did.

13   Q.    And based upon your comparison of the two, of the sample

14   and the original blister pack, what did you observe from your

15   observations about the name Tamiflu and how it appeared on the

16   sample and how it appeared on the original?

17   A.    That -- that my first impression was correct, that it is

18   different from our product, our product looks different.

19   Q.    Okay.  I'm going to take -- which one is the first one,

20   this one?

21   A.    This one is the first one.

22   Q.    I'm going to take it out of the bag so we can show it to

23   the members of the jury.  And while I'm doing that I'm going

24   to ask you to explain how the name Tamiflu is different on the

25   sample as compared to the authentic blister pack.  I believe

1    you just testified that the word Tamiflu appears in a straight

2    line on this sample; is that correct.

3    A.   Yes, that's correct.

4    Q.   And how is that different from the authentic or the

5    original?

6    A.   The original would be every second Tamiflu writing would

7    not be on the same line, but below.  So they are not in a line

8    but -- I don't know how to word it.

9    Q.   I believe you just testified that the word Tamiflu would

10   be up on one tablet and then down on the next tablet; is that

11   right?

12   A.   Yes, it's like a -- Tamiflu, Tamiflu, Tamiflu.

13   Q.   In your observations about the sample, did you notice

14   anything else that was different from the original other than

15   the name Tamiflu as it appears on the sample?

16   A.   Yes, I did.  The field where the variable data is written

17   on the blister, it's a field you see on the right side.  It is

18   smaller than on the original sample and also the writing is

19   different.

20   Q.   I'm going to try to point this out to the members of the

21   jury, if I can.  Is this the field for the variable data that

22   you're testifying about?

23   A.   Yes, it is.

24   Q.   And with the sample it is smaller than as compared to the

25   original; is that correct?

NIELSEN   -   DIRECT

1    A.    The sample is smaller, yes.

2    Q.    The field is smaller?

3    A.    The field is smaller.

4    Q.    And what information is contained in the field?

5    A.    The lot number, the manufacturing date and the expiry

6    date -- expiration date.

7    Q.    Did you notice anything else that was different?

8    A.    Yes, I did.  When you compare this sample to our original

9    product -- I don't know if you can see it here -- there are

10   like a perforated line or there should be in order that you

11   can divide every single blister pocket from the blister.  And

12   here you see it's -- that there should be something.  Our

13   original product is really clear.

14   Q.    Okay.

15   A.    And there's one thing more that I saw.

16   Q.    Please share with us.

17   A.    When you seal the blister, the pattern that you get on

18   the blister foil -- on this blister here, it looks like it's

19   been sealed with plate sealing.  And on the original product,

20   the pattern is different.  And it comes from typical rolled

21   sealing.  So the machine is different for the sealing which

22   has been used for this one and which has been used for the

23   original.

24   Q.    So for this sample it is your opinion that this -- the

25   plate sealing was done as compared with the original --

1    explain that to me once again.  I'm getting confused.

2    A.   The pattern, which is on the -- what you see here on the

3    foil --

4    Q.   Yes.

5    A.   -- is different on the two samples, the original sample

6    and on this sample.  This pattern we see here would be typical

7    for plate sealing because it's, like -- it has points which is

8    going to be bored in.  You see the holes.  We use a machine

9    for packaging the original product, which is a different

10   sealing system.  It's a roll sealing.  And there the pattern

11   is, like, not holes being burn in but it's more like lines

12   that are sealed on.

13   Q.   Based upon your observations, did you suspect that this

14   sample was counterfeit?

15   A.   Yes.

16   Q.   Did you refer this sample to your chemistry lab for

17   chemical analysis?

18   A.   Yes, I did.

19   Q.   Do you know who Dr. Anton Fischer is?

20   A.   Yes, I know.

21   Q.   And who is Dr. Fischer?

22   A.   Dr. Fischer is one of my colleagues at the quality

23   control and they are doing analytical investigations.  They

24   are doing it, for example, in our lab, HPLC.

25   Q.   Did you send this sample to Dr. Fischer for an analytical

1    or chemical analysis?

2    A.   Yes, I did.

3    Q.   What was your conclusion about this sample?  Was this

4    sample counterfeit or was it authentic?

5    A.   This sample is counterfeit.  It's not a Roche product.

6    Q.   Let me show you the next sample which has the complaint

7    number -- the Roche Complaint No. 38120 and ask you,

8    briefly -- let's take it out of the bag so you can see it

9    clearly -- did this sample have similar -- let me ask a

10   different question.  What did you observe about this sample?

11   Let's start with the variable data.

12   A.   It is -- it is very -- it's smaller area.  It looks

13   smaller in the area than our original product.  The writing,

14   it says expire date, the XP 04-2010.  And it says the lot

15   number is B1117.  Then it says MFD and I'm not able to read.

16   Q.   The manufacturing date?

17   A.   Yes.

18   Q.   As with the first sample, did you also observe that the

19   word Tamiflu appears in a straight line and not in an up and

20   down pattern --

21   A.   Yes.

22   Q.   -- as is found with the authentic product?

23   A.   Yes.

24   Q.   Did you find similar differences with the way that this

25   sample was sealed as compared with the authentic product?

NIELSEN  -  DIRECT

1  A.   Yes, the same for this.  It looks like a plate sealing,

2  not like a rolled sealing.

3  Q.   And did you also observe -- I think you just testified

4  about this -- that the variable data field is smaller on the

5  sample as compared with the authentic?

6  A.   Yes.

7  Q.   Did you also send this sample to Dr. Fischer for chemical

8  analysis?

9  A.   Yes, I did.

10  Q.   Did you compare this sample with the authentic product so

11  that you could observe the differences?

12  A.   Yes, I did.

13  Q.   And based upon the testing of the second sample, did you

14  conclude that the second sample was also counterfeit?

15  A.   Yes, I did.

16  Q.   Does the lot number for a product for Tamiflu -- does a

17  lot number tell you where the product was manufactured?

18  A.   Yes, it does.  "B" stands for Basel in Switzerland.

19  Q.   How is that spelled, B-a-s-e-l; is that correct?

20  A.   B-a-s-e-l.

21  Q.   Okay.  So Lot No. B117, is that a lot number that has

22  been used by Roche for the production of Tamiflu?

23  A.   Yes, it is.

24  Q.   Okay.  And in the year 2007, did Roche manufacture or

25  produce Tamiflu in China?

NIELSEN   -   DIRECT

1   A.   No, they did not.

2   Q.   In 2007, do you know where Tamiflu was packaged and

3   manufactured?

4   A.   I can tell you about the concerned lot number.

5   Q.   Yes, B117, which is the number that's found on two

6   samples.

7   A.   Yes.

8   Q.   Were those -- using that lot number, were any of those

9   Tamiflu products manufactured in China?

10  A.   No.

11  Q.   And where were they manufactured?

12  A.   They were manufactured -- manufacturing of the capsules

13  was in Basel in Switzerland.  Then the lot was packaged in

14  Kaiseraugst in Switzerland and some captures of this lot

15  number went to Brazil where they were also packaged.

16  Q.   Is Tamiflu a registered product of Roche?

17  A.   Yes, it is.

18  Q.   Do you know when Tamiflu first became a product -- a

19  registered product of Roche?  Do you know the year?

20  A.   No.  It depends on which country.  Now, for the U.S. the

21  first date of use was in November 2 -- November 1999.

22  Q.   November 1999?

23  A.   Yes, November 1999.

24  Q.   And that was the date of first use in the United States?

25  A.   Yes, that's correct.

NIELSEN - CROSS

```
 1              MR. LEWIS:  May I have a moment, Your Honor?

 2              THE COURT:  Yes.

 3              MR. LEWIS:  We'll pass the witness at this time, Your

 4   Honor.

 5              THE COURT:  All right.  Mr. Amann.

 6              MR. AMANN:  Thank you, Judge.

 7                        CROSS-EXAMINATION

 8   BY MR. AMANN:

 9   Q.   Dr. Nielsen, good afternoon.

10   A.   Good afternoon.

11   Q.   How are you today?

12   A.   Fine, thank you.

13   Q.   You're from Switzerland?

14   A.   No, I'm from Denmark.

15   Q.   You're from Denmark.  English is not your first language?

16   A.   No, it's not.

17   Q.   What is your first language?

18   A.   Danish.

19   Q.   Danish.  When you're trying to speak English, sometimes

20   you have trouble searching for the right word --

21   A.   It could happen, yes.

22   Q.   -- now and again.

23              Now, with respect to Lot No. 1117, you have that lot

24   number in your Roche database, is that true?

25   A.   In which Roche database?
```

1  Q.   I think you made some reference to a database that you

2  were referring to?

3  A.   Yes, that's correct.  In the complaint database we have

4  suspected counterfeit cases, yes, we have it in there.

5  Q.   All right.  With respect to Lot No. B1117, can you tell

6  us how many Tamiflu pills were made by Roche that has that lot

7  number, do you know?

8  A.   I'm not sure I understand your question.

9  Q.   Okay.  A lot number has many pills in it.  Okay.  What

10 I'm trying to figure out is how many pills are in that lot

11 number, B1117.

12 A.   No, I don't know.

13 Q.   All right.  Are you familiar, Doctor, with how Tamiflu is

14 made, the chemical process as a pharmacist?

15 A.   I don't know every single step.  I know in general what

16 Tamiflu is.

17         MR. AMANN:  All right.  May I approach, Your Honor?

18         THE COURT:  Yes.

19 BY MR. AMANN:

20 Q.   For demonstrative purposes I'll ask you if you can just

21 recognize some of that chemistry that's going on there.

22 A.   Uh-huh.

23 Q.   Just take a moment and review it and see if that is

24 familiar to you as to how Tamiflu is produced, the chemical

25 process that goes into putting it altogether.

NIELSEN  -  CROSS

```
 1   A.   I don't think I'm the right person for saying anything

 2   about this.

 3   Q.   Okay.  So that's something you don't feel competent to

 4   talk about?

 5   A.   Yes.

 6   Q.   All right.  Very good.  With respect to -- let's talk

 7   about this exhibit for a moment.  Now, this box right here, is

 8   that part of an exhibit or is that what you brought with you?

 9   A.   I brought that with me.

10   Q.   Okay.  So this box right here is not a part of any

11   Government exhibit, it didn't come out of any pack?

12   A.   No, no, no, I took it with me from Switzerland.

13   Q.   From Switzerland.  And it is the real Tamiflu?

14   A.   Yes, it is.

15   Q.   All right.  If I -- do you mind if I look at this?

16   A.   No, of course not, go ahead.

17   Q.   Now, is this the Tamiflu that's marketed in the United

18   States?

19   A.   No, it's not.

20   Q.   Do you know where this box that you brought, where it is

21   marketed?

22   A.   Yes, I know.  New Zealand, this one.

23   Q.   New Zealand.  If you know, how many production factories

24   does Roche have around the world that make Tamiflu?

25   A.   That makes Tamiflu?
```

NIELSEN  -  CROSS

446

```
 1   Q.   Just makes it, not markets it or packages it, produces
 2   it.
 3   A.   I don't know the exact number, but it's not many.
 4   Q.   Do they have some in Europe?
 5   A.   Yes.
 6   Q.   And New Zealand apparently?
 7   A.   No.
 8   Q.   And not New Zealand.  Okay.  They have a distributor in
 9   New Zealand?
10   A.   Yes.
11   Q.   So they have companies that make it and then they also
12   have companies that package it and distribute it?
13   A.   Yes.
14   Q.   Okay.  Two separate deals.  All right.  Now, with respect
15   to how many companies they have around the world that package
16   it, do you have any idea?
17   A.   It's not many.  We package most of it in Basel.  Now
18   Brazil was packaging some as I told you.  There are a few
19   others, but I don't know exactly how many.
20   Q.   Okay.  May I borrow this?
21   A.   Yes, please.
22        MR. AMANN:  Judge, for demonstrative purposes may I
23   use what the witness has identified as genuine Tamiflu?
24        THE COURT:  Sure.
25
```

Jeanette Byers, CSR, RPR (713)250-5087

```
 1   BY MR. AMANN:

 2   Q.   Okay.  I just want to be able to give -- does this help

 3   you to show the comparison that you were talking about earlier

 4   to the folks of the jury?

 5   A.   It does, yes.

 6   Q.   All right.  This top one is, I believe, the one that you

 7   testified was the --

 8   A.   For the Roche product.

 9   Q.   Not real.

10   A.   Yes.

11   Q.   And the bottom one, we have it on your word, it is real.

12   A.   Yes.

13   Q.   Okay.  Go through for us, again, please, the -- I guess

14   you called them the variable data.

15   A.   The variable data, yes.  You should -- there are --

16   Q.   If you can -- and I don't know if you have the ability to

17   point on your screen up there or not but -- that's okay.

18           Okay.  I'm sorry I got the terminology wrong.  Just

19   by visual examination then, if you could tell us the

20   differences that you see here between the top one, which is

21   not the real one and the bottom one which is the real one.

22   A.   Yes.  We can start with the writing Tamiflu.

23   Q.   Yes.

24   A.   On the top you see Tamiflu all on one line.

25   Q.   On the top it's all one line.
```

1   A.   Tamiflu, next to it, Tamiflu again, Tamiflu, it's all in

2   one --

3   Q.   I see.  Okay.

4   A.   And on the original below you see Tamiflu, one is up,

5   then Tamiflu is down, then it's up again.

6   Q.   Then it's up again.  If somebody -- would you agree with

7   me, Doctor, that you have specialized training in being able

8   to tell the difference between what is real and what is not

9   real with respect to the Roche product Tamiflu?

10  A.   Yes.

11  Q.   All right.  If you did not have that training, would you

12  be able to make this determination?  If I just covered up what

13  was the real one, would you be able to see the top one was

14  fake?

15  A.   Now, I would because I see them every day, original

16  product.  But a normal person, I think would not.

17  Q.   Would not be able to do it.  Okay.  Now, we talked about

18  the Tamiflu going up and down.  Is there something else about

19  the foil we need to talk about?

20  A.   Yes.  It's pattern on the top.  You see its many small

21  holes.  And on the lower one you have, like, lines.  But it's

22  easier to see if you have the sample in hand because it's

23  where the foil is, like, pressed in so the lines are pressed

24  into the foil on the lower one and on the upper one it's,

25  like, holes pressed into the foil.

NIELSEN - CROSS

1    Q.   That's an incredible subtle difference, isn't it?

2    A.   It is different, yeah.

3    Q.   I mean, you understand the word "subtle" as in little,

4    hard to see?

5    A.   Uh-huh, okay.  It is.

6    Q.   Hard to see difference?

7    A.   Yes.

8    Q.   Okay.  What else about the foil pack?

9    A.   Another difference is the perforated line which we have

10   on the original.  The lower one you see the perforations,

11   which makes it easier to divide each single blister pocket

12   from the blister.

13   Q.   You're talking about these lines right here -- never

14   mind.  You see where the perforation is?

15   A.   Yes.

16   Q.   Okay.

17   A.   You don't see it clear on the upper one.  If you have

18   something handed, you see it, but it's not clear at all and

19   it's very light.

20   Q.   Okay.  Again, that is something that the average everyday

21   person wouldn't notice if they were just taking this product

22   and pulling it out of the pack, they wouldn't say, "Oh, boy,

23   there's perforation here and not a perforation here."

24   A.   Yes.

25   Q.   You need specialized training for that?

NIELSEN  -  CROSS

1   A.   Yeah, correct.

2   Q.   Now, I did that -- we talked then about Government's

3   exhibit -- that was 54.  If I ask you the same questions about

4   the foil pack that's in the other Government's exhibits, your

5   answers would be the same with regard to the foil pack and the

6   difference and so forth?

7   A.   Yes.

8   Q.   Are you taking that sample back with you?

9   A.   Yes, I am.

10  Q.   Okay.  Kind of like to have the real one around so we

11  can --

12          MR. AMANN:  Okay.  I'll try to figure that out,

13  Judge.

14  BY MR. AMANN:

15  Q.   Now, I believe you also stated that in -- Roche did not

16  manufacturer Tamiflu in China.

17  A.   Yes.

18  Q.   I want to ask you a question or two, if I could, about

19  that.  Dr. Nielsen, in December 2005 didn't Roche allow

20  Shanghai Pharmaceuticals in China to manufacture Tamiflu?

21  A.   Yes.  I'm not sure about the dates.  We have given

22  licenses to China for producing Tamiflu but --

23  Q.   One of the reasons that you allowed China -- and, as a

24  matter of fact, Vietnam was another country that you allowed

25  to manufacture Tamiflu.  One of the reasons you did that is

NIELSEN - CROSS

1    because Tamiflu was designed to combat an outbreak of avian

2    flu, bird flu.

3    A.   That's correct.

4    Q.   And everybody was concerned that it might become a

5    pandemic.  You understand the word "pandemic"?

6    A.   Yes.

7    Q.   And so Roche allowed china and, in fact, Vietnam to

8    manufacture Tamiflu, didn't they?

9    A.   Yes.

10            MR. AMANN:  All right.  I pass the witness, Your

11   Honor.

12            THE COURT:  Any redirect, Mr. Lewis?

13            MR. LEWIS:  No, Your Honor.  We'll pass the witness.

14            THE COURT:  May the witness be excused?

15            MR. LEWIS:  Yes, Your Honor.

16            THE COURT:  Thank you, Dr. Nielsen, you may be

17   excused.

18            The Government may call its next witness.

19            MR. LEWIS:  The United States now calls Dr. Anton

20   Fischer, Your Honor.

21                     DR. ANTON FISCHER

22   having been first duly sworn, testified as follows:

23            THE COURT:  Be seated, please.

24

25

FISCHER - DIRECT
452

```
 1                        DIRECT EXAMINATION

 2   BY MR. LEWIS:

 3   Q.   Good afternoon, sir.  Could you please state your full

 4   name and spell your first name and last name for the members

 5   of the jury?

 6   A.   My name is Dr. Anton Josef Fischer, F-i-s-c-h-e-r.

 7   Q.   And how is your first name spelled?

 8   A.   Anton?

 9   Q.   Yes.

10   A.   A-n-t-o-n.

11   Q.   How are you employed, sir?

12   A.   Sir?

13   Q.   How are you employed?  Where do you work?

14   A.   I'm head of QC lab in Roche Baden for control of the

15   laboratory since 2003.

16   Q.   Can you explain to the members of the jury your general

17   job duties, your responsibilities?

18   A.   We are doing, as the quality control lab, routine

19   released medicines and stability analysis and especially in my

20   function I have an additional lab doing analysis on complaints

21   and counterfeits.

22   Q.   Have you had the occasion to examine or analyze few or

23   many suspected counterfeit samples?

24   A.   We have many counterfeit samples, especially for Tamiflu,

25   we get about one suspected counterfeit per month.
```

1    Q.    If I can step back for a moment, can you tell us briefly

2    about your education.  Where did you attend university?

3    A.    I started pharmacy in Wurzburg, Germany and finalized it

4    with a doctorate on pharmaceutical analysis in '88, 1988.

5    Q.    And since that time have you worked in the field of

6    chemistry or fields related to chemistry?

7    A.    I was a QC head since then in two different companies

8    before I joined Roche in 2003.  And there I did also the

9    stability and release testing, and especially since then, my

10   very special knowledge on NIR spectroscopy.

11   Q.    Can you, just briefly, spell the name of the city where

12   you earned your Ph.D.?

13   A.    It was Wurzburg.

14   Q.    And how is that spelled?

15   A.    W-u-r-z-b-u-r-g.

16   Q.    Do you know Dr. Christin Nielsen?

17   A.    Yes.

18   Q.    How do you know her?

19   A.    She is a colleague of mine in the complaint management of

20   Roche.

21   Q.    Did there come a point in time when Dr. Nielsen sent you

22   two samples --

23   A.    Yes.

24   Q.    -- of suspected counterfeit Tamiflu?

25   A.    Yes.

FISCHER - DIRECT

1  Q.   And let me show you what's been admitted into evidence as

2  Government's Exhibit No. 54.  There are two plastic bags that

3  contain two blister packs of suspected counterfeit Tamiflu.

4  Did Dr. Nielsen send you those two samples to be analyzed?

5  A.   Yes.

6  Q.   And what year was that?

7  A.   This was last year in May.

8  Q.   Okay.  And what is the first thing you did to perform

9  your test or your analysis of these two samples?

10 A.   The first thing that we do, especially in my lab, we do

11 this NIR spectroscopy testing.  This is a non-destructive

12 fingerprinting technique.  Additionally to the classical, I

13 ask the spectroscopy, that is also a fingerprinting technique,

14 but it's to take out the powder.

15 Q.   Please continue.

16 A.   Then we additionally did two -- on these samples two

17 chromatography tests.  That means one gas chromatography mass

18 spectroscopy analysis and an HPLC which means high performance

19 liquid chromatography test.

20 Q.   Thank you.  I want to go through those, each of those

21 tests and the purpose of those tests.  Before I do that, you

22 mentioned -- or used the term "fingerprinting technique."

23 A.   Yes.

24 Q.   You were not literally searching for a person's

25 fingerprint or what are you searching for?

FISCHER - DIRECT

1   A.   If you have -- if you use spectroscopy, you get

2   absorption bands in this spectrum.  And especially for NIR and

3   IR spectroscopy you get very sharp or other bands that are

4   very specific for the specimen that you analyze.  So if there

5   are small differences regarding chemical or physical aspects

6   of the sample, compare to the original -- I mean, Roche

7   authentic sample, you would immediately see that.  That's why

8   it's accounted for being a fingerprint technique.

9   Q.   So it is a -- in a graph or chart form information that

10  you learn from your test that identifies the ingredients or

11  chemical formula for a particular sample; is that correct?

12  A.   That's correct.

13  Q.   More or less?

14  A.   More or less, yes, that's it.

15  Q.   Let's talk about the NIR test.  What's the purpose of

16  that test?  What do you learn from that test?

17  A.   The purpose of that test is to get very quickly an NIR

18  image.  That means every single pixel of the image we get is

19  one complete NIR spectrum.  And we, by comparing those NIR

20  spectra by one image would get 82,000 spectra out of one.  And

21  we can do this comparison between the suspect counterfeit in

22  this case and the Roche original sample, the Roche original

23  sample that we are using.

24  Q.   Does the NIR test tell you whether the API exists within

25  the tested sample?

1   A.    Well, yes, we have -- we are applying specific

2   mathematical statistical procedure with that, chemometric

3   procedure called that we can analyze and tell that a certain

4   extracted information out of this spectrum is related to the

5   API.  So we can tell whether the API is in or something is

6   wrong with it.

7   Q.    Does the NIR test tell you the amount of the --

8   A.    No.

9   Q.    -- API that exists within the sample?

10  A.    No.  We get only a very rough estimation of that.  We can

11  tell if this was the case in here that we have not the full

12  amount of API that we have in the Roche sample.

13  Q.    Okay.  And I want to go through these one at a time

14  because they were tested separately.  And let's start with the

15  lowest number sample.  It's hard for me to read it upside

16  down.

17  A.    36.

18  Q.    Can you read the sample number there?

19  A.    This is 36270.  This is the complaint number that we take

20  as our reference number throughout this analysis.

21  Q.    And with that particular sample, No. 36270, the result of

22  the NIR test, did you find that the API, the active

23  pharmaceutical ingredient was contained in that sample?

24  A.    That was, yes, we saw that.

25  Q.    And tell us about the IR test, the second test that you

FISCHER - DIRECT

 1  performed.

 2  A.   IR chromatography is usually accompanied with NIR

 3  spectroscopy.  We get different information out of this region

 4  of the spectrum.  IR is -- NIR is, beside the visible range

 5  and then comes the IR range, so I get different new

 6  information about that, also a fingerprinting technique.  And

 7  here we saw that the API was present.  Also we cannot tell the

 8  amount.  But we saw another aspect, talcum, that isn't a

 9  excipient, an additional substance in the powder was not

10  present.  And so we saw that also in the NIR image.

11  Q.   So in this sample when you performed the second test, the

12  IR test, you found that there was talcum in the sample; is

13  that correct?

14  A.   We found no talcum.

15  Q.   No talcum.

16  A.   Yeah.  It should be in the authentic Roche and we saw

17  that it was not inside this.  It has a very sharp peak and

18  that was missing.

19  Q.   So talcum is ordinarily found in the authentic product,

20  but you did not find it --

21  A.   Yes.

22  Q.   -- in using the IR test for this particular sample?

23  A.   That's right.

24  Q.   And tell us what you found -- I'm sorry.  Tell us the

25  purpose of the third test, the gas chromatography HPLC test?

1   A.   The gas chromatography is performed when we have -- when

2   we see with IR spectroscopy that something is different.  And

3   with gas chromatography we find that another excipient, sodium

4   stearyl fumarate, a lubricant, was also missing.

5   Q.   Was missing --

6   A.   We found --

7   Q.   -- from this sample; is that correct?

8   A.   Yes, yes.  We saw the API also that was given, but this

9   lubricant was missing.

10  Q.   And can you say it once again.  Then I want you to spell

11  it, the excipient that was missing, stearyl --

12  A.   Yeah, stearyl fumarate, s-t-e-a-r-y-l f-u-m-a-r-a-t-e.

13  Q.   Okay.  So based upon your analysis of this sample, Sample

14  No. 36270, these three tests, the NIR, IR and the gas

15  chromatography test, did you conclude that this sample was

16  counterfeit or authentic?

17  A.   We concluded it was counterfeit.

18  Q.   And did you prepare a report?

19  A.   Yes.

20  Q.   Let me show you an excerpt from the report that's been

21  marked for identification purposes as Government Exhibit 54-A.

22  Is this one page from your report?

23  A.   This is the complaint, 38120.  This is the other case.

24  Q.   All right.  So if you can hang on to that, I'll come back

25  to that.

459

1   A.    Yeah.

2   Q.    Let's talk about the second sample.  What is the

3   complaint number for the second sample?

4   A.    This is 38120.

5   Q.    And did you perform the same three tests on the second

6   sample --

7   A.    Yes.

8   Q.    -- as you did with the first sample?

9   A.    Yes.

10  Q.    NIR, IR and gas chromatography test?

11  A.    Yes.

12  Q.    And let's go through them one at a time.  What result did

13  you observe on the second sample when you applied the NIR

14  test?

15  A.    We found the same picture.  So that this sample was

16  identical, that means we found the same results.

17  Q.    Same results.  In other words, you found that the active

18  pharmaceutical existed?

19  A.    Was present, yes.

20  Q.    Was present in the sample.  And when you applied the IR

21  test, what did you learn or what did you observe from the

22  results of the IR test when you applied it to the second

23  sample?

24  A.    I got this additional report.  Can I have a look at that?

25  Q.    Sure, if it helps to refresh your recollection.

FISCHER - DIRECT
460

1    A.    Yes, that's it.

2    Q.    And what did you observe from the result of the second

3    test on the second sample?

4    A.    The excipients were also not in -- were different from

5    the Roche authentic product, but here we found -- and one --

6    substances that are sugars out of the GC and MS tests that we

7    did.

8    Q.    Okay.

9    A.    And also the absence of this lubricant, stearyl fumarate.

10    Q.    The absence of the lubricant, was that the result you

11    learned from the third --

12    A.    From the third, yes, yes.

13    Q.    -- test, the gas chromatography test?

14    A.    Yes.

15    Q.    Okay.

16    A.    This is the third method.

17    Q.    And based upon your application of these three tests,

18    what did you conclude regarding the second sample --

19    A.    Also a counterfeit.

20    Q.    -- authentic or counterfeit?

21    A.    Also a counterfeit.

22    Q.    All right.  And I handed to you earlier an excerpt from

23    your report for Complaint No. 38120.  Is that a copy of one of

24    the pages in your report?

25    A.    Yes, that's --

FISCHER - DIRECT

1   Q.   And this concerns the second sample that you tested; is

2   that correct?

3   A.   That's correct.

4        MR. LEWIS:  Government would now offer into evidence,

5   Your Honor, Government's Exhibit No. 54-A.  And I'll show it

6   to counsel.

7        MR. AMANN:  I have no objection, Your Honor.

8        THE COURT:  54-A is admitted.

9   BY MR. LEWIS:

10  Q.   Dr. Fischer, can you tell us, if you know, the amount in

11  milligrams of the API, the active pharmaceutical ingredient,

12  in Tamiflu, how many milligrams?

13  A.   Yes, we have 75 milligrams of active substance in each

14  capsule.  That corresponds to the salt that is put as a powder

15  into the capsule.  That is 98.5 milligrams.

16  Q.   And let's go through them one by one.  For the first

17  sample, do you know the amount of the active pharmaceutical

18  ingredient, the API that was contained in the first sample?

19  A.   That was 74.1 milligram of --

20  Q.   So 74.1 milligrams per capsule?

21  A.   Per capsule, yes.

22  Q.   And what about the second sample, what was the API?

23  A.   Oseltamivir phosphate, sorry, the salt that is put in the

24  capsule.

25  Q.   Is that the same as the API?

1   A.   The API is the powder that you have.  But on the package

2   it's labeled 75 milligrams.  That is the -- you know, 75

3   milligrams means this is oseltamivir, the name of the API.

4   And if I say 98.5 milligrams of oseltamivir phosphate, this is

5   the substance that you put into the capsule.  So this is the

6   same.

7   Q.   Okay.  What about the second sample, how many milligrams

8   of API were found in the second sample?

9   A.   We found 72.9 milligrams of oseltamivir phosphate.

10  Q.   If you know, what is the tolerance level for API in

11  Tamiflu?

12  A.   We have 100 percent plus or minus 5 percent as the

13  tolerance for release to the market.

14  Q.   And what does that mean in your understanding?  What does

15  the tolerance level mean?

16  A.   That means a hundred percent should be inside the

17  capsule.  Due to variances in the production, you are allowed

18  to be within the range of 95 to 105 percent of the claim.

19  This is the normal for each pharmaceutical product on the

20  market.

21  Q.   Can you explain to the members of the jury what we're

22  looking at in Government's Exhibit No. 54-A, an excerpt from

23  your report?  What is being shown in this picture?  Can you

24  see it?

25  A.   Yes.  What is your question?

FISCHER - CROSS

```
1   Q.   Yes.  The question is -- and I'll rephrase it so I can
2   help out perhaps.  Does this picture show both the suspect
3   sample, Complaint No. 38120, and the original authentic
4   product?
5   A.   Yes.
6   Q.   It does.  The suspect sample is on the left and the
7   original is on the right; is that correct?
8   A.   Yes.  And one reference sample that we take.
9   Q.   And there are capsules at the top in the first picture
10  and the bottom picture has what, what's shown --
11  A.   This is the powder that is inside the capsule -- that was
12  inside the capsule.
13  Q.   So just looking at this picture, they look pretty
14  similar, is that correct, the authentic as well as the sample?
15  A.   Pretty similar, yeah, that's true.
16          MR. LEWIS:  May I have a moment, Your Honor?
17          THE COURT:  Yes.
18          MR. LEWIS:  Pass the witness at this time.
19          THE COURT:  Thank you.
20          Mr. Amann.
21          MR. AMANN:  Thank you, Judge.
22                    CROSS-EXAMINATION
23  BY MR. AMANN:
24  Q.   Dr. Fischer, good afternoon.
25  A.   Good afternoon.
```

FISCHER - CROSS

464

1   Q.   My name is Colin Amann.  Are you originally from Germany?

2   A.   From Germany, yes.

3   Q.   I thought I recognized the accent.  Are you familiar with

4   how Tamiflu is made, the chemical process by which it is

5   produced?

6   A.   No.

7   Q.   Okay.  Let me -- I'm going to show you something and see

8   if it jiggles any of your memory as a chemist.

9   A.   I'm a pharmacist.

10  Q.   Pharmacist.  Okay.  Do pharmacists have to have training

11  in chemistry as well?

12  A.   Yes.

13  Q.   I'll ask you if you recognize any of the chemical

14  processes involved on this sheet?  And if you don't, that's

15  fine.

16  A.   Well, as I'm not -- this is not my focus of my

17  profession, you know, we have colleagues that are very good at

18  that.

19  Q.   Okay.  That's fine.  Thank you.  Would you agree with me

20  me, sir, that the production, based on your knowledge, that

21  the production of the Tamiflu or -- well I'll restrict it to

22  Tamiflu -- is probably a pretty involved chemical process,

23  there are many steps that must be gone through?

24  A.   That's true.

25  Q.   And Roche, in fact, has a very elaborate production line

FISCHER - CROSS

465

1    where all of these various processes take place; is that

2    right?

3    A.    Yeah, that's true.

4    Q.    And at the -- and there's a lot of expensive machinery

5    involved in the production of -- let's keep it just with

6    reference to Tamiflu; correct?

7    A.    You mean the API substance here or the product?

8    Q.    The chemicals, the machines that are used to put the

9    chemicals together, the machines that are used to put the

10   chemicals in the tablets, the machines that are used to put

11   the tablets in the blister packs and the machines that are

12   used to put the blister packs in the packages.

13   A.    Okay.

14   Q.    First of all, process.

15   A.    Yes.

16   Q.    Big investment --

17   A.    Yes.

18   Q.    -- for Roche, lots of money in the development of Tamiflu

19   and marketing of Tamiflu?

20   A.    Yes, sir.

21   Q.    Now, you talked about that with respect to Tamiflu that

22   you were actually in your complaint division receiving about

23   one complaint a month.  Do you remember saying that?

24   A.    Yes, yes.

25   Q.    So that means that you -- or somebody was submitting a

FISCHER - CROSS

1    sample to you about once a month and asking you to please

2    examine this or determine whether or not it's real product.

3    A.    Yes.

4    Q.    Yes?

5    A.    Yes.

6    Q.    How long has that been going on?  How long have you been

7    asked to do this on a once a month basis?

8    A.    It started in the end of 2005 that we got our first

9    suspect Tamiflu and all that.

10   Q.    Okay.  So from 2005 to this good day now, about once a

11   month?

12   A.    Once a month.

13   Q.    Okay.  Now, with respect -- and I'm not going to go in

14   great detail about how the IR machine works and the GC and all

15   of that works.  Do you know about how much an IR machine

16   costs?

17   A.    Well, around about in dollars 40 to 60,000.

18   Q.    And how about a gas chromatography?

19   A.    100,000.

20   Q.    How about a mass spectrometer?

21   A.    Even more.

22   Q.    How about the high performance liquid chromatography?

23   A.    80 to 100,000.

24   Q.    And about the NIR machine?

25   A.    This imaging machine costs about 250,000 swiss francs,

FISCHER - REDIRECT

1    around about the same amount in dollars, yes.

2    Q.    So a significant investment to purchase all of these

3    machines and have them in one place and one laboratory at one

4    time; yes?

5    A.    Yes, plus don't use one certain machine, not only for one

6    analysis but for many.

7    Q.    Sure because you do quality control as well?

8    A.    Yes.

9    Q.    Because after you produce the product you have to, every

10   now and again, pull one out and make sure it's right?

11   A.    Yes.

12   Q.    We looked at part of your report, I believe Government's

13   Exhibit 54-A.  Do you have your entire report with you?

14   A.    I have.

15   Q.    May I look at this briefly?

16   A.    Sure.  This is the other one from 36270.  This is a copy

17   of our original.

18   Q.    Okay.  And this is for the other sample?

19   A.    Yes.

20            MR. AMANN:  Okay.  Thank you very much.  Pass the

21   witness, Your Honor.

22            MR. LEWIS:  One question, please, Your Honor.

23                      REDIRECT EXAMINATION

24   BY MR. LEWIS:

25   Q.    Dr. Fischer, if a person or a company wanted to produce

TARVER - DIRECT

1  counterfeit Tamiflu, they wouldn't need all of the same

2  equipment --

3  A.    Yes.

4  Q.    -- that Roche has, would they, to produce a counterfeit

5  product?

6  A.    Yes.

7  Q.    They would not need that expensive equipment; is that

8  correct?

9  A.    Yes, that is correct.

10         MR. LEWIS:  No further questions.  Thank you very

11  much.

12         THE COURT:  May the witness be excused.

13         MR. AMANN:  Yes, Your Honor.

14         THE COURT:  Thank you.  Doctor, you're excused.

15         All right.  The Government may call its next witness.

16         MR. LOUIS:  The Government calls Ed Tarver to the

17  stand.

18         THE COURT:  Please come around and be sworn as a

19  witness.

20                        ED TARVER

21  having been first duly sworn, testified as follows:

22         THE COURT:  Be seated, please.

23         Mr. Louis, you may proceed.

24         MR. LOUIS:  Thank you, Your Honor.

25

TARVER  -  DIRECT

1                        DIRECT EXAMINATION

2    BY MR. LOUIS:

3    Q.    Please state your name and spell your last name for the

4    benefit of the jury and the court reporter.

5    A.    Edward Tarver.  That's T-a-r-v-e-r.

6    Q.    How are you employed, Mr. Tarver?

7    A.    I'm special agent with the U.S. Immigration and Customs

8    Enforcement.

9    Q.    Is that known as ICE?

10   A.    ICE, yes, sir.

11   Q.    And where are you assigned within the Immigration and

12   Customs Enforcement?

13   A.    Houston, Texas.

14   Q.    Are you assigned to a specific division or squad?

15   A.    Yes, sir, I am.

16   Q.    And what is that?

17   A.    I'm assigned to the investigation unit that investigates

18   counterfeit pharmaceuticals and commercial fraud.

19   Q.    How long have you been a assigned to that particular

20   unit?

21   A.    Approximately ten years.

22   Q.    And how many total years of experience do you have

23   working with Immigration and Customs Enforcement?

24   A.    I've got 37 years.

25   Q.    Prior to working for the -- your 37-year tenure with ICE,

TARVER - DIRECT

1   did you have any other law enforcement experience?

2   A.   Total I have 16 years with the Louisiana state police as

3   detective and 22 years with ICE, 37 altogether, 38.

4   Q.   37, 38 years in law enforcement?

5   A.   Yes.

6   Q.   Do you have an occasion assigned to a commercial fraud

7   group to participate in investigations concerning the

8   counterfeiting of commercial products?

9   A.   Yes, sir, I do.

10  Q.   Does that include pharmaceutical products?

11  A.   Yes, sir, it does.

12  Q.   And did you have an occasion to be involved in

13  investigation of the defendant, Mr. Kevin Xu?

14  A.   Yes, sir, I did.

15  Q.   And what role did you play in this investigation?

16  A.   I was the -- I'm the program manager for the

17  investigative unit, which means I direct investigations and

18  come up with investigative strategies to use in investigations

19  and assist agents in their investigations, both in

20  interrogation and investigations.

21  Q.   All right.  With respect to this case, did you have an

22  occasion to -- after obtaining all the -- were you involved in

23  the obtaining of any pharmaceutical drugs that were sent to

24  either a drop box or a mailbox drop utilized by the

25  Immigration and Customs Enforcement?

TARVER  -  DIRECT

1    A.   Yes, sir, I was.

2    Q.   And did you assist in sending any pharmaceutical products

3    off to the labs?

4    A.   Yes, sir, I did.

5    Q.   In addition, did you have an occasion to figure out or

6    contact individuals to find out what the average wholesale

7    price of the drugs at issue?

8    A.   Yes, sir, I did.

9    Q.   The drugs at issue in this case are what?

10   A.   It's Plavix, which is for heart disease, Zyprexa, which

11   is for dementia, Casodex, which is a cancer drug, Aricept,

12   which is for Alzheimer's disease and Plavix -- Zyprexa, which

13   is for -- Tamiflu, I'm sorry, Tamiflu was the other one.

14   Tamiflu, which is for bird or avian flu.

15   Q.   All right.  Let me show you what's already been marked

16   and admitted into evidence as Government's Exhibit 57.  Now,

17   this is a chart that was prepared by another agent within your

18   unit, Corbin Wickman?

19   A.   Yes, sir, it was.

20   Q.   And this particular chart has the price that was paid to

21   Mr. Kevin Xu for the various pharmaceutical drugs; is that

22   right?

23   A.   That's correct, sir.

24   Q.   There were two purchases of various pharmaceutical drugs.

25   Can you see that?

TARVER  -  DIRECT

1   A.   Yes, sir.

2   Q.   Let me give you the original.  It's here somewhere.

3   Looking at -- can you see that?

4   A.   Yes, sir, I can see it.

5   Q.   Have you had to -- this has the retail price; is that

6   right?

7   A.   That's correct.

8   Q.   Were you able to find out what the average wholesale

9   price was?

10  A.   Yes, sir, I was.

11  Q.   And for the record, what is the average wholesale price?

12  What does that term mean?

13  A.   It's a wholesale acquisition cost.  That's the cost that

14  a distributor would have to pay for the pharmaceutical and

15  then tack on his own cost in order to sell it to the consumer.

16  Q.   Who did you consult to find out what the wholesale

17  acquisition cost would be?

18  A.   We consulted the pharmaceutical companies that

19  manufacture the drug.

20  Q.   So now, let's take the first line that we have here, I

21  think it's Tamiflu.

22  A.   Yes, sir.

23  Q.   Come all the way across, Tamiflu, 100 boxes, there were

24  seven tablets per box and the average retail price is $10.71.

25  Do you see that?

TARVER  -  DIRECT

1   A.   Yes, sir.

2   Q.   Now, the price that we -- that was paid to Mr. Xu is

3   $2.20; is that right?

4   A.   $2.20.

5   Q.   What is the average wholesale price, then, for a tablet

6   of -- this is per tablet; is that right?

7   A.   That's correct.  And actually those are closer to the

8   wholesale figures.  He got the wrong value up there.  But the

9   average wholesale is going to be somewhere around -- I'm

10  sorry.

11          MR. AMANN:  Pardon me, sir, I don't mean to interrupt

12  you.

13          With respect to what somebody else told him about

14  what wholesale prices may have been, Your Honor, I think that

15  is a hearsay statement and I would object to it.

16          THE COURT:  Sounds like hearsay to me, Mr. Louis.

17  BY MR. LOUIS:

18  Q.   Did you yourself make a determination as to what the

19  wholesale price was?

20  A.   I contacted the pharmaceutical companies to get the

21  wholesale price that they were charging to their customers.

22  Q.   All right.  And have you in the connection with your

23  investigations done it on many occasions?

24  A.   I've done it on almost every case, sir.

25          MR. LOUIS:  Your Honor, this chart has already been

1   admitted into evidence.  This is for purposes of

2   clarification.  It is not offered for additional purposes.

3   It's offered simply to clarify information that's a part --

4          THE COURT:  Sounds to me like it's offered for the

5   truth of the matter asserted, which would make it, by

6   definition hearsay.

7          MR. LOUIS:  Well, I will ask it in this regard.

8   BY MR. LOUIS:

9   Q.  With respect to the figures that are in evidence, is the

10  wholesale price higher or lower?

11         MR. AMANN:  Your Honor, that asks for information

12  that is based on hearsay.

13         THE COURT:  I sustain the objection.

14         MR. LOUIS:  All right.

15  BY MR. LOUIS:

16  Q.  Well, let's look at this chart.  This chart has the

17  retail value?

18  A.  That's actually closer to the wholesale value.

19         MR. AMANN:  Your Honor, he's testifying to hearsay.

20  I object to it and ask the Court to instruct the jury to

21  disregard what he just said.

22         THE COURT:  All right.  The jury will disregard the

23  last answer.

24  BY MR. LOUIS:

25  Q.  The price that you paid, based on this chart, the price

```
 1   that you paid Mr. Xu, is that significantly lower than the

 2   retail price that's listed here?

 3   A.   It's much significantly lower, sir.

 4   Q.   And that's for the Tamiflu.  Let's quickly go Zyprexa.

 5          THE COURT:  We've already covered this and the

 6   exhibit speaks for itself.  We've covered this with another

 7   witness.

 8          MR. LOUIS:  Yes, sir.

 9   BY MR. LOUIS:

10   Q.   Lastly, did you have an occasion to obtain information

11   about the email account from Mr. Xu?

12   A.   Yes, I did.

13   Q.   And who did you contact to obtain that information?

14   A.   I contacted the internet service provider for Mr. Xu,

15   the -- or the account holder for Mr. Xu's internet account.

16   Q.   And for what purpose did you do that?

17   A.   To determine who the account's registered to and where

18   the IP address is which allowed us to determine where the

19   conversations were originating.

20   Q.   And let me show you Government's Exhibit No. 1.  Is that

21   information that you received back from the service provider?

22   A.   Yes, sir, it is.

23   Q.   And then looking at what's been marked and admitted as

24   Government's Exhibit No. 13, is that the same email account

25   that you were provided information on?
```

1    A.    Yes, sir, it is.

2              MR. LOUIS:  Pass the witness.

3              MR. AMANN:  May I approach very quickly, Your Honor?

4              THE COURT:  Yes.

5              MR. AMANN:  I meant the witness.  Sorry.

6              I have no questions, Your Honor.

7              Wait, wait.  I'm sorry.  Somebody's yelling at me.

8              Actually may I borrow your --

9              MR. LOUIS:  You want to offer it?

10             MR. AMANN:  No, I'm just going to ask him a couple of

11   questions from it and I want to have it handy.

12             May I approach the witness again, Your Honor?

13             THE COURT:  Yes.

14                         CROSS-EXAMINATION

15   By MR. AMANN:

16   Q.    Agent Tarver, good afternoon.

17   A.    Yes, sir.  How are you doing?

18   Q.    Tired.  Now, when you were trying to figure out -- I

19   guess an IP address is internet provider address; correct?

20   A.    That's my understanding, yes, sir.

21   Q.    Okay.  And the internet provider address is -- can be

22   established to many different places; right?

23   A.    That's my understanding.

24   Q.    I mean, an internet provider address can be -- it can

25   come from a Starbucks, it could come from a Denny's, it could

1    come from just anywhere; right?

2    A.   That's my understanding.

3    Q.   Okay.  And what you need to do is each computer has a

4    little -- I think they call it a mac device in the computer

5    that makes -- creates some kind of signature so that based on

6    the IP address you can go back and check that IP address and

7    match it to the mac address?

8    A.   I don't know.  All I can tell you is that we have some

9    agents who are trained in that.  And we give them the

10   information and then they can give us the information back.

11   Q.   Okay.  So you're as -- about computer savvy as I am then.

12   A.   I wish I could tell you I knew more, but all I can tell

13   you is I give information to them and they give me the

14   information back.

15   Q.   All right.  That's fine.

16          MR. AMANN:  Thank you, Your Honor.  I pass the

17   witness.

18          MR. LOUIS:  No questions.

19          THE COURT:  Thank you, Mr. Tarver.  You're excused.

20          THE WITNESS:  Thank you, sir.

21          MR. LOUIS:  Your Honor, the Government would rest at

22   this time.

23          THE COURT:  All right.  Do you have a witness

24   available for this afternoon?

25          MR. AMANN:  Not until tomorrow morning, Your Honor.

1          THE COURT:  All right.  We're moving along pretty

2     quickly.  So it may be that the case will be presented to you

3     tomorrow.  We don't know for sure.  But, again, thank you for

4     being here promptly this morning.  We're going to adjourn a

5     little bit early.  We'll reconvene again at 8:30 tomorrow

6     morning.  I remind you again, do not discuss the case with

7     anyone or allow anyone to discuss the case with you.  Do not

8     read or listen to any mention of the case in the media and do

9     not do any independent investigation or research.  I'll see

10    you bright and early at 8:30 tomorrow morning.  Thank you.

11          (Outside the presence of the jury.)

12          THE COURT:  Be seated please.

13          All right.  The Government having rested --

14          First of all, I need to put on the record that one of

15    the jurors handed the bailiff a note at 12:56 saying,

16    "translator for Mr. Xu is distracting, overrides audio and

17    sometimes witnesses."  I informed counsel outside the presence

18    of the court reporter earlier.  I just want to put this on the

19    record.

20          All right.  Government having rested, the defense may

21    now make any motion.

22          MR. AMANN:  Judge, briefly, under Rule 29 we would

23    ask this Court to consider instructing a judgment of

24    acquittal.  And my major point on that is that the Government

25    is required to prove by the elements of the offense and by the

1    allegations contained in the indictment that these various

2    drugs, Zyprexa, the Plavix, and the Court is very familiar

3    with all the drugs, have been trade market -- trademarked, I'm

4    sorry, registered and patents are currently on file, have not

5    expired and that is an element of the offense.  The Government

6    has rested.  We've not heard word one about any of these

7    products being trademarked, about whether the patents are

8    still alive, whether they've lapsed.  We just don't know.  And

9    that's an element of the offense and the Government has not

10   even attempted to prove that.

11        THE COURT:  What's the Government's response?

12        MR. LOUIS:  The Government's response is we've called

13   a witness from every trademark holder except Casodex.  And we

14   have established from the trademark holder that the products

15   that Mr. Xu provided to the undercover agent were trademark

16   products, they were not the authentic product, they traveled

17   through interstate commerce.

18        THE COURT:  Well, Mr. Vernon Lewis established that

19   for Roche.  I don't recall that you asked any of the other

20   chemists or pharmaceutical manufacturer representatives about

21   trademarks or other forms of intellectual protection.

22        MR. LOUIS:  I asked -- the first witness we called

23   was from -- Amy Callanan, I asked her if she compared the

24   suspect sample with the trademark with the reference sample,

25   with the trademark sample.  She said they did that and that

```
 1   the sample was counterfeit.  I asked that question to each and
 2   every chemist from every pharmaceutical company and especially
 3   with the last witness, Michael Dalton, specifically is this
 4   product, Zyprexa, a product that is trademarked by Lilly.  I
 5   have the actual excerpt from the report.  And I asked him to
 6   compare the product reference sample from the legitimate
 7   product, authentic product to the counterfeit suspect sample.
 8   And each and every time the answer was that this product was
 9   not the authentic product of the trademark.
10          MR. AMANN:  Your Honor, may I briefly respond?
11          THE COURT:  All right.
12          Well, also, the exhibits offered by the Government
13   for some of the legitimate products have the simple "TM" or
14   "R" by them.  And they have that symbol by all of the
15   counterfeit products.  I don't know whether that is sufficient
16   to establish that element or not.
17          MR. LOUIS:  It's the Government's contention that it
18   is.  The Government does not have to have the actual date and
19   time.  The question would be whether or not the trademark
20   holders were called to testify that this is a registered --
21   that this is a product, authentic product or not authentic
22   product.  We established that.
23          THE COURT:  I didn't recall each of your witnesses
24   testifying to that.  I know the Roche -- one of the Roche
25   representatives did.
```

1          Go ahead.

2          MR. AMANN:  Your Honor, in the indictment if we just

3    look at Counts 5 through 9 -- let's use 5 as an example.

4    They're talking about Eli Lilly and that the mark on the

5    alleged counterfeit was substantially indistinguishable from

6    the genuine mark and registered for that good on the principal

7    register in the United States Patent and Trademark Office.

8    That is an element of the offense because trademarks expire.

9    Every so often they expire.  They need to be reviewed.  For

10   the offense in question, we're talking about the years from

11   July 2006 through July 2007 or thereabouts.  There has to be

12   proof from the U.S. Patent Office, via by some authentic

13   certified document or something of that nature that these

14   patent trademarks were alive in effect and applicable.

15          THE COURT:  Well, that might -- first of all, I'm not

16   persuaded that the Government has failed with respect to all

17   of the products.  Certainly not with respect to Tamiflu.

18          Moreover, the Counts 2, 3 and 4 don't require

19   registration, they just require misbranding.

20          Count 1, there could be a conspiracy misbrand without

21   a conspiracy to introduce counterfeit prescription drugs.  So

22   I'm going to deny your motion.  If the jury finds a verdict of

23   guilty, you can file a motion supported by legal authority

24   then and I'll give it more careful consideration.

25          You can respond then.

1          And by then we'll have a transcript of the record

2    which should inform our discussion and my analysis.

3          MR. AMANN:  Yes, sir.  And as part of the Rule 29

4    motion, I would make the argument that based on the evidence

5    we have before us, that no rational juror could find beyond

6    all reasonable doubt that Mr. Kevin Xu knew that these items

7    were counterfeit.  I believe the proof is lacking in that

8    regard.  The Court has been taking copious notes throughout

9    the course of the trial, I don't need to belabor the reasons.

10   The reasons from my standpoint are fairly obvious.  They

11   didn't prove he had a factory, they didn't prove he was a

12   manufacturer.  They took no steps to try to ascertain that.  I

13   just don't think there's enough evidence to prove beyond a

14   reasonable doubt to the extent that a rational juror could

15   find Mr. Xu guilty.

16         THE COURT:  Well, there's ample evidence that his

17   knowledge and mens rea objection has no merit.

18         All right.  What we do need -- have y'all looked at

19   the charge?

20         MR. LOUIS:  I have.

21         THE COURT:  We're going to take a short recess.

22   Also, we probably ought to submit for the verdict form for

23   Count 1 -- we ought to give the jury a chance to find a

24   conspiracy to violate either 3320(a) or 33 -- or 21 USC 331(a)

25   or (i).  Is there an instruction on 331(a)?

1            MR. LOUIS:  Your Honor --

2            THE COURT:  I tell you what, let's just take a

3    ten-minute recess.  I want to talk about that issue and then

4    I'll entertain the defendant's objections.  Take a ten-minute

5    recess.

6            We'll need the defendant here for this.

7            THE MARSHAL:  Yes, Your Honor.

8            (A recess was taken.)

9            THE COURT:  Please be seated.

10            First, I'll hear objections by counsel to the charge

11    that I've given you at the noon recess.

12            Does the Government have any objections?

13            MR. LOUIS:  The Government has no objections.

14            THE COURT:  All right.  Let's hear from the

15    defendant.  What, if any, objections does the defendant have?

16            MR. AMANN:  Judge, I have a few referring to the

17    Court's charge.  On Page 6 of the Court's charge, we have in

18    the second full paragraph beginning, "You are the sole judges

19    of the credibility," the second sentence, "An important part

20    of your job will be making judgments about the testimony of

21    witnesses[including the defendant.]"  Mr. Xu is not going to

22    testify.  I'd like to have that excluded.

23            THE COURT:  I'll exclude that and I'll exclude the

24    language on the next page also.

25            MR. AMANN:  Yes, sir.

1          THE COURT:  I have it in there because you hadn't

2     made your election yet.  Okay.  Thank you.

3          MR. AMANN:  Judge, moving to Page 12 of the charge

4     concerning certain chart summaries and the like, I don't know

5     that those are in play here.  If they are, I just don't --

6          MR. LOUIS:  I had one that I was going to offer, but

7     I did not so --

8          THE COURT:  Okay.  Well, that's good.  The less I

9     have to read, the better.

10         MR. AMANN:  Okay.  With respect on Page 13 the

11    definition of "knowingly," the second full paragraph beginning

12    with, "You may find the defendant had knowledge," that whole

13    paragraph, I believe, relates to deliberate ignorance.  I

14    think the deliberate ignorance charge should be used very

15    sparingly.  I don't believe it's warranted in this case and I

16    would object to its inclusion in the Court's charge.

17         THE COURT:  Well, it's clearly supported by this case

18    for a number of reasons.  I noted the most blatant evidence

19    supporting it would be Mr. Xu's testimony on July 1 in which

20    he stated on the tape words to the effect of coaching

21    Mr. Sherman about how to disclaim knowledge concerning the

22    branding of the pills.  There's another reference where they

23    had a discussion about the fact that even if the treatment for

24    cancer didn't work, it wouldn't necessarily prove that the

25    drug was counterfeit because the oncologist might then just

1    prescribe another drug for the same treatment.  There's

2    evidence of willful blindness here so that objection is

3    overruled.

4         MR. AMANN:  Thank you, Your Honor.

5         Moving along, trying to see what pages I have dog

6    eared here, moving along to Page No. 23, this regards

7    trafficking in counterfeit goods.  We had requested the Court

8    to submit in our requested instructions a fifth element to the

9    effect that the use of the counterfeit mark was likely to

10   cause confusion, to cause mistake or to deceive.  It's my

11   understanding that the Court is going to deny that request.

12        THE COURT:  I am.  I looked at the Fifth Circuit

13   authority, which the Government submitted beginning with

14   United States versus Salton, 115 F.3d 321, which uses the

15   exact language both as to elements of the offense and

16   definitions submitted by the Government.  *Salton* was approved

17   by the Fifth Circuit in United States versus *Hanafy*,

18   H-a-n-a-f-y, 302 F.3d 485, which actually cites *Salton*.  And

19   in a later case, *United States versus Zheng Yi* 460 F.3d 623.

20   I asked my law clerk to research it and we searched every

21   circuit in the United States and have not found one circuit

22   that includes your fifth element.  So I'm going to go along

23   with the Fifth Circuit.

24        MR. AMANN:  All right.  And just so the record is

25   clear because I don't know if our previous discussion was

1  actually on the record, I requested it simply because the

2  Government had alleged as an element in the relevant counts of

3  the indictment so, therefore, I thought it was incumbent upon

4  them to prove it.

5        THE COURT:  Of course, the jury will see the

6  indictment but the jury will be instructed that what the

7  Government has to prove is what is contained in these

8  instructions.  Furthermore, your fifth element about likely

9  confusion seems to me to be covered by the definition of

10  counterfeit mark, which is included in the Court's

11  instructions.

12        MR. AMANN:  I understand that.  I'm sorry.  The

13  Court's overruling that particular objection?

14        THE COURT:  The Court's overruling both of your

15  objections to the instructions on Counts 5 through 9.

16        MR. AMANN:  With respect to the definition of

17  counterfeit mark, in my requested instructions I submitted a

18  verbatim recitation of what counterfeit mark means taken right

19  from the statute itself.  It's my -- looking at the Court's

20  charge, the counterfeit mark on Page 23, the last sentence

21  from the end is, according to this charge, "spurious mark used

22  in connection with trafficking," et cetera, et cetera.  The

23  Court can certainly read that.  I think that the counterfeit

24  mark definition should be the three elements of the definition

25  which are conjunctive in nature, should be as set forth in my

 1    requested charge, it's defendant's requested Jury Instruction

 2    No. 7 that has been filed.  It's right out of the statute,

 3    Your Honor, it is conjunctive so, therefore, I think all three

 4    parts of that definition should be set forth to the jury.

 5              THE COURT:  I'm going to overrule that objection.

 6              MR. AMANN:  And --

 7              THE COURT:  The lesser included instruction is the

 8    one you requested.

 9              MR. AMANN:  Yes, sir.  And I believe that's been

10    included in the Court's charge.  And I believe -- I haven't

11    actually made it to the verdict form yet, but I'm there right

12    now.  I don't know that it's been included in the Court's

13    charge, the requested verdict form that we submitted with

14    respect to the lesser included.

15              THE COURT:  Question what?  It's in there?

16              MR. AMANN:  Is it?  I'm sorry.

17              THE COURT:  It should be.

18              MR. LOUIS:  It is.

19              THE COURT:  Look at Page -- bottom of Page 1 of the

20    verdict form.

21              MR. AMANN:  Okay.

22              MR. LOUIS:  Also Page 21.

23              MR. AMANN:  I'm sorry.  I just read the top part.  I

24    was going quickly, Your Honor.

25              THE COURT:  I know.  It's been a busy day.

```
 1          MR. AMANN:  That concludes our objections, Your

 2   Honor.

 3          THE COURT:  All right.  Now, since the defense has

 4   raised a colorable objection to one of the elements of one of

 5   the crimes.  I think what we need to do is provide a different

 6   verdict form for Count 1, which asks whether the jury finds

 7   the conspiracy to traffic or attempt to traffic in counterfeit

 8   goods in violation of 2320(a) or alternatively (b) or (c); in

 9   other words, I want three verdict forms for Count 1 so if, in

10   fact, you lose on the 2320(a) substantive offenses, the

11   conspiracy could still be found based on conspiracy to violate

12   a statute other than 2320(a).  Do you understand?

13          MR. LOUIS:  Yes, I was going to say, I just realized

14   there's not a unanimity instruction in here, is there.

15          THE COURT:  No.

16          MR. LOUIS:  All right.  I would -- the Government

17   would recommend putting one in.  I had one in the previous

18   case.  I just don't have it with me.  It just dawned on me

19   when the Court said that -- I have no objection to a unanimity

20   instruction.  That's cures that.

21          THE COURT:  That doesn't cure that.  I've got the

22   same problem in the Enron case.  There were 50 pages of

23   briefing on that.

24          MR. LOUIS:  Okay.

25          THE COURT:  So I'd rather not have it in this case.
```

1          MR. AMANN:  May I coattail all that briefing?

2          THE COURT:  No, I don't think -- we're not

3     submitting --

4          MR. AMANN:  Okay.

5          THE COURT:  -- the alleged instruction -- the

6     instruction, two judges of the Fifth Circuit have found

7     inappropriate.  But we do need -- what is a 331(a) violation?

8          MR. LOUIS:  331(a) is the introduction into

9     interstate commerce of a product that's been misbranded.  And

10    the second one, 331(i) is introduction -- is a product that is

11    counterfeit.

12         THE COURT:  All right.

13         MR. LOUIS:  And that's set forth in the indictment,

14    three ways in which a conspiracy --

15         THE COURT:  Okay.  The jury is told later on about

16    misbranded drugs.  What if the jury comes back and says, "How

17    do we know whether there's a conspiracy to violate 331(i)?

18    You haven't given us a definition of the elements of 331(i)

19    violation."  You understand my concern?

20         MR. LOUIS:  Yes.

21         THE COURT:  You haven't alleged a 331(i) substantive

22    violation, but you've alleged a conspiracy to violate it.  So

23    I need some instruction of what would be required.

24         MR. LOUIS:  I want to say let's just take it out.

25         THE COURT:  Pardon me?

490

```
 1            MR. LOUIS:  Let's just take it out.  Really there is

 2    very little evidence at this point.  The evidence that -- so

 3    if it's a question of how to instruct the jury on that, I do

 4    have something I can look at if the Court gives me about ten

 5    minutes.

 6            THE COURT:  No.  What I want you to do is you get the

 7    definition or the instruction you want for 331(i).

 8            MR. LOUIS:  I have it.

 9            THE COURT:  And then you get the proposed verdict

10    form for Count 1.  You fax them to opposing counsel.  Y'all

11    either agree -- by 8:20 tomorrow let me have your respective

12    submissions and some law that makes your submission superior

13    to your opponent's.  It's not helpful for me to discuss it in

14    general.  It would be more helpful for me to see the precise

15    language.

16            MR. LOUIS:  I've got it.  It's just in a different

17    case.  I'll go pull it and I'll send him that information.

18            THE COURT:  And y'all talk about it.  You don't have

19    to -- I want you to talk before you file tomorrow.

20            MR. AMANN:  We talk quite a lot, Your Honor.

21            THE COURT:  Okay.  Good.  Let's -- you're also going

22    to give me an exhibit list, which includes all these --

23            MR. LOUIS:  I had it and I looked at it before I

24    handed it to the Court and there is a couple of typos.  So I'm

25    going to go down and fix that and I'll bring it to your law
```

1   clerks in a few minutes.

2          THE COURT:  Okay.  And we'll cover that -- let me

3   just cover what is in evidence now, other than that, so we can

4   save some time tomorrow.

5          Exhibit keepers, turn to your notes, please.

6          MR. AMANN:  I'll call for my substitutes for that,

7   Your Honor.

8          THE COURT:  Okay.  We'll go through the pages.  There

9   are no defense exhibits in evidence at this point.  We'll go

10  to the pages.

11         On Page 1, Government's Exhibits 2, 3, 3-A, 4, 4-A,

12  5, 5-A, 6, 7, 7-A, 8, 9 and 9-A are in evidence.

13         Any disagreement?

14         MS. KETTERMAN:  No, sir.

15         THE COURT:  Page 2, all the exhibits except 11 are in

16  evidence.

17         MS. KETTERMAN:  I agree.

18         THE COURT:  Page 3, all of the exhibits are in

19  evidence.

20         MS. KETTERMAN:  I agree.

21         THE COURT:  Page 4, Exhibits 37 through 44 are

22  admitted.  45 and 46 were not admitted.  47 through 50-A were

23  not offered.  And 51 and various subparts to be identified

24  were admitted.  Does defense agree?

25         MS. KETTERMAN:  I agree, Your Honor.

```
 1              THE COURT:  Page 5, 52, 52-A, 53, 53-A, 54 and 54-A
 2    were admitted.  56 and various subparts to be identified were
 3    admitted.  57 was admitted.  Government's Exhibit 60, Pages 1,
 4    2, 4, 5, 6, 14, 15, 16, 18 and 26 were admitted.  Pages 17 and
 5    27 were not admitted.  No others were offered.  Then
 6    Government Exhibit 61 and 62 were admitted.
 7              Are we all in harmony on that?
 8              MS. KETTERMAN:  Yes, sir.
 9              MR. LOUIS:  Yes.
10              THE COURT:  Okay.  How long will your character
11    witness take?
12              MR. AMANN:  Judge, he is -- I don't know, less than
13    an hour.
14              THE COURT:  All right.  Then we'll probably argue in
15    the morning.  Does anybody need more than 30 minutes?
16              MR. AMANN:  I might need 30 minutes just to walk back
17    and forth on all the exhibits.
18              MR. LOUIS:  35.
19              THE COURT:  You know if I said an hour and 30, you
20    would want an hour and 40.
21              MR. LOUIS:  Just in my mind thinking this is why I --
22    one of the times I had a trial and the Court gave me 30
23    minutes and I ended up taking 26 minutes and I looked around
24    and I remember co-counsel had about four minutes left.  So
25    that's why I said 35.
```

1          THE COURT:  I think we can get by -- if you're still

2    going with 30 and you need a minute or two, just ask me.

3          MR. LOUIS:  All right.

4          THE COURT:  30 minutes.

5          MR. LOUIS:  You'll probably throw something at me if

6    I take that time.

7          THE COURT:  You know, I had that experience arguing

8    before the Texas Supreme Court.  We divided up the argument.

9    My co-counsel took all the time, he got reversed and I got

10   reversed too because I didn't have a chance to distinguish my

11   case.  So what I learned, next time I'm going first.  So

12   Mr. Lewis gets to go first tomorrow.

13         MR. LOUIS:  If the court orders it.

14         THE COURT:  I didn't say which Mr. Lewis.

15         Okay.  So, anyway, that's what we'll do tomorrow.

16   I'd really like to get -- I hope you can agree on these

17   instructions because I would like to get -- I've got to get

18   this revised and typed in the morning.

19         Okay.  We'll stand in recess until tomorrow morning.

20      (Court recessed at 4:37 p.m.)

21

22         I certify that the foregoing is a correct transcript
     from the record of the proceedings in the above-entitled
23   matter.

24
                              _____
25                               /s/
                                 JEANETTE BYERS, RPR
                                 September 3, 2008

Jeanette Byers, CSR, RPR (713)250-5087