```
 1                  THE UNITED STATES DISTRICT COURT
                 FOR THE SOUTHERN DISTRICT OF TEXAS
 2                        HOUSTON DIVISION


 3

    THE UNITED STATES OF      )   No. H-07-CR-362
 4  AMERICA                   )
                             )   HOUSTON, TEXAS
 5   -vs-                     )   JULY 3, 2008
                             )
 6  KEVIN XU                  )   8:29 a.m.


 7                           Volume IV


 8                   TRANSCRIPT OF JURY TRIAL
              BEFORE THE HONORABLE SIM LAKE AND A JURY
 9
    A P P E A R A N C E S:
10
    FOR UNITED STATES:
11     SAMUEL LOUIS and VERNON LEWIS
       Office of the US Attorney
12     919 Milam
       PO Box 61129
13     Houston, Texas 77208
       713-567-9000
14     713-718-3406(fax)


15  FOR DEFENDANT:
       COLIN B. AMANN and JULIE A. KETTERMAN
16     Ketterman & Amann
       P.O. Box 131766
17     2603 Augusta, Suite 1060
       Houston, Texas 77057
18     713-522-97777
       713-522-9888(fax)
19
       SEAN BUCKLEY
20     Habern, O'Neil, Buckley & Pawgan, LLP
       300 West Davis, Suite 540
21     Conroe, Texas 77301
       713-863-9400
22
       INTERPRETERS:
23     JUNE HU MANDARIN
       PETER WANG
24
         OFFICIAL COURT REPORTER:  JEANETTE C. BYERS, RPR, CSR
25          PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPH,
         TRANSCRIPT PRODUCED BY COMPUTER-AIDED TRANSCRIPTION
```

1                          **I  N  D  E  X**

2    **WITNESS**                                                    **PAGE**
        STEPHEN T. McCANE
3       DIRECT EXAMINATION................................    500
        CROSS-EXAMINATION.................................    523
4       REDIRECT EXAMINATION..............................    533
        RECROSS-EXAMINATION...............................    535

5

6       DEFENDANT RESTS...................................    536

7       GOVERNMENT RESTS..................................    536

8       REPORTER'S CERTIFICATION..........................    558

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              (Outside the presence of the jury.)

 2              THE COURT:  Please be seated.

 3              I'll talk to you briefly about the charge.

 4              Does the Government have the additional instructions

 5    I discussed with you yesterday?

 6              MR. LOUIS:  I do, Your Honor.

 7              THE COURT:  May I see them?

 8              MR. AMANN:  I've got a copy, Judge, if I may

 9    approach.

10              Oh, Sam, you got it.

11              THE COURT:  Okay.  This is an instruction for 21 USC,

12    Section 331(i).

13              Does the defense agree that that is the correct

14    instruction?

15              MR. AMANN:  We do, Your Honor.  I have no objection.

16              THE COURT:  All right.  Then I think we should put

17    it -- put it between Pages 19 and 20.

18              Now, how about the verdict form?

19              MR. LOUIS:  I was actually downstairs fighting with

20    the copies, that's why I waited so --

21              THE COURT:  Do you have one?

22              MR. LOUIS:  I do not have one.  I was trying to go

23    downstairs and -- that's why I'm late -- trying to print one

24    out.

25              THE COURT:  But have you created it and just not
```

1    printed it?

2            MR. LOUIS:  I have worked on it and I was trying to

3    print it out and make some changes to it, but I couldn't do it

4    this morning because our printer downstairs -- computer system

5    downstairs, for whatever reason this morning, is not working.

6            THE COURT:  Okay.  Do you have a proposed

7    instruction?

8            MR. AMANN:  No, Your Honor.  I was in agreement with

9    the Government's.

10           THE COURT:  Okay.

11           MR. LOUIS:  I apologize.  I've been here since about

12   7:30.

13           THE COURT:  Okay.  Josh, come here.

14           (Discussion was held off the record.)

15           MR. LOUIS:  I have some language, if the Court is

16   talking about the instruction, I have some that I was trying

17   to work off of.  This is one that was previously given by

18   Judge Werlein where there's multiple objects of a conspiracy.

19   I was working off of that.

20           THE COURT:  Just a minute.

21           (Discussion was held off the record.)

22           THE COURT:  Is your witness here?

23           MR. AMANN:  He is, Your Honor.

24           Before we get started, may I do a little bit of

25   housekeeping?

```
 1            THE COURT:  Sure.

 2            MR. AMANN:  Yesterday the Court did not allow us to

 3    admit Defendant's Exhibits 1 through 4.  What I would like to

 4    do, Your Honor, is just offer them for purposes of the record

 5    and either make them a Court's exhibit or --

 6            THE COURT:  I've already noted on the exhibit list

 7    they're not admitted.  And this would be 5.

 8            MR. AMANN:  Okay.  May I submit the actual exhibits?

 9            THE COURT:  Yeah, they're attached.

10            MR. AMANN:  Okay.

11            THE COURT:  I told you if you had some law, I would

12    reconsider.  Have you found any law?

13            MR. AMANN:  Judge, we found some, but it wasn't -- I

14    didn't think it was powerful enough and I didn't want to fight

15    blindfully.  I was comfortable with the position we had.  And

16    I didn't think the law was powerful enough at this point to

17    bring Agent Sherman back on and go through the whole thing

18    again.

19            THE COURT:  Okay.

20            MR. AMANN:  It's just for the appellate record.

21            THE COURT:  It will be filed.  You can check.

22            MR. AMANN:  I'm just -- you know me.

23            THE COURT:  Better to be safe than sorry, sure.

24            MR. AMANN:  Yes, sir.  Thank you.  And I think we

25    also filed a revised list --
```

1           THE COURT:  You did.

2           MR. AMANN:  -- with those exhibits.

3           THE COURT:  You did.

4           All right.  Shall we bring the jury in?

5           MR. AMANN:  We can, Your Honor.

6           THE COURT:  Bring the jury in.

7           (Jury comes in.)

8           THE COURT:  Good afternoon, ladies and gentlemen.

9    Please be seated.  Thank you again for being here on time.

10          The Government having rested, the defendant may now

11   call witnesses.  Of course the defendant has no obligation to

12   offer any testimony or present any witnesses.  Do you have any

13   witnesses you wish to call?

14          MS. KETTERMAN:  We do, Your Honor.

15          THE COURT:  All right.  You may call your first

16   witness.

17          MS. KETTERMAN:  Thank you, Judge.

18          Defendant calls Stephen McCane.

19          THE COURT:  Please come around and be sworn.

20                    STEPHEN T. McCANE

21   having been first duly sworn, testified as follows:

22          THE COURT:  You may proceed.

23          MS. KETTERMAN:  Thank you, Judge.

24

25

<u>DIRECT EXAMINATION</u>

BY MS. KETTERMAN:

Q.   Mr. McCane, would you please introduce yourself to the judge and jury.

A.   My name is Steve McCane.  I'm a consultant to American companies selling American products to China.  I started my Chinese studies back in --

Q.   Let me stop you there.

A.   All right.

Q.   We'll get into that.

     For the purposes of the record, could you please spell your first and last name.

A.   Stephen, S-t-e-p-h-e-n, T.  McCane is M-c-C-a-n-e.

Q.   Okay.  Now, as you started to talk about, what is -- where do you work?

A.   I'm a private consultant so I -- companies hire me to take their products to China.

Q.   And where do you live?

A.   I live in St. Louis, Missouri.

Q.   And how long have you been working in this type of business?

A.   Since 1992.

Q.   You mentioned a few minutes ago that you have studied the Chinese culture and things of that sort.  Could you explain to the jury what you were beginning to explain before I

1    interrupted you?

2    A.    Someone asked me a question about Buddhism.  I was a

3    devout Christian at the age of 19 and still am.  And he asked

4    me a question about Buddhism the week before I attended my

5    first week in college.

6              MR. LOUIS:  Objection.  Nonresponsive.

7              THE COURT:  Overruled.

8    A.    And so I studied religion and as I got into religion, I

9    became an exchange student at the Chinese University of Hong

10   Kong from 1975-76, (spoke Chinese,) which is Mandarin.

11   BY MS. KETTERMAN:

12   Q.    Can you slow down a little bit.

13   A.    Oh, I'm sorry.

14   Q.    This lady right here is taking down everything you say so

15   if you can slow down a little bit especially with the Chinese

16   terms.

17   A.    I went to the Normal University in Taipei, Taiwan.

18   Q.    Could you spell Taipei, Taiwan for us.

19   A.    T-a-i-p-e-i, Taiwan, T-a-i-w-a-n.

20   Q.    So you studied there.  And then what?

21   A.    Then I went to the Chinese University of Hong Kong.  I

22   was an exchange student during the Cultural Revolution.  Mao

23   Zedong was still living, and Zhou Enlai, the two main leaders

24   in China, were still living at that point.

25   Q.    So you are -- you can speak Chinese?

McCANE   -   DIRECT

```
 1  A.   Marginally, yes.  I can get around China very easily.

 2  Q.   Okay.  And in total, how long did you actually live in

 3  China?

 4  A.   Two-and-a-half years.

 5  Q.   Since then have you worked constantly with China back and

 6  forth?

 7  A.   All right.  Since 1979 when Deng Xiaoping changed the

 8  atmosphere, the business atmosphere in China, I didn't work

 9  anymore in China.

10  Q.   Now, you explained that your job is that the companies

11  hire you as a consultant?

12  A.   Yes.

13  Q.   Do they do this specifically for relations in China?

14  A.   Yes.

15  Q.   And could you explain to the jury exactly what your job

16  is?

17  A.   My job is not to be Chinese, first of all.  My job is to

18  be an American.  So I take the Chinese culture of the business

19  culture and the other aspects of the culture and I translate

20  them into American terms so that the American businessman has

21  clean understanding of what's going on.

22  Q.   Okay.  Now, have you -- do you know Kevin Xu?

23  A.   Yes, I do.

24  Q.   When is it that you first met Kevin Xu?

25  A.   I met Kevin on our T2 -- can I say who hired me?
```

McCANE  -  DIRECT

```
 1   Q.   Well, just when and --
 2   A.   I met him in April of 2006.
 3   Q.   Okay.  And at that time you were working for what
 4   company?
 5   A.   I was working for T2 Laboratories out of Jacksonville,
 6   Florida.
 7   Q.   What was your position at T2 in April of 2006?
 8   A.   Vice president of international sales.
 9   Q.   Okay.  And you worked with a man named Scott Gallagher;
10   is that correct?
11   A.   That's correct.
12   Q.   And what position did Scott Gallagher have?
13   A.   He was president of T2.
14   Q.   And you were vice president?
15   A.   Yes.
16   Q.   Okay.  And, if you could please, just briefly explain
17   what T2 Laboratories -- what was the business?
18   A.   T2 Laboratories was a chemical manufacturing facility in
19   Jacksonville, Florida.  They manufactured several chemicals
20   but they had invested 5 million U.S. dollars in
21   methylcyclopentadienyl manganese tricarbonyl, which on the
22   street is called MMT, which is an octane boosting additive to
23   gasoline.
24   Q.   Okay.  Now, when you say you worked in chemicals, were
25   these chemicals such as what?
```

McCANE   -   DIRECT

1    A.   This was liquid manganese that you add at very marginal

2    amounts to gasoline to boost the octane in the gasoline by

3    two.

4    Q.   We're talking gas and oil and those types of thing?

5    A.   Gas and oil, right.

6    Q.   Now, in April of 2006 what brought you to meet Kevin Xu?

7    How did that come about?

8    A.   I was hired in November of 2005.

9    Q.   At T2?

10   A.   At T2.  And I researched China regarding this chemistry.

11   And I had a hundred and fifty different potential leads, which

12   I brought down to less than ten.

13   Q.   Okay.  Let me stop you right there.  Leads for what?

14   A.   For potential sellers of our chemistry.

15   Q.   Okay.  So would it be fair to say you were looking for a

16   representative of T2 who was in China to sell the T2

17   chemicals?

18   A.   That's a correct statement.

19   Q.   Okay.  So you started a search for a representative?

20   A.   Yes.  And it was our second trip.  Our first trip was to

21   Shanghai.  And we evaluated what I considered to be the number

22   one potential person and after meeting and attempting to do

23   business with this individual, we knocked him off the list.

24   Q.   Okay.  And eventually you found Mr. Xu?

25   A.   Yes.

McCANE  -  DIRECT
505

1  Q.   And did T2 ultimately start a business relationship with

2  Mr. Xu?

3  A.   After several months, yes.

4  Q.   Okay.  In the beginning -- and I'm talking about April of

5  2006 -- is that when you actually met face to face with

6  Mr. Xu?

7  A.   Yes, I -- actually I was across town, very far from his

8  offices and I gave him a call.  This was my second call that

9  day.  And it was 10:00 in the morning and he said, "Let's have

10 lunch at your hotel," which impressed me right off because it

11 would take about that much time for him to come across town to

12 our hotel.

13 Q.   Okay.  Now, before April of 2006 when you actually met

14 Mr. Xu face to face, had you corresponded with him via email

15 or any other means?

16 A.   Yes, I had.  I started to correspond with him in December

17 and he had favorable responses.  He's a very responsive

18 individual and his English was good in written form.

19 Q.   Now, when you say he was very responsive, could you

20 explain a little bit what you mean by that?

21 A.   If you email or fax 100 Chinese individuals on a subject

22 matter, you'll be lucky if you get five responses.  And out of

23 those five responses you'll get -- you'll be lucky if you get

24 two that are responsive, meaning they'll do more than one

25 email or whatever.

McCANE   -   DIRECT

```
 1    Q.   So would you say that, based on your experience with the
 2    Chinese and dealing with the Chinese culture, was it more
 3    usual or unusual in how quickly Mr. Xu would respond to you?
 4    A.   It was the type of business relationship I like.  The
 5    other way is to go to China and constantly meet people and
 6    evaluate it that way.  And that's --
 7    Q.   Maybe you misunderstood my question.  I probably didn't
 8    say it correctly.  You testified that Kevin would respond to
 9    you quickly.
10    A.   Yes.
11    Q.   In other words, he wouldn't take days to respond?
12    A.   No.
13    Q.   It happened quickly?
14    A.   Very quickly.
15    Q.   Was that characteristic of Mr. Xu, was it a usual trade
16    of the Chinese culture or was it unusual?  Was it rare?
17    A.   I would think it's very rare.
18    Q.   Once you -- in the beginning when you were corresponding
19    back and forth with Mr. Xu -- you said it started in
20    December --
21    A.   Yes.
22    Q.   -- of '05?
23    A.   '05.
24    Q.   Up until -- from December of 2005 until April of 2006,
25    was there any type of contract between T2 and Kevin Xu?
```

McCANE  -  DIRECT

507

```
 1  A.    No.

 2  Q.    But there was -- would it be fair to say that there were

 3  negotiations regarding business dealings during that time?

 4  A.    No, there was -- there was just an attempt to see if

 5  there was interest in our product.

 6  Q.    I'll reword it.  Were there negotiations as far as

 7  whether Mr. Xu was going to become a representative of T2 or

 8  not?

 9  A.    I was negotiating.  He didn't understand I was.  But,

10  yes, I was trying to see if he was on my short list.

11  Q.    So it was a test run?

12  A.    Yes.

13  Q.    Okay.  When, from December of 2005 until April of 2006,

14  when did T2 actually begin to contract with Mr. Xu?

15  A.    We didn't at all contract during that period of time.

16  Q.    Okay.  When is it that you did contract with him?

17  A.    We began talking about contracts in early June of '06.

18  Q.    Okay.  So during December of 2005 and June of 2006 did

19  Mr. Xu -- did you have him do any test runs as far as what he

20  was capable of?  Do you understand my question?

21  A.    Yes, I do.  And this might be more of a lengthy answer.

22  Trying to crack the petrochemical industry in China --

23  Q.    Let me stop you there.  Could you explain what the

24  petrochemical industry is, just briefly.

25  A.    The petrochemical industry is that which controls the
```

McCANE  -  DIRECT

1  discovery -- the point out of the ground oil and refining of

2  oil.

3  Q.  Okay.

4  A.  China cracked -- the petrochemical industry in China is

5  very difficult.

6  Q.  Okay.

7  A.  Very difficult.

8  Q.  Okay.

9  A.  There are no ways into that industry as can be attested

10  by the U.S. lack of cracking that industry.

11  Q.  Okay.  I'm going to stop you there again.  Would it be

12  fair to say that what you're talking about is, as far as

13  cracking the industry, are you saying that it's tough for

14  American business to get into the Chinese business?

15  A.  Yes.  It's a national security concern of China.

16  Q.  Okay.

17  A.  So they don't allow foreign individuals to get close into

18  that industry.

19  Q.  What is it exactly that T2 was wanting Mr. Xu to do?

20  A.  To sell our chemistry into their refining process.

21  Q.  And what was -- was he successful.

22  A.  The test would be whether we could get an audience with

23  powerful individuals in those two companies, Sinopac and Petro

24  China.

25  Q.  And Petro China, that's equivalent to what company here

McCANE   -   DIRECT

1    in the United States?

2    A.   It's larger than Exxon.  Last year it had greater profits

3    than Exxon.

4    Q.   So you were, more or less, again, testing Mr. Xu, just

5    giving him an open opportunity to see what he can do?

6    A.   Petro China has one president and 16 vice presidents.

7    And if you can't crack the vice presidential level, you can't

8    do your job well.

9    Q.   And did Mr. Xu get you or get T2 an opportunity to visit

10   with one of those vice presidents?

11   A.   Yes, he did.

12   Q.   How long did it take him to do that?

13   A.   He did it within three days.

14   Q.   When you first met Mr. Xu, what is your understanding as

15   to what Mr. Xu's business was?  What did he do for a living?

16   A.   He started his career out at Sino-Chem.  Sino-Chem is the

17   largest chemical --

18   Q.   Let me start --

19   A.   Okay.

20   Q.   I don't want to get to the history just yet.  At the time

21   you met Mr. Xu in April of 2006, what is your understanding as

22   to what Mr. Xu did for a living.

23   A.   He traded chemicals.

24   Q.   Okay.  And when you talk about trading chemicals, would

25   it be fair to say he was -- what the term is -- I don't really

McCANE  -  DIRECT

1    know what it is -- but a commodities trader?

2    A.    Commodity and specialized chemicals, yes.

3    Q.    All right.  And could you explain to the jury exactly

4    what it means to trade chemicals or to be a trader of

5    chemicals?

6    A.    The trading of chemicals in China, someone needs to go

7    through the process of learning to trade.  To export from

8    China, you need a specific license.  To import to China you

9    need a specific license.  And with chemicals you need specific

10   licenses towards the specific chemicals.

11   Q.    All right.  Let's stop there.  Without going into a lot

12   of detail, what -- just in very general terms, could you

13   explain to the jury what it means to trade chemicals?

14   A.    It means to buy and sell chemicals on the open market.

15   Q.    Okay.  Is a trader in chemicals or a commodities trader

16   who specializes in trading chemicals, would they be considered

17   a salesman?

18   A.    Very much so.

19   Q.    That's what it is really?

20   A.    But not all traders have salesmen quality.

21   Q.    And I understand that.  I'm just saying in very simple

22   terms, Mr. Xu's a salesman?

23   A.    Yes.

24   Q.    In your dealings with Mr. Xu, was he a hard worker?

25   A.    Extremely hard.

1   Q.   How many hours a day would he put in for your company on

2   average?

3   A.   At least 14.

4   Q.   And specifically in your dealings with Mr. Xu through T2

5   did you know Mr. Xu to be honest in his dealings with you?

6   A.   Very much so.

7   Q.   Straightforward?

8   A.   Yes.

9   Q.   When it came to a point where you actually contracted

10  with Mr. Xu, he wasn't considered an employee of T2, was he or

11  was he?

12  A.   No, never was he an employee of T2.

13  Q.   Okay.  And what was his -- ultimately what was the

14  contract between T2 and Mr. Xu?

15  A.   It was between T2 and Orient Pacific.

16  Q.   And Orient Pacific is what?

17  A.   A company that -- I don't know the --

18  Q.   Mr. Xu's company; correct?

19  A.   Yes, but I don't know the stock ramifications of who owns

20  Orient Pacific.

21  Q.   Okay.  But as far as you know, it's a company --

22  A.   He's the president.

23  Q.   He's the president.  Okay.  Ultimately what was the

24  contract between T2 and OPI?

25  A.   Yes.

McCANE  -  DIRECT
512

1    Q.    As far as what did he get paid?

2    A.    He got paid 5 percent of sales.

3    Q.    Okay.  So it would be important for him to make a big

4    sale?

5    A.    With no sales he made no money.

6    Q.    Right.  In the Chinese culture -- and you have how many

7    years with the Chinese culture, about?

8    A.    About 34, 35 years.

9    Q.    Okay.  Could you explain -- I want to word this

10   correctly -- I'll ask it this way:  Is Mr. Xu a

11   service-oriented individual?

12   A.    Yes, very much so.

13   Q.    And you know what I mean by "service oriented"?

14   A.    Yes.

15   Q.    Could you explain to the jury what your opinion of a

16   service-oriented person is?

17   A.    In a Chinese cultural point of view?

18   Q.    Yes, sir.  Yes, sir, I'm sorry, I should have --

19   A.    I do business with a lot of different Chinese

20   businessmen.  And when I do business, it's all in Chinese

21   because I'm partially fluent.  I wouldn't say I'm fully fluent

22   in Chinese, but I'm partially fluent.  And when business has

23   to be translated, the speed of business slows down

24   dramatically and also the activities of the business slows

25   down.  So with any Chinese businessman, I would prefer that it

1  be all in Chinese so that the speed of the business would be

2  very quick and that the nature of the business would be

3  Chinese.  So what I would like out of a Chinese businessman is

4  for him to correspondence with me either in Chinese or English

5  what corresponded that day.  I took a lot of notes but I

6  didn't get everything.  A lot of words I don't know.  Kevin

7  was a person who never went to sleep without sending you a

8  memorandum of that business day.  So often we would get

9  memorandums -- because I traveled with Scott a lot, sometimes

10  without Scott, 2:00 or 3:00 in the morning after an exhausting

11  business day starting at 7:00 and ending at 9:00.

12  Q.  So you would have a meeting with Kevin and before the

13  day's end he would have typed up a memo of the notes of the

14  meetings?

15  A.  All in English, yes.

16  Q.  All in English.  And he would get that over to you guys

17  before his day ended; is that correct?

18  A.  Yes.  And we would review it 5:00, 6:00 in the morning.

19  You're always suffering from jet lag, you're always up early.

20  You would review it so you started the day running rather than

21  walking.

22  Q.  Is that something, again, that is common or uncommon as

23  far as the Chinese culture, for him to be a go getter that

24  way?

25  A.  It's very uncommon.

McCANE  -  DIRECT
514

1  Q.   Would you characterize Mr. Xu as a people pleaser?

2  A.   Very much so, yes.

3  Q.   And in your dealings with Mr. Xu, did he always -- was he

4  very agreeable?  Do you understand what I'm asking?

5  A.   Yes.  I mean, he had a backbone and, you know, he had his

6  objectives but when it came to finalizing some issue, he was

7  agreeable enough that we got through the issue and moved on.

8  Q.   Let me stop you there.  I'm going to word it a little

9  differently.  Is Mr. Xu the type of person if I,

10  hypothetically, if I asked him, "Can you make me a cake," is

11  he the type of person that would say, "Yes, I'll get it done"

12  or --

13  A.   Yes, even if he couldn't do it.

14  Q.   -- did he say, "No, I can't do it"?

15  A.   If he couldn't make it, he would figure out how to do it

16  and he would make a cake.

17  Q.   Okay.  And that's what I was trying to get to.  If

18  somebody offered him an opportunity to do something, in your

19  dealings with Mr. Xu, in your opinion, was he the type to turn

20  something down or figure out how to make it work?

21  A.   He was totally functional.

22  Q.   Okay.  Now, Kevin's family, is he married?

23  A.   Yes, he is married to Jennifer.

24  Q.   And does he have any children?

25  A.   Yes, he does.

McCANE  -  DIRECT

```
 1  Q.   And how many children does he have?

 2  A.   He has one child.

 3  Q.   Boy, girl?

 4  A.   Boy.

 5  Q.   How old is he?

 6  A.   Six.

 7  Q.   Mr. Xu lives in China; correct?

 8  A.   Yes.

 9  Q.   Now, knowing Kevin the way you do -- well, let me back

10  up.  You understand what Mr. Xu is charged with; correct?

11  A.   Yes.

12  Q.   In a very general sense, you understand -- or do you

13  understand what happened that got him to where he is today as

14  far as sitting in this chair?

15  A.   I don't know the specifics.

16          MR. LOUIS:  Objection.  Calls for speculation.

17  There's no foundation.  This witness knows nothing about this

18  case.

19          THE COURT:  I think that question was designed to

20  find out whether that's true or not.

21          Do you know anything personally about the facts of

22  this case?

23          THE WITNESS:  No, sir.

24          THE COURT:  All right.

25          MS. KETTERMAN:  Thank you.  Judge.
```

McCANE  -  DIRECT

```
 1   BY MS. KETTERMAN:

 2   Q.   In your dealings with Kevin -- now, you said that -- when

 3   you said -- when T2 first started in looking at Kevin to see

 4   whether they wanted to hire him, you tested him, so to speak?

 5   A.   Yes.

 6   Q.   Is that something that Kevin would do also with his

 7   dealings with other people?

 8   A.   Most definitely.  In fact, I was thinking like a Chinese

 9   individual when I tested him.

10   Q.   Okay.  Are you familiar with the term, "form versus

11   function"?

12   A.   Yes, very much so.

13   Q.   And in America, in the United States, we are -- are we

14   form-type people or are we function-type people?

15   A.   We like to see ourselves as function, but culturally we

16   are very much form.  We observe form in the beginning of the

17   relationship more than function.

18   Q.   And could you explain to the jury what is meant by we're

19   a formed society?

20   A.   When you ask a 5-year-old boy what he wants to do, he's

21   not thinking how much money he's going to make.  When he says

22   I want to be a fireman, he's looking at the big red hat and

23   the fire engine.  It's more of an emotional form than it is a

24   functional decision.  But if you ask a 5-year-old Chinese boy,

25   he'd already been told that accountants make good money and
```

McCANE   -   DIRECT

1    et cetera and he's thinking function and he's not thinking

2    about the red hat or the fire engine.

3    Q.   So would it be fair to say that in the Chinese culture,

4    they're raised to think about how am I going to support my

5    family?

6    A.   Very much so.

7    Q.   And not what big red hat I get to wear?

8    A.   On top of that they have a beehive society.  For every

9    one individual, we have to have five.

10           MR. LOUIS:  I have to object.  This witness is not

11   established and qualified to give those types of opinions as

12   to --

13           THE COURT:  Well, he's got 30 plus years experience

14   in Mainland China.  I'll overrule the objection.  You can

15   finish your answer.

16   BY MS. KETTERMAN:

17   Q.   The beehive society.

18   A.   The beehive society has had more competition than we do

19   for any job.

20   Q.   So if you were going to get ahead in China, you would

21   really have to be a go getter?

22   A.   Much more so than the U.S.

23   Q.   Okay.  Now, as far as OPI, the company that Kevin is

24   president of, was that a large company?

25   A.   No.

McCANE  -  DIRECT
518

1  Q.   Okay.  Was it more or less a one-man show?

2  A.   More or less, yes.

3  Q.   Okay.  Did his wife help out in the business?

4  A.   No.

5  Q.   Okay.  Did he have a secretary?

6  A.   He had a secretary, Miss Chow.

7  Q.   Okay.  And off and on, would he have part-time or

8  contract employees?

9  A.   He would but they wouldn't stay around because they

10 couldn't keep up with Kevin.

11 Q.   Okay.  Have you actually been to Kevin's office?

12 A.   Many time.

13 Q.   In China; correct?

14 A.   Yes.

15         MS. KETTERMAN:  May I approach the witness, Your

16 Honor?

17         THE COURT:  Yes.

18 BY MS. KETTERMAN:

19 Q.   Mr. McCane, I'm going to show you what has been marked as

20 Defendant's Exhibit 4, 5, 6, 7, and 8.  Without going into

21 what these pictures are, could you take a look at those

22 pictures for just a moment without going into what they're a

23 picture of?

24 A.   4 is --

25 Q.   Just look at them first.

McCANE   -   DIRECT

```
 1  A.    Okay.  Okay.

 2  Q.    Do you recognize these photographs?

 3  A.    Yes.

 4  Q.    Do these photographs, do they show -- do they accurately

 5  depict what they purport to depict?  In other words, is what's

 6  in these what's really in these?

 7  A.    Yes.

 8  Q.    Could you explain -- we'll start with 4 here -- what are

 9  these photographs pictures of?

10  A.    This is the 28th floor of the Plaza Royale, has a whole

11  condo complex behind it, which is business people live there.

12  When you first enter on the 28th floor --

13  Q.    Just generally speaking, what are those photographs of?

14  A.    On 4 you enter and you'd look to your left and that's

15  what you would see.

16  Q.    Okay.  Let me see.  Is that Kevin's office?

17  A.    Yes.

18  Q.    Okay.  That's what I wanted.

19         MS. KETTERMAN:  Okay.  Judge, if I may publish to the

20  jury using the Elmo.

21         THE COURT:  You need to label that.  Could you listen

22  just a second, please.

23         MS. KETTERMAN:  Yes.

24         THE COURT:  You need to label like 4-A.  You already

25  have a 4.
```

McCANE   -   DIRECT

1             MS. KETTERMAN:  Yes, sir.

2             THE COURT:  You need to show it to the other side.

3             MS. KETTERMAN:  Yes, sir.

4             THE COURT:  All right.  What are the photographs that

5    you're offering?  Give me the numbers.

6             MS. KETTERMAN:  4-A, Your Honor, 5, 6, 7 and 8.

7             THE COURT:  Is there any objection to any of those?

8             MR. LOUIS:  No objection, Your Honor.

9             THE COURT:  They're admitted.

10            MS. KETTERMAN:  Thank you, Judge.  May I publish them

11   using the Elmo?

12            THE COURT:  Yes.

13   BY MS. KETTERMAN:

14   Q.   This photograph right here, is this a photograph of part

15   of Kevin's office?

16   A.   Yes.

17   Q.   And there's -- over on the left-hand side, there's what

18   appears to be a sign or poster board.  Is that from your

19   company?

20   A.   Kevin made that for us.  The "E" there, the Ecotane was

21   our product's name and you can see T2 Labs.

22   Q.   Okay.  Defendant's Exhibit 5, this is another photograph

23   of almost the same area; correct?

24   A.   Yes.

25   Q.   Okay.  And is this stairs right here going up?

McCANE  -  DIRECT

```
 1   A.   That's the entrance, so if you keep on going you would

 2   leave the office.

 3   Q.   Okay.  Defendant's Exhibit 6, is this part of Kevin's

 4   office also?

 5   A.   Yes, it is, it's going the opposite direction.

 6   Q.   And 7?

 7   A.   That's where the secretary worked.

 8   Q.   Okay.  And 8?

 9   A.   That's where the guests of the month would work.

10   Q.   Did Kevin have any type of factories?

11            THE COURT:  Any type of what?

12            MS. KETTERMAN:  Factories.

13            MR. LOUIS:  Objection, unless this witness has some

14   personal knowledge.

15            THE COURT:  Sustained.

16   BY MS. KETTERMAN:

17   Q.   In your dealings with Kevin and working with Kevin and

18   being in China, do you know whether he owned any type of

19   factory?

20   A.   In my dealings with Kevin he never mentioned owning a

21   factory.

22   Q.   Did you spend -- if you could, in a month's time from

23   April of 2006, how much time a month would you spend in China

24   with Kevin?

25   A.   From April till the next year, we had taken over ten
```

McCANE  -  DIRECT

1    trips and each trip was 17 days.

2    Q.    So you were there a fair amount of time?

3    A.    Yes.

4    Q.    And with Kevin a fair amount of time?

5    A.    We'd arrive in Beijing and the next day we'd be out in

6    some refinery, yes.

7    Q.    Okay.  Now, during those 17-day stays did Kevin ever

8    mention to you that he had to leave because he had a factory

9    to run?

10    A.    Never.

11    Q.    Okay.  Did he have any kind of manufacturing plant, to

12    your knowledge?

13    A.    Not to my knowledge.

14    Q.    Okay.  Did he have any sort of printing plant such as

15    printing anything from newspapers to photographs to boxes?

16    A.    Not to my knowledge.

17            MR. LOUIS:  Objection.  Calls for speculating about

18    that.

19            MS. KETTERMAN:  If he knows.

20            THE COURT:  Overruled.

21    BY MS. KETTERMAN:

22    Q.    Did he ever mention anything like that to you?

23    A.    No.

24    Q.    Okay.  Other than this small office, to your knowledge,

25    did Kevin have any other business facility?

1  A.   He had an office in Nanjing.  He was born in Nanjing and

2  he had an office in Nanjing.

3  Q.   Okay.  And was that office -- had you been to that

4  office?

5  A.   No, I haven't.

6  Q.   Okay.  And -- I lost my train of thought.

7          MS. KETTERMAN:  May I have a moment, Your Honor?

8          THE COURT:  Yes.

9          MS. KETTERMAN:  At this time I pass the witness.

10          THE COURT:  Mr. Louis.

11          MR. LOUIS:  Thank you.

12                       CROSS-EXAMINATION

13  BY MR. LOUIS:

14  Q.   Good morning, Mr. McCane.

15  A.   Good morning.

16  Q.   Now, you indicated that you have a company called T2; is

17  that right?

18  A.   I work for a company called T2.

19  Q.   And you're the vice president of international sales?

20  A.   They made me vice president, yes.

21  Q.   All right.  And just so we're clear, this is a company

22  that you were trying to, at least with respect to China, be

23  able to provide your product which would boost octane?

24  A.   Yes, sir.

25  Q.   And you began making inquiries to find someone who could

McCANE - CROSS
524

```
 1  help you market this product in China?

 2  A.   That's true.

 3  Q.   And you found Kevin Xu?

 4  A.   That's right.

 5  Q.   And during the time period, I think you said, between

 6  2005 and April of 2006 you were basically trying to find

 7  someone; is that correct?

 8  A.   That's a correct statement.

 9  Q.   And in that time period there were emails back and forth;

10  is that right?

11  A.   That's correct.

12  Q.   And those emails were in English, weren't they?

13  A.   They were.

14  Q.   And it was clear, based upon your emails -- and I believe

15  those emails were probably very specific because you're trying

16  to find someone who has knowledge about petrochemicals; right?

17  A.   That's a correct statement.

18  Q.   And so Mr. Xu had no problems understanding what you were

19  submitting in the emails and responding back to you; correct?

20  A.   That's correct.

21  Q.   Now, you met with him in April of 2006?

22  A.   That's correct.

23  Q.   Was that in China?

24  A.   Yes.

25  Q.   And when you met with Mr. Xu he had never met you before?
```

Jeanette Byers, CSR, RPR (713)250-5087

McCANE   -   CROSS

1   A.   Never before.

2   Q.   And when you sat down with Mr. Xu, did you explain to him

3   exactly what you wanted him to help you with?

4   A.   Yes.

5   Q.   And during that time period you were discussing with him

6   ways in which he might be able to get -- or help you be able

7   to meet with some high-ranking officials to be able to, at

8   least, showcase and market your products?

9   A.   I did not reveal exactly how I wanted to do it.  I was

10   more testing him to see if he could understand how to do it

11   with -- what I was doing without me telling him.

12   Q.   You were not going to provide, at your first meeting, all

13   the information; is that right?

14   A.   No.

15   Q.   Because as a good businessman you're not going to do

16   that; right?

17   A.   Especially to Chinese you wouldn't do that.

18   Q.   Because, as you mentioned, the Chinese culture could take

19   your information and then make it their own?

20   A.   Right.

21   Q.   They're good at technically -- I hate to use the term --

22   but they can reproduce exactly what you were proposing?

23   A.   Possibility.

24   Q.   Take it and counterfeit it, make it their own; right?

25   A.   There a possibility.

McCANE  -  CROSS

1    Q.    And as your experience with the Chinese culture, that

2    happens on a fairly regular basis?

3    A.    Especially the south.

4    Q.    So when you me with Mr. Xu you were feeling him out to

5    see exactly how he might respond?

6    A.    That's correct.  I was testing his character.

7    Q.    And then after talking with Mr. Xu you felt comfortable

8    that he might be able to assist you?

9    A.    Yes.

10   Q.    Now, at some point in time you entered into a contract

11   with Mr. Xu; is that right?

12   A.    That's a correct statement.

13   Q.    And when was that contract entered into?

14   A.    The letter intent would start at the end of June of '06

15   and I believe the contract -- I incurred Scott Gallagher to

16   sign the contract within weeks of the letter of intent.  And

17   we were the ones who proffered the contract.

18   Q.    And why did you need a contract with Mr. Xu?  You said

19   you met with him, you felt good, but now you wanted a

20   contract.  What was the purpose of having a contract with

21   Mr. Xu?

22   A.    It was all face.  In other words, from a Chinese point of

23   view, by having a contract I would give good face to him.

24   Q.    Isn't it true, sir, that when you do the majority of your

25   business you enter into contracts with folks, don't you?

McCANE - CROSS
527

```
 1   A.   Not in China.  Depends on what I'm doing.

 2   Q.   Would it be fair to say, sir, when you were engaging

 3   folks to, at least, market your services and they're receiving

 4   a percentage of the sales, this is going to be a written

 5   contract?

 6   A.   Yes, amen.

 7   Q.   Because you're not going to leave it to one person to

 8   decide whether or not, "Well, I say I sold 10 percent, they

 9   say I sold 2 percent"; right?

10   A.   Yes, that's right.

11   Q.   You're going to spell out the terms of that agreement?

12   A.   Yes, we will.

13   Q.   And there's nothing to hide, both sides know exactly what

14   the terms of that agreement is?

15   A.   Yes.

16   Q.   So if there's a dispute, they can go and litigate that,

17   is that right, if there's a dispute?

18   A.   Litigation process in China is different than here.

19   Q.   Well, that may be true, but the point of the matter is,

20   if there's a disagreement between the parties there's some

21   document that says at that time this is what we agree on?

22   A.   That's correct.

23   Q.   Now, and Mr. Xu, you said, was going to get -- was it

24   10 percent or 5 percent?

25   A.   5 percent.
```

McCANE  -  CROSS

1    Q.   Now, did Mr. Xu actually assist you in meeting some of

2    the folk with the petrochemical industry?

3    A.   Yes, sir.

4    Q.   Now, in preparing for that meeting, Mr. Xu didn't discuss

5    hiding or not disclosing certain information to those

6    officials, did he?

7    A.   No.

8    Q.   He didn't suggest to you that, "We should not reveal

9    pertinent information," did he?

10   A.   No.

11   Q.   Did you provide data to these individuals to show this is

12   how our products could help boast octane?  Did you have

13   specific test-market information?

14   A.   Quite a lot, yes.

15   Q.   That's right.  And all that information was accurate,

16   wasn't it?

17   A.   Yes, sir.

18   Q.   You didn't try to lie to anybody or misrepresent what the

19   data was, did you?

20   A.   That would be stupid for us to do so.

21   Q.   You wouldn't do that, would you?

22   A.   No.

23   Q.   All right.  Mr. Xu -- you said you testified that you

24   weren't aware that Mr. Xu -- let me ask you this question.

25   When you and Mr. Xu had discussions about him representing

McCANE - CROSS

```
 1   your company, did he ever -- did you ever tell him this would
 2   be a secret business?
 3   A.   No.
 4   Q.   Did he ever tell you this would be a secret business?
 5   A.   No.
 6   Q.   Did he ever suggest to you, sir, that you should -- if
 7   you send your product in, mislabel it so that the customs
 8   officials when it comes, they won't know what it is?
 9   A.   No, we never did that.
10   Q.   Because you and Mr. Xu were conducting a legitimate
11   business; right?
12   A.   And we were dealing with hazardous material.
13   Q.   That's right.  Now, you indicated Mr. Xu's company dealt
14   with raw material.  I think that's what you said.
15   A.   He traded chemical material, yes.
16   Q.   So when you went to his office, you didn't see any
17   pictures that we see, there are no documents on his desk,
18   there's no samples or anything of petrochemicals, are there?
19   A.   Well, no, I don't see any in those pictures.
20   Q.   But that's what his business was?
21   A.   Yes.
22   Q.   So they're somewhere but they're not in these pictures;
23   right?
24   A.   No.
25   Q.   And you've never been to Mr. Xu's other office?
```

McCANE  -  CROSS

530

```
 1   A.    No.

 2   Q.    You don't know what Mr. Xu was doing with respect to that

 3   office, do you?

 4   A.    That's a correct statement.

 5   Q.    You don't know anything about this case, do you?

 6   A.    Just what I read in the paper.

 7   Q.    And when you discussed with Mr. Xu the business venture,

 8   you said he -- you would discuss it and then he would send

 9   very detailed reports back to you in English.

10   A.    Yes.

11   Q.    Mr. Xu didn't have any problems understanding, did he?

12   A.    It's actually very easy for people to write English

13   versus listen and understand English.  Most Chinese business

14   people can -- who have worked with English can write it but

15   they don't necessarily have to understand English.

16   Q.    We've not talking about most, we're talking about Mr. Xu.

17   A.    Mr. Xu has average English skills for a Chinese

18   individual, but excellent written skills.

19   Q.    So if Mr. Xu was telling somebody how to spell the word

20   c-o-a-l, coal, would that indicate that somebody has an

21   understanding of how to spell the word coal if he's trying to

22   correct somebody?

23   A.    I suppose, yes.

24   Q.    And you said the Chinese culture's a little different

25   than the culture here.
```

McCANE  -  CROSS

```
1   A.   Yes.

2   Q.   Now, Mr. Xu is a businessman, is he not?

3   A.   Yes.

4   Q.   He was in the business to make money?

5   A.   That's correct.

6   Q.   That's a universal language of business, isn't it?

7   A.   Yes, it is.

8   Q.   So if it's in China or it's in the United States, the

9   opportunity to make money is something that Mr. Xu, you said,

10  relished; is that right?

11  A.   He was a hard-working businessman.

12  Q.   He jumped to the opportunity to make some money; is that

13  right?  I think that's what you said.

14  A.   Opportunities he would take advantage of, yes.

15  Q.   And whether or not Mr. Xu took advantage of some illegal

16  opportunity, you have no knowledge about that, do you?

17  A.   That's a correct statement.

18  Q.   You have no knowledge about whether Mr. Xu told anybody

19  that he provided generic chemicals to Chinese hospitals, you

20  know nothing about that?

21  A.   I don't know anything about that.

22  Q.   And you don't know anything about Mr. Xu sending any

23  pharmaceuticals to Europe or anything like that?

24  A.   I don't know anything about that.

25  Q.   Did Mr. Xu introduce you to any of his other business
```

McCANE  -  CROSS

1    colleagues that he did business with?

2    A.   He would introduce me to friends.

3    Q.   But not business colleagues?

4    A.   No, they would be -- well, a lot of businessmen, he

5    introduced me to a lot of businessmen.  They're just

6    businessmen and they had different positions.

7    Q.   Okay.  Just so we're absolutely clear, I want to show you

8    quickly some photographs.  Mr. Xu never discussed sending any

9    of your products in barrels like this?

10   A.   No.

11   Q.   And as far as Mr. Xu's business venture, the only one

12   that you know of is him working with you and trying to help

13   you get business in China; would that be a fair statement?

14   A.   That's a correct statement.

15          THE COURT:  Any redirect?

16          MS. KETTERMAN:  Just a couple of questions, Your

17   Honor, if I may.

18          MR. LOUIS:  May I have a moment?

19   BY MR. LOUIS:

20   Q.   Do you have any knowledge about the term parallel

21   importer?  Do you know what a parallel importer is?

22   A.   A parallel importer?

23   Q.   Yes.  By your expression, that seems to --

24   A.   No, I -- you know, I have an MBA in Asian business

25   dynamics.  And that's the first time I heard that term.

1    Q.   All right.  And so you have no knowledge of whether

2    Mr. Xu has any dealings as a parallel importer?

3    A.   I couldn't answer that because I don't know what it

4    means.

5            MR. LOUIS:  Thank you, sir.

6            Pass the witness.

7            MS. KETTERMAN:  Just a few, Your Honor.

8                      REDIRECT EXAMINATION

9    BY MS. KETTERMAN:

10   Q.   Mr. McCane, the Government asked you if -- or was talking

11   about having a contract with Kevin as a Chinese person because

12   they could easily reproduce.

13   A.   Right.

14   Q.   Okay.  After you dealt with Kevin via correspondence and

15   then met him, did you form an opinion in your specific

16   dealings with him whether he could be trusted with your

17   business?

18   A.   The key in this dealing with Chinese individuals when

19   money starts to flow you watch how they deal with the money.

20   And we were paid very quickly and he got his 5 percent cut.

21   And that, to me, makes him an honest businessman.

22   Q.   Okay.  So when he would make a sale, I mean, as far as

23   you know, he never kept any of the money, your business got

24   the money; is that correct?

25   A.   Each container that we sent to Kevin was worth 450,000 US

McCANE   -   REDIRECT

1    dollars so he kept it there.  He could have stole it, he could

2    have run with it, what have you.  When it got sold, he paid

3    us.

4    Q.    Is it normal in the Chinese culture -- well, I guess any

5    culture -- when you first start negotiating, is it normal in

6    sales to immediately have a contract?

7    A.    No.

8    Q.    Okay.  That's something that comes whether it's days,

9    weeks or months later; correct?

10   A.    That's correct.

11   Q.    In sales, would it be fair to say that most salesmen do

12   what's called puffing?

13   A.    All the time.

14   Q.    Could you explain to the jury what "puffing" is?

15   A.    Puffing is being agreeable in nature, getting all the

16   sandpaper out of your personality so that you may accomplish

17   the final end which is to do business.

18   Q.    So would it be fair to say that in puffing that it's

19   reasonable for a person to say -- or if you ask me, could you

20   do X, Y and Z, even if I don't know what it is, I'm going to

21   agree, I'm going to say, "Yes, yes, I can do it"?

22   A.    Yes.

23   Q.    And then "I'll figure out later how to do it"; right?

24   A.    Yes.

25   Q.    Or "figure out how to get it"?

McCANE   -   RECROSS

1    A.    Yes.

2    Q.    Is that the type of person that Kevin was in your

3    dealings with him?

4    A.    He had good salesman qualities, yes.

5    Q.    Now, in your dealings with Kevin, did you ever ask him to

6    hide any of your chemicals?

7    A.    No.

8    Q.    Did you ever ask him to try to sneak them into any

9    country in any sort of secret way?

10   A.    No.   These are hazardous chemicals.   There's a lot of

11   laws surrounding them.

12   Q.    Right.   But my question is:   Did you ever propose to him

13   or did you ever give him the idea that this -- "I don't want

14   anybody to know about this"?

15   A.    No.

16   Q.    "So let's keep this big secret" or "let's hide them"?

17   A.    No.

18          MS. KETTERMAN:   I pass the witness, Your Honor.

19          THE COURT:   Anything else, Mr. Louis?

20                    RECROSS-EXAMINATION

21   BY MR. LOUIS:

22   Q.    Is it normal for someone to tell you that they don't want

23   a written contract?

24   A.    In China, no, no.

25   Q.    If you're doing a legitimate business, would you ask

McCANE  -  RECROSS

```
 1   somebody to pay the importer so they could have your goods to

 2   pass through?

 3   A.   No, you wouldn't want to enter that type of -- you know,

 4   you'd want a legitimate business.

 5   Q.   And you wouldn't want to make those suggestions, would

 6   you?

 7   A.   That would be foolish.

 8   Q.   Because that would be, what, illegal?

 9   A.   Right.

10            MR. LOUIS:  Thank you, sir.

11            THE COURT:  May the witness be excused?

12            MS. KETTERMAN:  He may, Your Honor.

13            THE COURT:  Thank you, sir.  You're excused.

14            All right.  The defendant may call its next witness.

15            MR. AMANN:  Defendant closes, Your Honor.

16            THE COURT:  Okay.  Does the Government have anything

17   else?

18            MR. AMANN:  We'll rest, I should say.

19            MR. LOUIS:  The Government rests, Your Honor.

20            THE COURT:  All right.  Ladies and gentlemen, we're

21   going to take a recess now.  It's going to be more than

22   15 minutes because, let me tell you what we have to do.  I

23   have to give the -- both sides an opportunity to be sure that

24   all their exhibits are in evidence.  We've been working on the

25   jury instructions that you will hear in a few minutes.  I have
```

1    to give them a final opportunity to review those and object,

2    if they wish.  I have to have them typed and duplicated.  I

3    have to get the courtroom ready for final argument.  So it's

4    going to take more than 15, but less than 30 minutes probably

5    to get all that done.  In the meantime, I ask that you stay

6    around the jury room.  I mean, you can go outside to make a

7    cellphone call or something but when we're ready for you, we

8    want you to be here, because we're trying to use your time

9    efficiently, to argue the case to you this morning.  So we'll

10   stand in recess for some amount of time more than 15 but less

11   than 30 minutes to be determined.

12           Thank you.

13           (Outside the presence of the jury.)

14           THE COURT:  Be seated.

15           All right.  Let's do some housekeeping matters.

16           First of all, the Government gave me a revised

17   exhibit list.  I show the following exhibits to be in

18   evidence -- get your list and let's be sure we all agree.

19           MS. KETTERMAN:  Yes, sir.

20           THE COURT:  As to 52, I show 52, 52-A, 52-B, 52-C,

21   52-D, and 52-I.  I don't show anything as to 52-E, but since I

22   didn't have a list, it may have been offered but I not made a

23   note of it.

24           MS. KETTERMAN:  I have 52-E as offered and admitted

25   on July 2nd.

```
 1              THE COURT:  All right.  Then 52-E also.
 2              As to 56, I show the following:  56, 56-A, 56-B, 56-C
 3    and 56-D.
 4              Do you all agree?
 5              MS. KETTERMAN:  I do, Your Honor.
 6              MR. LOUIS:  Yes.
 7              THE COURT:  All right.  If you will just have a seat
 8    I'm having the verdict form retyped in what I think is the
 9    proper manner.
10              MR. LOUIS:  May I run to the restroom real quick?
11              THE COURT:  Sure.
12              Let me give these back to the defense.  These are
13    extra photographs I don't need.
14              MS. KETTERMAN:  Sorry about that, Your Honor.
15              THE COURT:  No, that's fine.
16              So y'all need to marshal the exhibits, that is, to
17    put in one location the exhibits that have been admitted.  You
18    each have a copy of the exhibit list.  So that's what you're
19    doing, I assume.
20              MR. LOUIS:  Yes, we're taking stuff that's not
21    admitted.
22              THE COURT:  Okay.  Before they go to the jury, I'll
23    ask each of you to confirm that's what in evidence.
24              (There was a recess taken.)
25              THE COURT:  Let me give you that revised verdict
```

 1   form.

 2            Here's one for the Government.

 3            There's one for the defense.

 4            If you will have a seat, I'll tell you what we've

 5   done.  You see that on Count 1 I've just given the jury three

 6   questions.  They find guilt or not guilt as to the three

 7   alleged statutory conspiracies.  That way we'll know which, if

 8   any, conspiracies the jury finds the defendant guilty of.

 9   Does everyone agree that that's the proper way of submitting

10   this?

11            MR. LOUIS:  I have no objection to this.

12            MR. AMANN:  Yes, Judge, just so they understand that

13   they all have to be unanimous on each individual one.  One

14   juror can't say, "I believe this is conspiracy."

15            THE COURT:  I'll tell them -- I'll tell them orally

16   that they have to be unanimous as to whichever ones they

17   answered.

18            MR. AMANN:  Right.  Thank you, sir.

19            THE COURT:  All right.  Does defense want to renew

20   its motion for purposes of appeal?

21            MR. AMANN:  Yes, our Rule 29 motion for judgment of

22   acquittal, Your Honor.  I stated my grounds yesterday.  The

23   same grounds.  I don't think the Government proved the

24   trademark as registered like they are supposed to, like they

25   have alleged and as is an element of the offense.

```
 1              THE COURT:  Motion is denied.

 2              Either of you going to use the machines, the overhead

 3   or --

 4              MR. LOUIS:  No, we don't have enough time.  We're

 5   just going to use the Elmo, Your Honor.

 6              THE COURT:  Okay.  All right.  We'll take a 15-minute

 7   break.  When we come back, I will charge the jury.  The

 8   Government may make an opening statement and then the defense.

 9   We can probably get it done without a recess, but we'll just

10   have to see how it goes.

11              Anything else?

12              MR. LOUIS:  No.

13              MR. AMANN:  No, sir.

14              THE COURT:  Take the defendant back up and give him a

15   break and we'll --

16              When everybody's ready, we'll reconvene.

17              (There was a recess taken.)

18              (Jury comes in.)

19              (The jury instructions were given, but not

20   transcribed.)

21              (The Government's and defendant's closing arguments

22   were given, but not transcribed.)

23              THE COURT:  Thank you.

24              All right.  Ladies and gentlemen, in just a moment

25   I'm going to ask that you return to the jury room and begin
```

1    your deliberations.  You should not deliberate unless all of

2    you are present in the jury room.  The first thing you should

3    do is select your foreperson who will guide your

4    deliberations.

5           When the jury goes back to the jury room, I'm going

6    to ask that our two alternates wait outside the jury room.  I

7    want to thank Miss Weaver and Mr. Baron for your patience and

8    your cooperation.  It looks like we have 12 able jurors, who

9    will be able to deliberate.  So I'm going to release you with

10   two caveats.

11          First, we will call you and let you know what the

12   verdict is if you will give your phone number to Miss Carr.

13          Secondly, until we call you, do not talk to anyone

14   about the case or allow anyone to talk to you because I have,

15   in one rare instance, had to recall an alternate juror when

16   one of the jurors got sick.  So until we call you and let you

17   know what the verdict is, you are still under my instructions

18   not to discuss the case or allow anyone to discuss it with

19   you.

20          We will have brought to the jury all of the exhibits

21   that are admitted into evidence and a copy of the indictment.

22   The indictment I've already referred to in the instructions.

23   We will not have a transcript of any of the testimony.  That's

24   why I've allowed you to take notes.  I remind you that if you

25   took notes, you should rely primarily on your own recollection

1    of what the evidence is.  Notes are not more important than

2    that recollection, they are only memory aids.  And if you took

3    notes, you should not share them with anyone else.

4            From here on out you set your own schedule.  You can

5    decide when to take a break.  You can decide when or whether

6    to take a lunch break.  If you take a break, those of you who

7    remain in the jury room should not discuss the case.  Only

8    when all of you are together in the jury room may you

9    deliberate.

10           You may now retire to the jury room and commence your

11   deliberations.

12           (Outside the presence of the jury.)

13           THE COURT:  All right.  Do we have the exhibits

14   assembled?

15           There are only a few of defense exhibits, they're the

16   four photographs.  We've discussed several times the

17   Government's exhibits.

18           Listen up.  I have another matter in about

19   15 minutes.

20           You get together and agree on those that are the

21   exhibits.  And if they are, let my law clerk know.  He will

22   have the bailiff come in and take them in the jury room.

23           Okay.  If there's a disagreement, let my law clerk

24   know and I will come in and resolve the disagreement and then

25   we will call the bailiff.

1          Are there any questions?

2          MR. AMANN:  No, sir.

3          MR. LOUIS:  No, sir.

4          THE COURT:  Okay.  We need to do that in about 15

5  minutes because we have some other folks who will be here.

6          Thank you very much.

7          And I also require one lawyer for each side to be

8  present while the jury is deliberating in case we have a note

9  or a verdict.  So we'll let you know if they take a lunch

10  recess and we'll let you know when they expect to return so

11  you can take a break.

12          Okay.  Any questions?

13          MR. AMANN:  No, sir.

14          (There was a recess taken while the jury

15  deliberates.)

16          THE COURT:  The jurors have submitted a note which

17  says, "Judge Lake, the jurors have requested to view the

18  Bangkok video.  Is this possible?"

19          First of all, it's in evidence, isn't it?

20          MR. LOUIS:  Yes, it's in evidence.

21          MR. BUCKLEY:  That's my understanding too, Your

22  Honor.

23          THE COURT:  So the question is -- there doesn't seem

24  to be any reason they shouldn't look at it.  The question is:

25  Do we have a monitor and a DVD player?

1          CASE MANAGER:  I can probably see if our system's

2     department has a laptop that we could use for them to view it

3     on.

4          THE COURT:  Does the Government have one downstairs

5     that you view it on in your office?

6          MR. LOUIS:  We have one that we use in trial.  That's

7     what I was going to suggest.  I can probably go ahead and get

8     it.

9          THE COURT:  Where is it?  I mean, is it in the bank

10    of the Southwest Building or is it in this building?

11         MR. LOUIS:  I need to check with the paralegal

12    because she took it downstairs and I'm not sure if she took it

13    back to the office or not.

14         THE COURT:  Okay.  Why don't you go check.

15         MR. LOUIS:  Okay.

16         (There was a recess taken.)

17         THE COURT:  What's the answer?

18         MR. LOUIS:  Well, we have one.  We can provide it.

19    The only problem is it's the Government's and it's got a pass

20    protect on it.

21         THE COURT:  It's got a what on it?

22         MR. LOUIS:  It has a pass protection so in order for

23    them to -- we can probably go ahead and open it.  But after a

24    certain time it will -- in order to access it, you have to

25    have a code because it's a Government computer so you have to

1    have a password.

2            THE COURT:  Okay.  Well, it's all right.  You can

3    open it.  Let's go get it.

4            MR. LOUIS:  It's right here.

5            THE COURT:  How do they see it?

6            MR. LOUIS:  On the screen.

7            PARALEGAL:  On the little screen.

8            THE COURT:  Okay.  Let's be sure we've got the right

9    exhibit.  I don't want them just flipping through your file.

10            MR. LOUIS:  It's already loaded in here.  We can have

11    them play the exhibit that's in evidence, either one.  We

12    loaded all the exhibits in here.

13            THE COURT:  Well, what is the correct exhibit number

14    of the -- it's Exhibits 8 and 9.

15            MS. KETTERMAN:  One of them is the hour or two long

16    one and then there's one that's the excerpts.

17            MR. LOUIS:  The video is 8, the audio is 9 and the

18    excerpts are 9-A so I imagine they want to listen to the audio

19    because the video is just the --

20            THE COURT:  The excerpts are 9-A?

21            MR. LOUIS:  Yes.

22            THE COURT:  That's all they've heard.

23            MR. LOUIS:  Right.  We have that.  That's in here as

24    well.

25            MR. BUCKLEY:  Do you know, Your Honor, whether

1    they've specified in their question whether they wanted the

2    excerpts or the whole -- I'm just curious about that.

3              THE COURT:  I'll just ask them.

4              I propose to say, "Do you want to watch the entire

5    video or only the excerpts that were played in Court?"

6              Is that agreeable?

7              MR. AMANN:  Yes, sir.

8              MR. LOUIS:  Yes, sir.

9              THE COURT:  How long did the excerpts take?

10             MR. LOUIS:  We had one, two, three, four -- is that

11   eight excerpts?  Eight excerpts and, I think, it took a total

12   of, roughly, I think it was 35 minutes --

13             THE COURT:  Okay.

14             MR. LOUIS:  -- as opposed to an hour and a half.

15             THE COURT:  It might be easier just to bring the jury

16   in and play them in here.  I mean, is it possible to take that

17   back there and first show the bailiff how to operate it and

18   then have him show someone else how to operate it?

19             MR. LOUIS:  Depends on how technically challenged

20   they are because it's just each excerpt is a way you have to

21   click on that, you know, come on and click on the next one.

22   If the Court wants to, we can try to show them.

23             MR. AMANN:  Judge, the only -- I guess, while they're

24   watching it, I'm sure they would want to feel encouraged to

25   talk and discuss things as they were hearing and perceiving

 1    stuff.  I wouldn't want that to be stifled by being in the

 2    courtroom, if that's a concern.

 3            THE COURT:  Can you download those nine excerpts on a

 4    separate disk and just give that to them?

 5            MR. LOUIS:  Yes.  It may take a little bit.  We have

 6    it in evidence.

 7            THE COURT:  So that disk they have is just the

 8    excerpts?

 9            MR. LOUIS:  Yes, 9-A is just the excerpts.

10            THE COURT:  Okay.  So all we need now is a way for

11    them -- if that's what they choose -- is to show it.

12            CASE MANAGER:  They're taking a one-hour lunch break.

13            THE COURT:  They would like to watch just the

14    excerpts and --

15            Wait a minute.  Tell them to hold on.

16            Okay.  They would like just to watch the excerpts and

17    instead of the Bangkok, they would like to see the Houston

18    video.  So is the Houston video --

19            MR. LOUIS:  It's also an exhibit.  It's on a separate

20    disk.

21            THE COURT:  Is the sound and the video on the same

22    one?

23            MR. LOUIS:  Yes.

24            THE COURT:  Okay.  So what we need now is a machine.

25    What exhibit is that?  That is 43, I believe.

```
 1              Okay.  Let them go, I'm sorry, I've got an answer.

 2              MR. LOUIS:  If we can get 43 and then also, I guess,

 3    make sure -- send this back and --

 4              THE COURT:  Well, they have 43.  Do they already have

 5    a disk?

 6              MR. LOUIS:  Yes.  I mean, you said you wanted --

 7              THE COURT:  Was it in that box?

 8              MR. LOUIS:  Yes, Your Honor.

 9              THE COURT:  Okay.  So what they need is a machine

10    that will play it.

11              MR. LOUIS:  Yes.

12              THE COURT:  All right.  On the record, the jury has

13    submitted two notes.  The first says, "The jurors have

14    requested to view the Bangkok video.  Is this permissible?"

15              In response, after obtaining the concurrence of all

16    counsel, I ask the jury, "Do you want to watch the entire

17    video or only the excerpts that were played in Court?"

18              The jury then responded, "They would like to watch

19    the excerpts and instead of the Bangkok, they would like to

20    see the Houston video."

21              Since the Houston video is already in evidence, they

22    have a right to watch it.  Does everyone agree?

23              MR. LOUIS:  Yes, Your Honor.

24              MR. AMANN:  Yes, Your Honor.

25              THE COURT:  So what we need now is to find a device
```

```
 1   by which they can watch it.

 2          MR. LOUIS:  We will tender the computer.  What I

 3   would suggest, while everyone is present, if we would be able

 4   to get the Government's Exhibit 43, put it in there, have it

 5   already set, send it back and then it's available and ready to

 6   go.

 7          THE COURT:  Can you ask the bailiff to get

 8   Government's Exhibit 43?

 9          (Discussion was held off the record.)

10          THE COURT:  All right.  They've gone to lunch so now

11   we're going to go to lunch.  We'll come back in 45 minutes,

12   see if it works and we'll show it to them.

13          The defendant will be back here in 45 minutes as will

14   all counsel.

15          We'll stand in recess.

16          (There was a lunch recess taken.)

17          THE COURT:  Be seated.  Let's see if the disk will

18   play all right.

19          MR. AMANN:  Judge, actually we've got a portable DVD

20   player so we wouldn't have to use the Government's computer

21   that has all their other exhibits on it.  And if there's a TV

22   available, this DVD player will actually plug into the TV.

23          THE COURT:  Where is the TV?

24          MR. AMANN:  I was asking.

25          MS. KETTERMAN:  You don't need one.  You can watch it
```

1    on this.

2            MR. AMANN:  You can watch it on this.

3            THE COURT:  Well, let's just see how it works.

4            MR. AMANN:  Okay.

5            (Trying DVD player.)

6            THE COURT:  Stop it.  That's good.  Does everybody

7    agree that that device is suitable to play the exhibit?

8            MR. AMANN:  Yes, sir.

9            MR. LOUIS:  Yes, except the sound.

10           (Discussion was held off the record.)

11           THE COURT:  Ask the bailiff to come in.

12           All right.  I want you to plug it in.  I want you to

13   show him how to use it.  I know you'd like to go back there

14   and show it.

15           MS. KETTERMAN:  I'd be more than happy to.

16           (Bailiff comes in.)

17           THE COURT:  We're going to show them an exhibit.  The

18   exhibit's the DVD.  So you're going to have you take it back

19   there and plug it in and show it.  It only involves pressing

20   one button so I'm going to show you how to do it.

21           (Discussion was held off the record.)

22           THE COURT:  Okay.  We'll stand in recess pending

23   another note or verdict.

24           You may want to leave the defendant here for a while.

25   It's up to you.  You can leave him or take him back, whatever

 1    is convenient.

 2            We'll stand in recess.

 3            (There was a recess taken.)

 4            THE COURT:  Have a seat please.

 5            The jury has advised they've reached a verdict.  Is

 6    everyone present?

 7            MR. AMANN:  Yes, we are.

 8            THE COURT:  Okay.  Bring the jury in, please.

 9            MR. LOUIS:  Judge, he may want to put his tie on

10    before they come in.

11            MR. AMANN:  Yes.  We just thought it was a note so he

12    didn't have his tie on.

13            (Discussion was held off the record.)

14            THE COURT:  Good afternoon.  Please be seated.  I'm

15    informed that you have reached a verdict.

16            Will the foreperson please hand the note to the

17    bailiff.

18            Thank you.

19            Do you need an interpreter?

20            MR. AMANN:  Judge, we don't need to delay things for

21    that, just for purposes of taking the verdict.

22            THE COURT:  Thank you.

23            MR. AMANN:  Thank you, Your Honor.

24            THE COURT:  All right.  Will the defendant please

25    rise.

1          I'll read the verdict.  We, the jury, find the

2    defendant guilty of conspiracy to traffic and attempt to

3    traffic in counterfeit goods in violation of Title 18, United

4    States Code Section 2320(a).

5          We, the jury, find the defendant guilty of conspiracy

6    to cause the introduction of prescription drugs into

7    interstate commerce that are misbranded in violation of

8    Title 21, United States Code, Section 331(a).

9          We, the jury, find the defendant guilty of conspiracy

10   to cause the introduction of counterfeit prescription drugs

11   into interstate commerce in violation of Title 21, United

12   States Code, Section 331(i).

13         Count 2:  We, the jury, find the defendant guilty of

14   the offense charged in Count 3.

15         Count 3:  We, the jury, find the defendant guilty of

16   the offense charged in Count 3 of the indictment.

17         Count 4:  We, the jury, find the defendant guilty of

18   the offense charged in Count 4 of the indictment.

19         Count 5:  We, the jury, find the defendant guilty of

20   the offense charged in Count 5 of the indictment.

21         Count 6:  We, the jury, find the defendant guilty of

22   the offense charged in Count 6 of the indictment.

23         Count 7:  We, the jury, find the defendant guilty of

24   the offense charged in Count 7 of the indictment.

25         Count 8:  We, the jury, find the defendant guilty of

1    the offense charged in Count 8 of the indictment.

2              And Count 9:  We, the jury, find the defendant guilty

3    of the offense charged in Count 9 of the indictment.

4              The verdict is signed by the foreman as -- be

5    seated -- as required by the Court's instructions.

6              In order for the record to be clear that it is a

7    unanimous verdict, I'm going to ask each of you by name to

8    state that this is your verdict.

9              Miss Rhodes, is that your verdict?

10             JUROR:  It is, sir.

11             THE COURT:  Mr. Copeland, is that your verdict?

12             JUROR:  Yes, Your Honor.

13             THE COURT:  Mr. Robson, is that your verdict?

14             JUROR:  Yes, Your Honor.

15             THE COURT:  Mr. Rump, is that your verdict?

16             JUROR:  Yes, Your Honor.

17             THE COURT:  Miss Pirtle, is that your verdict?

18             JUROR:  Yes, Your Honor.

19             THE COURT:  Miss Brinkman, is that your verdict?

20             JUROR:  Yes, Your Honor.

21             THE COURT:  Mr. Orozco, is that your verdict?

22             JUROR:  Yes, Your Honor.

23             THE COURT:  Mr. Knievel, is that your verdict?

24             JUROR:  Yes, Your Honor.

25             THE COURT:  Miss Arevalo, is that your verdict?

1          JUROR:  Yes, Your Honor.

2          THE COURT:  Mr. Asevedo, is that your verdict?

3          JUROR:  Yes, Your Honor.

4          THE COURT:  Mr. Benner, is that your verdict?

5          JUROR:  Yes, sir.

6          THE COURT:  And Mr. Nguyen, is that your verdict?

7          JUROR:  Yes, sir.

8          THE COURT:  Would you please stand, Mr. Xu.

9          In accordance with the unanimous verdict of the jury,

10   I now adjudge you guilty of Counts 1 through 9.  You may be

11   seated.

12          Ladies and gentlemen, I want to thank you very much

13   for your patience and your attention to the evidence and the

14   diligence you exercised today in your deliberations.  I know

15   when you came here Monday you probably hoped that you would

16   not be selected as a juror.  We as citizens of this country

17   have a number of benefits that we all share.  We also have

18   certain responsibilities as citizens.  Voting is one and jury

19   service is another.  It's difficult to serve as a juror.  In

20   many cases it interferes with your jobs or your personal

21   lives.  But that's the only way we have in this country of

22   resolving disputed lawsuits is to have a jury of citizens

23   decide whether in this case the Government could prove the

24   charges beyond a reasonable doubt.

25          You have the satisfaction of knowing that if you or a

1    friend or a loved one or an employer was a party to a civil or

2    criminal case, that you or they would have their case presided

3    over with equal attention and diligence as you have presided

4    over this case.  So I thank you and the parties thank you.

5    More importantly, our system of justice thanks you because in

6    many parts of the world people are convicted and sent to

7    prison without the rights that defendants have in this

8    country.

9           In just a moment I'm going to excuse you.  I'll ask

10   that you return to the jury room.  My case manager, Miss Carr,

11   will be back there to give you documentation to show your

12   employer or anyone else that you need to show where you've

13   been and so that you can be paid for your service.

14          After today you may discuss the case with anyone or

15   you may decline to do so.  There's one exception.  The rules

16   of this Court do not allow you to discuss your participation

17   as a juror with the parties to the case.  So if anyone should

18   call you and wish to talk to you about the case, be sure that

19   that person is not affiliated with the United States

20   Government or the defendant.  We do that because the primary

21   reason that parties call jurors is to try to show some type of

22   jury misconduct and it's not appropriate under our local rules

23   for them to do that.  So you may talk to friends, family

24   members, anyone else but not a party to this case.

25          Also, it's my practice to come back when I excuse the

1    jury and see if you have any questions about the process or,

2    more importantly, any suggestions for how we can improve the

3    process because your taxes pay me and all the other court

4    personnel and if there's some suggestions you have for

5    improving it, we'd like to know.  On the other hand, you don't

6    need to stick around.  This is not some campaign appearance.

7    I'm appointed for life.  I'm not seeking your vote in the next

8    election, but I am seeking your ideas about things that you

9    think should be done differently.

10             You may now return to the jury room.  I'll be back

11   momentarily.

12             (Outside the presence of the jury.)

13             THE COURT:  Sentencing will be September 26th at 3:00

14   p.m.

15             Be seated.

16             The Rule 29C states that a defendant may move for

17   judgment of acquittal or renew such a motion within seven days

18   of a guilty verdict or after the Court discharges the jury,

19   whichever is later.  Since they both occurred today, that

20   would be seven days from today.  I think, given the argument

21   raised on the trademark issue, that it makes no sense to file

22   such a motion until you have a transcript of the trial because

23   we all have our own recollections and we all took our own

24   notes.  So I would like the Government to agree on the record

25   that the seven-day time period is extended until seven days

1    after the court reporter delivers the transcript to counsel.

2             MR. LOUIS:  No objection.

3             THE COURT:  Is that agreeable?

4             MR. LOUIS:  That's agreeable.

5             THE COURT:  So the court reporter will sell you a

6    copy for a reasonable fee and you have seven days from the day

7    you receive the certified copy of the transcript to file your

8    motion.

9             MR. AMANN:  Yes, sir.  Thank you.

10            THE COURT:  All right.  Is there anything else that

11   we need to do this afternoon?

12            MR. LOUIS:  Not from the Government, Your Honor.

13            MR. AMANN:  I do not believe so, sir.

14            THE COURT:  All right.  I appreciate it.  It was a

15   well and efficiently tried trial from all cases -- from all

16   standpoints.

17            Mr. Xu, the fact that you didn't win does not mean

18   your lawyers did not do a good job.  Quite frankly, the

19   evidence was overwhelming.  So you need to thank your lawyers.

20   I think the jury deliberated for quite a while and tried to

21   reach a fair decision given the evidence in the case.

22            If you'll wait, we'll give you back your player.

23            MS. KETTERMAN:  Yes, sir.

24            THE COURT:  And the Government will need to file a

25   motion to withdraw the large bulky exhibits before you leave

1  because we don't have any way to store them.  So you need to

2  stick around.

3         So the defendant is remanded to the custody of the

4  marshal.

5         Subject to receiving your DVD player and the

6  Government's withdrawing the large bulky exhibits, counsel are

7  excused.  I'll be back in just a moment.

8     (Court recessed at 4:39 p.m.)

9

10

11

12         I certify that the foregoing is a correct transcript
   from the record of the proceedings in the above-entitled
   matter.

13

14                                    _____
                                         /s/
15                                    JEANETTE BYERS, RPR
                                      September 3, 2008
16

17

18

19

20

21

22

23

24

25