```
            IN THE UNITED STATES DISTRICT COURT
            FOR THE SOUTHERN DISTRICT OF TEXAS
                      HOUSTON DIVISION
```

UNITED STATES OF AMERICA,        §
                                 §
          Plaintiff,             §
                                 §
v.                               §    CRIMINAL NUMBER H-07-362
                                 §
KEVIN XU,                        §
                                 §
          Defendant.             §

**MEMORANDUM OPINION AND ORDER**

Pending before the court is defendant Kevin Xu's Motion for Judgment of Acquittal as to Counts Five Through Nine of the Indictment (Docket Entry No. 84). In opposition, the United States has filed Government's Response to Defendant's Motion for Acquittal as to Counts Five Through Nine of the Indictment(Docket Entry No. 85). For the reasons stated below, Xu's Motion for Judgment of Acquittal as to Counts Five Through Nine of the Indictment will be granted in part and denied in part.

**I. Background**

Kevin Xu was indicted by a grand jury on August 23, 2007, on nine counts, including one count of conspiracy to traffic in counterfeit pharmaceutical drugs in violation of 18 U.S.C. § 371, three counts of introducing into interstate commerce misbranded drugs with the intent to defraud and mislead in violation of 21 U.S.C. §§ 331(a) and 333(a)(2), and five counts of trafficking in

counterfeit goods in violation of 18 U.S.C. § 2320(a).[1]  Xu was tried before a jury beginning on June 30, 2008.[2]  On July 3, 2008, the jury unanimously found Xu guilty on all nine counts.[3]  Xu now seeks a judgment of acquittal as to counts five through nine, which involve trafficking in counterfeit goods, on the ground that the government failed to prove certain elements of the charged offense.

## II.  Standard of Review

In determining whether the prosecution introduced sufficient evidence to sustain a conviction, the court must determine whether any rational trier of fact could have found the essential elements of the charged offense beyond a reasonable doubt.  United States v. Valle, 538 F.3d 341, 344 (5th Cir. 2008) (quoting Jackson v. Virginia, 99 S. Ct. 2781, 2789 (1979)).  Rather than deciding whether the jury reached the correct verdict, the court must only determine whether the jury's verdict was rational.  United States v. Ramos-Garcia, 184 F.3d 463, 465 (5th Cir. 1999).

The court must view the evidence and the inferences that may be drawn therefrom in the light most favorable to the jury's verdict.  United States v. Patino-Prado, 533 F.3d 304, 308 (5th Cir. 2008).  If, however, the evidence presented "'gives equal or

---

[1]See Indictment, Docket Entry No. 15.  Counts five through nine charged Xu with trafficking in counterfeits of five different drugs: Zyprexa, Tamiflu, Plavix, Casodex, and Aricept.  See id. at 8-11.

[2]See I Tr. at cover.

[3]IV Tr. at 552-54; Verdict, Docket Entry No. 69.

nearly equal circumstantial support to a theory of guilt or innocence,' the court should reverse because 'under these circumstances a reasonable jury must necessarily entertain a reasonable doubt.'"  Id. (quoting Ramos-Garcia, 184 F.3d at 465).

### III.  Analysis

To obtain a conviction for a violation of 18 U.S.C. § 2320(a), the government must prove that

> (1) the defendant trafficked or attempted to traffic in goods or services; (2) such trafficking, or the attempt to traffic, was intentional; (3) the defendant used a counterfeit mark on or in connection with such goods or services; and (4) the defendant knew that the mark so used was counterfeit.

United States v. Hanafy, 302 F.3d 485, 487 (5th Cir. 2002).  The term "counterfeit mark," as used in the third element, is defined in the statute as a "spurious mark" that, among other things, "is identical with, or substantially indistinguishable from, a mark registered on the principal register in the United States Patent and Trademark Office and in use . . . ."  18 U.S.C. § 2320(e)(1)(A)(ii).  Xu contends that the government failed to satisfy the third element because the government failed to demonstrate that the true marks, which Xu allegedly infringed, were (1) registered with the Patent and Trademark Office and (2) in use.

**A.    Registered**

As part of demonstrating that the defendant has used a "counterfeit mark," the government must prove beyond a reasonable

doubt that the real mark, from which the spurious mark employed by the defendant is indistinguishable, was registered on the principal register in the United States Patent and Trademark Office at the time the defendant was trafficking in counterfeits.  See 18 U.S.C. § 2320(e)(1)(A)(ii); United States v. Park, 164 Fed. App'x 584, 585 (9th Cir. 2006); United States v. DeFreitas, 92 F. Supp.2d 272, 278 (S.D.N.Y. 2000).  As the Department of Justice's manual on prosecuting intellectual property crimes explains, "[p]roving the mark's registration is usually straightforward.  Generally, the government will simply offer a certified copy of the certificate of registration.  The court may take judicial notice of the certificates."  United States Department of Justice, Prosecuting Intellectual Property Crimes 99 (3d ed. 2006) (available at http://www.usdoj.gov/criminal/cybercrime/ipmanual/ipma2006.pdf). In fact, the certificate of registration is prima facie evidence that the mark is registered.  15 U.S.C. § 1057(b).[4]

In this case the government did not introduce certificates of registration for any of the drugs associated with counts five

---

[4]15 U.S.C. § 1057(b) provides, in full:

> A certificate of registration of a mark upon the principal register provided by this chapter shall be prima facie evidence of the validity of the registered mark and of the registration of the mark, of the registrant's ownership of the mark, and of the registrant's exclusive right to use the registered mark in commerce on or in connection with the goods or services specified in the certificate, subject to any conditions or limitations stated in the certificate.

through nine. At least two courts have held, however, that registration can be proved by other types of evidence. See Park, 164 Fed. App'x at 585; DeFreitas, 92 F. Supp.2d at 278.[5]

In Park the government introduced several items of evidence suggesting that the trademarks at issue were registered at the time the defendant conspired to traffic in counterfeit goods bearing those marks. Park, 164 Fed. App'x at 585. The government introduced a complaint from a civil action that had occurred about eight months before the seizure of the counterfeit goods upon which the criminal action was based. Id. The complaint stated that the trademark holders had registered and used the trademarks at issue. Id. In addition, the defendant's counsel in the civil action testified in the criminal case that the alleged victims of the defendant's trademark infringement were trademark owners at the time of the civil action. Id. Finally, a government special agent testified that the items seized were identical to items currently registered as trademarks with the United States Patent Office. Id. The Ninth Circuit concluded that because the evidence presented suggested that "the trademarks for the relevant items were registered . . . prior to and after the conspiracy was formed," the

---

[5] Probably because of the ease with which registration may be proved by offering the certificate of registration, courts have rarely had to consider whether other forms of evidence are sufficient to prove registration. The court was unable to identify any cases other than Park and DeFreitas considering the issue. The Government's Response did not cite any legal authorities on the issue.

jury could have reasonably concluded that the trademarks at issue were registered at the time of the conspiracy.  Id. at 585-86.

In DeFreitas the government presented both genuine and counterfeit items into evidence.  DeFreitas, 92 F. Supp.2d at 278. The CEO of the victim company testified about the genuine and counterfeit items and the trademarks included on each.  Id.  Each genuine item included a tag that displayed information about the victim company's trademark.  Id.  Further, the government introduced a page from a catalogue printed around the time of the alleged trafficking in counterfeit goods that explicitly stated that "Ty and Beanie Babies are registered trademarks of Ty Inc." Id.  The district court concluded that this evidence was sufficient for the jury to conclude that the trademarks were registered at the relevant time.  Id.  With these precedents in mind, the court will consider the evidence presented in this case for the drugs associated with counts five through nine.

1. Count Five - Zyprexa

The government presented the testimony of Michael Dalton, an employee of Eli Lilly, the company that manufactures Zyprexa.[6] Dalton testified that in his employment with Eli Lilly he supervises the physical and chemical analyses of suspected counterfeit Eli Lilly products.  He described the analyses that he

---

[6]See III Tr. at 309.

conducted of samples of counterfeit Zyprexa that the government had obtained from Xu and provided to Eli Lilly for testing.

While he was testifying about the counterfeit packaging that Xu produced, Dalton was asked "What's that little symbol that's next to Zyprexa?"[7] He responded that it was "[t]he registered trademark symbol."[8] Therefore, the jury could have reasonably inferred that the genuine Zyprexa packaging produced by Eli Lilly about the same time also included the registered trademark symbol. Xu did not impeach Dalton's testimony in any way. Although this evidence is not as substantial as that presented in DeFreitas or Park, because the court must view the evidence and associated inferences in the light most favorable to the verdict, the court concludes that the jury could have reasonably found that the trademark for Zyprexa was registered by Eli Lilly at the time Xu was trafficking in counterfeit goods.

2. Count Six - Tamiflu

The government contends that testimony of Dr. Christen Nielsen, an employee of Tamiflu manufacturer Hoffman-La Roche, established that the trademark for Tamiflu was registered at the relevant time.

---

[7] Id. at 326.

[8] Id.

On direct examination Nielsen was asked whether Tamiflu is "a registered product of Roche."[9] She replied affirmatively.[10] She was then asked whether she knew "when Tamiflu first became . . . a registered product of Roche?"[11] She said she did not know, but stated that "for the U.S. the first date of use was in . . . November 1999."[12]

This testimony does not mention the registration of a mark or trademark. Instead, Nielsen was asked if Tamiflu is "a registered product."[13] Nothing in the context of the statement suggests the registration to which Nielsen was referring was a trademark registration. No rational juror could have concluded from Nielsen's characterization of Tamiflu as a "registered product" that Hoffman-La Roche had registered a trademark for Tamiflu on the principal register in the United States Patent and Trademark Office. The government therefore failed to satisfy its burden to prove that Xu used a "counterfeit mark" for Tamiflu.

3. Count Seven - Plavix

The government points to four items admitted into evidence that could possibly have suggested that Sanofi Aventis, the manufacturer of Plavix, had registered a trademark for Plavix. The

---

[9] Id. at 442.

[10] Id. ("Yes, it is.").

[11] Id.

[12] Id.

[13] Id. (emphasis added).

first item is a sample of counterfeit Plavix that was sold to undercover government agents by Xu. It was admitted as Government's Exhibit 51B.[14] As the government points out, the sample packaging had printed on it the word "Plavix" followed by the registered trademark symbol, i.e., the letter "R" within a circle, or "®." The second item, which was admitted as Government's Exhibit 51A, is part of a report prepared by Sanofi Aventis that summarized the results of chemical analyses performed on counterfeit Plavix sold by Xu and retained samples of real Plavix.[15] On the second page of the exhibit appears the text "Plavix®," i.e., the word Plavix followed by the registered trademark symbol. The third and fourth items, which were admitted as Parts One and Two of Government's Exhibit 60, are photographs that were found on Xu's computer that depict what appears to be Plavix packaging bearing the registered trademark symbol, "®."[16]

The government suggests that the mere appearance of the registered trademark symbol, ®, in these four exhibits was enough to prove that Sanofi Aventis' trademark for Plavix was registered with the United States Patent and Trademark Office at the relevant time.[17] Although "[j]uries are free to use their common sense and

---

[14]See II Tr. at 198, 200.

[15]See II Tr. at 199-200.

[16]See II Tr. at 94.

[17]Indeed, the Lanham Act provides that "a registrant of a mark registered in the Patent and Trademark Office, may give notice that his mark is registered by displaying with the mark . . . the letter R enclosed within a circle, thus ®." 15 U.S.C. § 1111.

apply common knowledge, observation, and experience gained in the ordinary affairs of life when giving effect to the inferences that may reasonably be drawn from the evidence," United States v. Heath, 970 F.2d 1397, 1402 (5th Cir. 1992), the court is not convinced that the meaning of the "®" symbol is within the realm of common knowledge.  Moreover, even if it were, "there must be sufficient record evidence to permit the jury to consult its general knowledge in deciding the existence of the fact."  United States v. Jones, 580 F.2d 219, 222 (6th Cir. 1978).  The government did not present any testimony pointing out the symbol in these exhibits or explaining what the symbol meant as it did for Zyprexa.  Nor did it request that the court take judicial notice of the symbol or its meaning.  Further, the exhibits in which the symbol appeared next to the word "Plavix" were not offered for the purpose of demonstrating that the Plavix trademark was registered, but instead were offered to prove that the purported Plavix sold by Xu was counterfeit.[18]  This evidence was not sufficient to prove beyond a reasonable doubt that Sanofi Aventis had registered its Plavix trademark at the time that Xu was trafficking in counterfeit goods.

---

[18]Even if the exhibits had been offered to prove that the trademark for Plavix was registered, they would have been inadmissible as hearsay.  See Fed. R. Evid. 802 (providing that hearsay is not generally admissible); Fed. R. Evid. 801(c) (defining hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted").

### 4. Counts Eight and Nine - Casodex and Aricept

With regard to Casodex and Aricept, the government again relies only on a few exhibits that depict the registered trademark symbol, ®, near the Casodex name or mark or the Aricept name or mark. As with Plavix, the government did not present any testimony pointing out the registered trademark symbol in the pertinent exhibits or explaining what the symbol meant. It did not request that the court take judicial notice of the symbol or its meaning. Moreover, the exhibits in which the symbol appeared next to the word "Casodex" or "Aricept" were not presented for the purpose of demonstrating that the respective trademarks were registered, but instead were presented to prove that the drugs sold by Xu were not genuine. Therefore, for the same reasons stated above with regard to Plavix, the court concludes that this evidence was insufficient to establish beyond a reasonable doubt that the owners of the Casodex and Aricept trademarks had registered those trademarks at the time that Xu was trafficking in counterfeit goods.

**B.  In Use**

The government must also prove beyond a reasonable doubt that the genuine registered mark was actually in use at the time the defendant employed the spurious mark. <u>United States v. Foote</u>, 238 F. Supp.2d 1271, 1277 (D. Kan. 2002) ("[T]he law clearly holds that to sustain a conviction under 18 U.S.C. § 2320, the government must prove beyond a reasonable doubt that the registered mark was in use

at the time of the trafficking.") (citing 18 U.S.C. § 2320(e)(1)(A)(ii); <u>United States v. Guerra</u>, 293 F.3d 1279, 1290 (11th Cir. 2002); <u>United States v. Giles</u>, 213 F.3d 1247, 1251 (10th Cir. 2000)). At Xu's trial the government presented various evidence tending to show that the Zyprexa trademark was in use at the time that Xu trafficked in counterfeit Zyprexa products.[19]

The government presented the testimony of Eli Lilly employee, Michael Dalton. Dalton testified that he had compared counterfeit Zyprexa packaging and pills shipped by Xu to authentic Zyprexa packaging and pills.[20] From testimony that Eli Lilly had produced real packaging and pills and retained some as samples against which to compare counterfeits, a rational juror could have reasonably concluded that Eli Lilly was using its Zyprexa mark at the time or shortly before Xu was trafficking in counterfeit Zyprexa.

Additionally, during the testimony of Immigration and Customs Enforcement ("ICE") Special Agent Robert Sherman, the prosecution introduced Government's Exhibit 57,[21] which is a tabulation of all of the orders of counterfeit drugs shipped to undercover investigators by Xu. The tabulation includes the price paid to Xu for

---

[19] The court need not consider whether the trademarks for the other drugs were in use at the relevant times because the court has already determined that the government failed to prove that trademarks for those drugs were registered.

[20] See III Tr. at 311-36. See also Government's Exhibit 52A (showing suspect sample pills next to authentic sample Zyprexa tablets).

[21] See II Tr. at 214-16.

each shipment of counterfeit drugs and the contemporaneous retail prices for the real drugs, and includes Zyprexa.  Agent Sherman testified that the retail price listed was "what the retail price would have been."[22]  He further explained that agents in his office obtained the retail prices for the real drug by calling pharmacies "to see what they were selling it for."[23]  From this testimony and Government's Exhibit 57, a rational juror could have reasonably concluded that Zyprexa was on sale at retail outlets, and thus that the associated trademark was "in use" at the time or shortly after Xu was trafficking in counterfeit Zyprexa.  Accordingly, the government presented sufficient evidence to establish beyond a reasonable doubt that the real Zyprexa mark was "in use."  Cf. United States v. Park, 164 Fed. App'x 584, 585 (9th Cir. 2006) ("[U]se at the time of conspiracy can be indirectly established if the government provides evidence that trademarks for the relevant items were . . . used prior to and after the conspiracy was formed, as long as the evidence of preceding and subsequent . . . use is reasonably close to the time of the actual conspiracy.").

## IV.  Order

Defendant Xu's Motion for Judgment of Acquittal as to Counts Five Through Nine of the Indictment (Docket Entry No. 13) is

---

[22] Id. at 215.

[23] Id.

**GRANTED** as to Counts Six, Seven, Eight, and Nine, but is **DENIED** as to Count Five.

**SIGNED** at Houston, Texas, on this 4th day of December, 2008.

```
                              _____
                                      SIM LAKE
                              UNITED STATES DISTRICT JUDGE
```